**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN



FILED by _____ D.C.

AUG 2 0 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

TIMOTHY PATRICK REARDON,
        Plaintiff,
vs.
W.B. CARE CENTER, LLC d.b.a
WEST BROWARD CARE CENTER;
et. al.
        Defendants.
_____/

## EMERGENCY MOTION

### PLAINTIFF'S EMERGENCY MOTION
### FOR ORDER DIRECTING U.S. MARSHALS TO SERVE DEFENDANTS

### (1) INSTITUTIONAL LEASING 1, LLC;
### (2) MILLENNIUM MANAGEMENT, LLC;
### (3) MOORE STEPHENS LOVELACE, P.A.;

### PLAINTIFF'S SUBPOENA TO PRODUCE DOCUMENTS IN A CIVIL ACTION

#### Reason for Emergency

On the 24th of July, 2012, this Honorable Court issued Order [DE #14] ordering Plaintiff to deliver documents to the U.S. Marshals Service on or before Monday, July 30th, 2012.  Plaintiff completed this order.

#### Limiting Court Expense

U.S. Marshals have not served any Defendants as of Friday, August 17, 2012, and Plaintiff was told it could take until as late as September 15, 2012.  Therefore, Plaintiff has a "window of opportunity" to get Notice for Production served at the same time as Plaintiff's Complaint.

Since Plaintiff is informa pauper is, this would be another expense that this court must decide upon.

#### Justification for Spending Money to Serve Notice of Production

All Exhibits and arguments in this Emergency Motion are based on the idea that this Court must determine the "merits" of Plaintiffs request to have the U.S. Marshal Service serve the three defendants.

If, on the other hand, this Court does not need to analyze the merits at this point, then Plaintiff is informing the Court that all arguments and Exhibits in this Motion are also included in Plaintiffs RICO Case Statement, which will be filed by August 30, 2012, per previous order.

## Background

Plaintiff Timothy Patrick Reardon, (REARDON), appearing Pro Se, is basing his RICO case on both racketeering (fraud in a Title 11 case) and also collection of an illegal debt ($2,500,000 unfunded loan) against Plaintiff personally and also Plaintiff's nursing home management company and nursing home leasing company.

## Introduction

Plaintiff is not trying to argue its RICO case in an emergency motion.   All documents included as exhibits are only entered in regards to the issue of a loan of two-and-one-half million ($2,500,000) between Defendant Institutional Lending 1, LLC, and W.B. Care Center LLC d/b/a West Broward Care Center.

## Defendant – Institutional Leasing 1, LLC

Institutional received a $2,500,000 judgment against Plaintiff Timothy Patrick Reardon, personally, and Plaintiffs nursing home management company, Q.I.S. Management, LLC in state court action:

Institutional Leasing 1, LLC vs. W.B. Care Center, LLC d/b/a WEST BROWARD CARE CENTER, Florida limited liability company, QIS MANAGEMENT, LLC,  a Florida limited liability company, and TIMOTHY PATRICK REARDON, individually, and 'JOHN DOE CORP." and "JOHN DOE", names purposely fictitious and unknown.

Defendant also used $2,500,000 as "cash collateral" on two occasions when Plaintiff placed his nursing home in Chapter 11: in re: W.B. Care Center, LLC d/b/a WEST BROWARD CARE CENTER, Case No. 09-12957-BKC-JKO and also in 09-26196-BKC-JKO

Later, the $2,500,000 was Institutional's "credit bid" in a § 363 sale, to guarantee the starting bid would by $2,500,000 to purchase the last 4 years of a 5 year nursing home lease.  Needless to say, other bidders did not even want to spend the money of "due diligence" so the auction was cancelled and "sold" back to Institutional, the landlord/lender.

Institutional Leasing 1, LLC never funded the $2,500,000 loan.

Institutional Leasing 1, LLC is owned by "co-conspirator not named" Abraham Shaulson.

**Defendant – Millennium Management, LLC**

Defendant Millennium Management, LLC was hired by Plaintiff to do the "back office" support of a bookkeeping company, including monthly balance sheets, while also following all of the Federal guidelines for the production of Medicare and Medicaid Cost Reports.

Millennium Management, LLC never listed the $2,500,000 loan on any of the monthly Balance Sheets provided to W.B. Care Center LLC or to the State of Florida or the Federal Government.

Millennium Management LLC is also owned by "co-conspirator not named" Abraham Shaulson.

**Defendant – Moore Stephens Lovelace, P.A.**

Moore Stephens Lovelace, P.A. is an accounting firm specializing in producing Medicare and Medicaid cost reports for over 450 of Florida's 650 skilled nursing facilities.

Moore Stephens delivered the Lease Agreement to the Agency for Health Care Administration with the $2,500,000 Note Guarantee.

Moore Stephens never listed the $2,500,000 loan in any Medicaid or Medicare Cost Report.

**CONCLUSION**

Plaintiff respectfully requests an order directing the U.S. Marshal Service to Serve Subpoena to Produce Documents to Defendants:

(1) Institutional Leasing 1, LLC
(2) Millennium Management, LLC
(3) Moore Stephens Lovelace, P.A.

"Documents or electronically stored information of:

Cancelled check or proof of wire transfer of Two Million Five Hundred Thousand and 00/100 ($2,500,000) loan from Institutional Leasing 1, LLC to W.B. Care Center, LLC d/b/a West Broward Care Center as memorialized in attached Lease Agreement and Pledge and Security Agreement."

Respectfully submitted this 20th day of August,

Timothy Patrick Reardon, appearing pro se

226 N.E 1st Ave
Miami FL 33132

Exhibit A

Subpoena to Institutional Leasing 1, LLC

.

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | | |
|---|---|---|
| Timothy Patrick Reardon | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   12-20829 Lenard/O'Sullivan |
| Institutional Leasing 1, LLC | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Institutional Leasing 1, LLC c/o Registered Agent Millennium Management, LLC
10800 Biscayne Blvd, Suite 600, Miami FL  33161

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Documents or electronically stored information of cancelled check or proof of wire transfer of
Two Million Five Hundred Thousand and 00/100 ($2,500,000) loan from
Institutional Leasing 1, LLC to W.B. Care Center, LLC d/b/a West Broward Care Center
as memorialized in attached Lease Agreement and Pledge and Security Agreement

| Place: File with Clerk of Court in above case under title "Defendant Institutional Leasing 1's response to Plaintiff's Subpoena to Produce Documents" | Date and Time:  09/11/2012 0:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  _____

|  *CLERK OF COURT* | |
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

Exhibit B

Subpoena to Millennium Management, LLC

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | | |
|---|---|---|
| Timothy Patrick Reardon | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   12-20829 Lenard/O'Sullivan |
| Millennium Management, LLC | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Millennium Management, LLC c/o General Counsel, 10800 Biscayne Blvd, Suite 600
Miami, FL  33161

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Documents or electronically stored information of cancelled check or proof of wire transfer of Two Million Five Hundred Thousand and 00/100 ($2,500,000) loan from Institutional Leasing 1, LLC to W.B. Care Center, LLC d/b/a West Broward Care Center as memorialized in attached Lease Agreement and Pledge and Security Agreement

| Place: File with Clerk of Court in above case under title "Defendant Millennium Management's response to Plaintiff's Subpoena to Produce Documents" | Date and Time:<br><br>09/11/2012 0:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  _____

        *CLERK OF COURT*
                       OR

_____        _____
*Signature of Clerk or Deputy Clerk*                          *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

Exhibit C

Subpoena to Moore Stephens Lovelace P.A.

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| Timothy Patrick Reardon | ) |
| *Plaintiff* | ) |
| v. | ) |
| Moore Stephens Lovelace, P.A. | ) |
| *Defendant* | ) |

Civil Action No.   12-20829 Lenard/O'Sullivan

(If the action is pending in another district, state where:
                                                    )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   Moore Stephens Lovelace, P.A. c/o Registered Agent B&C Corporate Services of Central Florida,
       390 North Orange Avenue - Suite 1400, Orlando FL  32801

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Documents or electronically stored information of cancelled check or proof of wire transfer of Two Million Five Hundred Thousand and 00/100 ($2,500,000) loan from Institutional Leasing 1, LLC to W.B. Care Center, LLC d/b/a West Broward Care Center as memorialized in attached Lease Agreement and Pledge and Security Agreement

| Place: File with Clerk of Court in above case under title "Defendant Moore Stephens response to Plaintiff's Subpoena to Produce Documents" | Date and Time: 09/11/2012 0:00 am |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  _____

*CLERK OF COURT*

OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

Exhibit D

Pledge and Security Agreement of  Timothy P. Reardon

to Institutional Leasing 1, LLC

Membership Interests in W.B. Care Center, LLC

With attached:

Note Guaranty
Guaranty of Lease
Security Agreement
Promissory Note
Assignment of 100% Membership Interests

# PLEDGE AND SECURITY AGREEMENT

of

## TIMOTHY P. REARDON

- to -

## INSTITUTIONAL LEASING 1, LLC

### MEMBERSHIP INTERESTS

IN

## W.B. CARE CENTER, LLC

**Siller Wilk LLP**
675 Third Avenue
9th Floor
New York, New York  10017-5704

242583v1

2

## PLEDGE AND SECURITY AGREEMENT

**AGREEMENT** (this "**Agreement**") made as of the 30th day of June, 2008 by **TIMOTHY PATRICK REARDON**, an individual with an address at 2627 South Bay Shore Drive, Suite 2506, Miami, Florida 33133 (with its successors, the "**Pledgor**") in favor of **INSTITUTIONAL LEASING 1, LLC**, a Florida limited liability company (the "**Secured Party**").

### BACKGROUND

**WHEREAS**, the Secured Party has on this date made a loan of **Two Million Five Hundred Thousand and 00/100 ($2,500,000) Dollars** (the "**Loan**") to Pledgor, as evidenced by both a Promissory Note given by Pledgor of this date to the order of the Secured Party calling for repayment of the principal sum evidenced by said note on or before the Maturity Date (as defined in the Note) together with the payments required under said note and at maturity of said principal sum (as said note may be hereinafter modified, amended, extended, renewed or substituted for, the "**Note**") and a Loan Agreement of this date between Pledgor and the Secured Party (the "**Loan Agreement**"); and

**WHEREAS**, Pledgor is the owner and holder of one hundred (100%) percent of the membership interest (the "**Interest**") in W.B. Care Center, LLC, a Florida limited liability company (the "**Lessee**"), which shall lease certain real property from Secured Party (collectively, the "**Property**") consisting of certain parcels of real property (the "**Land**"), as more particularly described in **Exhibit "A"** hereto, having a street address of 7751 West Broward Blvd. Plantation, Florida 33324, and the buildings, structures and improvements (the "**Improvements**") now or hereafter situated on, under or above the Land and all easements, entitlements and other rights appurtenant thereto.   The Pledgor and the Lessee are each referred to as a "**Pledgor Party**," and collectively, the "**Pledgor Parties**"); and

**WHEREAS**, in order to induce the Secured Party to make the Loan, and to secure payment of the Note, Pledgor hereby assigns to the Secured Party, as security, and hereby grants a security interest in all of Pledgor's right, title and interest in the Interest, and all rights appurtenant thereto and interest therein, upon and subject to the terms and conditions hereafter in this Agreement set forth.

**NOW, THEREFORE**, in consideration of ten ($10.00) dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties hereto do hereby agree as follows:

1.   **The Pledge**.   In order to secure the punctual payment of the full amount of the Note when due (whether at stated maturity, by acceleration or otherwise) and all interest thereon and the full and timely performance of all other obligations of the Pledgor to the Secured Party now existing or hereafter arising under or in connection with the Loan, all as the same may hereafter be modified or amended (the "**Obligations**"), the Pledgor hereby pledges, hypothecates, mortgages, assigns, transfers and grants to the Secured Party a continuing security interest in, and general lien upon, all of the Pledgor's right, title and interest in the Interest, including, without limitation, all of Pledgor's right, title and interest in, to and under all (a) distributions of profits

1

Lessee, (c) distributions of cash flow by the Lessee, (d) property of the Lessee to which Pledgor now or in the future may be entitled, (e) proceeds of any liquidation upon the dissolution of the Lessee and winding up of any Lessee affairs, (f) general intangibles for money due or to become due (as defined in the Uniform Commercial Code of the State of New York) from the Lessee, (g) to the extent provided for herein, other rights of the Pledgor to receive any distributions or other payments of any kind whatsoever from or in respect of the Lessee or in any way derived from any Property, or from the ownership or operation thereof, whether any of the above distributions consist of money or property, and (h) all other rights of the Pledgor in the Lessee, including, without limitation, rights to reports, accounting, information, voting and rights to make decisions on behalf of the Lessee and the right to be named as a member on the books and records of the Lessee and in all proceeds of the foregoing (all of the foregoing referred to in clauses (a) through (h) above, collectively, are hereinafter referred to as the "**Collateral**") upon and subject to the terms and conditions hereafter in this Agreement set forth.

If, while this Agreement is in effect, the Pledgor shall become entitled to receive or shall receive any additional interest in the Lessee from any source whatsoever, or other options or rights, whether as an addition to, in substitution of, or in exchange for, any of the Collateral or otherwise, all of such additional interests shall automatically and immediately become subject to the security interest created by this Agreement and the Pledgor agrees to accept the same as Secured Party's agent and to hold the same in trust for the benefit of Secured Party and to assign the same forthwith to Secured Party in the exact form received, to be held by Secured Party subject to the terms of this Agreement as collateral for the Obligations. All sums of money and property so paid or distributed in respect of the Pledgor's interests in the Lessee, including but not limited to all cash distributions or dividends paid in respect of the such interests, that are received by the Pledgor shall be held by the Pledgor in trust, and applied first to the payment of current and accrued interest due pursuant to the Note.

2.    **Receipt of Documents.**  In order to confirm and perfect such security interest, Pledgor will (a) execute and deliver to Secured Party for filing one or more financing statements in connection with the Collateral in the form required to properly perfect Secured Party's security interest in the Collateral in all jurisdictions deemed appropriate by Secured Party to the full extent that such security interest in the Collateral may be perfected by such a filing (the UCCs), (b) with respect to the Pledged Equity that is represented by a partnership certificate, member certificate or stock certificate, or any other instrument, note, chattel paper or certificate qualifying as Collateral ("**Certificated Securities**"), deliver to Secured Party such Certificated Securities in Lessee duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, or enter into such other arrangement, as necessary to give control of any Collateral to Secured Party within the meaning of Section 8-106 of the UCC, (c) with respect to any pledged equity not represented by a Certificated Security, enter into such control agreements or other arrangements with Lender and with any Pledged Entity as necessary to give control of any Interests or Collateral to the Secured Party within the meaning of Section 8-106 of the UCC, and (d) promptly take all other actions required to perfect the security interest of the Secured Party in the Collateral under applicable law; the UCCs and the Certificated Securities shall hereinafter collectively be referred to as the "**Documents**").

3.    **Representations of the Pledgor and the Lessee.**  In order to induce the Secured Party to make the Loan and with the understanding that the Secured Party is acting in material

reliance thereon, the Pledgor and the Lessee make the following representations and warranties to the Secured Party:

(a)     The Pledgor and the Lessee have, and have duly exercised, all requisite power and authority to enter into this Agreement, to pledge the Collateral to the Secured Party as provided in this Agreement, and to carry out the transactions contemplated by this Agreement.

(b)     The execution and delivery of this Agreement, and the performance of its terms, will not result in any violation of any provision of the Articles of Organization or the Limited Liability Company Agreement of the Lessee, or violate or constitute a default under the terms of any agreement, indenture, or other instrument, license, judgment, decree, order, law, statute, ordinance or other governmental rule or regulation, applicable to the Pledgor, its members and/or the Lessee or any of their respective property;

(c)     The Pledgor is the sole and lawful, legal and beneficial owner of all of the Collateral, free of any and all liens, claims, pledges, mortgages, hypothecations and security interests, except for the lien created hereby;

(d)     The security interest created hereby in the Collateral, and the proceeds thereof, as provided for in this Agreement, now constitutes and shall continue to constitute a valid, perfected and enforceable first lien and security interest therein subject to no prior interest, lien, charge or encumbrance, or agreement purporting to grant to any party other than the Secured Party a security interest in the assets of the Pledgor and the Lessee which include all or any part of the Collateral;

(e)     The Pledgor and the Lessee have not granted, nor shall the Pledgor or the Lessee grant, any other security interest in any or all of the Collateral and Pledgor and the Lessee have not sold, assigned, pledged, hypothecated, encumbered, transferred or otherwise disposed, and shall not sell, assign, pledge, hypothecate, encumber, transfer or otherwise dispose, of any or all of the Pledgor's or Lessee's right, title or interest in the Collateral without the prior express written consent of the Secured Party, which consent the Secured Party may withhold in its sole discretion.

(f)     The Pledgor and the Lessee have not, within the 12-month period ending on the date hereof: (1) made a general assignment for the benefit of creditors; (2) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition in bankruptcy by its creditors; (3) suffered the appointment of a receiver to take possession of all or substantially all of its assets; or (4) suffered the attachment or other judicial seizure of all, or substantially all, of its assets; or (5) admitted in writing its inability to pay its debts as they come due.

(g)     Neither Pledgor nor the Lessee is insolvent nor will the Pledgor or the Lessee be rendered insolvent by consummating any of the transactions contemplated in this Agreement;

(h)     None of the information furnished by the Pledgor and/or the Lessee to the Secured Party with respect to the Collateral is false, incorrect, incomplete or misleading in any material respect.

(i)     There is no action or proceeding threatened or pending which in any way might affect the rights of the Secured Party under this Agreement, the Pledgor's and the Lessee's ability

to perform under this Agreement, or the validity or priority of the security interest created and granted by this Agreement.

(j)     The Pledgor and the Lessee are not in default under any agreement to which the Pledgor or the Lessee are a party.

(k)     The Pledgor, upon request by the Secured Party, but without cost or expense to the Secured Party, will execute, deliver, file and record such further agreements, instruments and documents as the Secured Party may require to impose, perfect and protect the security interest-lien created and granted by this Agreement and the Pledgor hereby authorizes the Secured Party to execute any such agreements, instruments and documents in the name of the Pledgor and/or the Lessee and to file and record the same.

4.     <u>Covenants of Pledgor and Lessee</u>.   The Pledgor and the Lessee jointly and severally covenant:

(a)     to pay or satisfy all of the Obligations;

(b)     to defend and hold the Secured Party harmless from and against all claims and demands by any person at any time claiming an interest adverse to Secured Party in the Collateral;

(c)     not to grant any other security interest in any or all of the Collateral and not to sell, assign, pledge, hypothecate, encumber, transfer or otherwise dispose of any or all of its right, title or interest in the Collateral without the prior express consent of the Secured Party;

(d)     to timely pay all of Pledgor's and the Lessee's debts and obligations;

(e)     to cause the Lessee to not take any actions set forth in <u>Schedule A</u> without the consent of the Secured Party; and

(f)     to cause the Lessee to give the Secured Party ten (10) business days advance written notice of the taking of any of the actions set forth on <u>Schedule B</u>;

(g)     to cause the Lessee to give notice to the Secured Party of the events described in <u>Schedule C</u> within ten (10) business days following the occurrence of such event.

(h)     to not directly or indirectly transfer, convey or exchange any of its ownership interest the Lessee.

(i)     to not amend the Limited Liability Company Agreement of the Lessee.

5.     <u>Insurance</u>.

(a)     The Pledgor will, at Pledgor's expense, maintain or cause to be maintained such other insurance with respect to the Collateral and the personal property secured in such amounts and against such insurable hazards as the Secured Party may determine in its reasonable discretion.   All insurance maintained by the Pledgor shall name the Secured Party as insured as its respective interests may appear.

242583v1                                          4

(b)     The Pledgor will deliver, or cause to be delivered, to the Secured Party, promptly upon request, (i) the original or true copies of all policies evidencing all insurance required to be maintained under subsection (a) or certificates of insurance and a letter from an insurance broker or agent satisfactory to the Secured Party to the effect that the insurance policies maintained by any Pledgor Party comply with the terms of this Agreement, and (ii) evidence as to the payment of all premiums due thereon. The Pledgor will also deliver to the Secured Party, promptly upon request, an affidavit of the Pledgor setting forth the particulars as to all such insurance policies and certifying that the same comply with the requirements of this paragraph, that all premiums due thereon have been paid and that the same are in full force and effect. The Pledgor will also deliver to the Secured Party, not later than thirty (30) days prior to the expiration of any policy, a binder or certificate of the insurer evidencing the replacement thereof and not later than thirty (30) days prior to the expiration of such policy an original copy (or true copy) of the new policy. In the event the Pledgor shall fail to effect or maintain or cause to be maintained any insurance required to be effected or maintained pursuant to the provisions of this paragraph: (i) the Pledgor will indemnify the Secured Party against damage, loss or liability resulting from all risks for which such insurance should have been effected or maintained; and (ii) the Secured Party shall have the right, but not the obligation, to obtain any such insurance and any amount expended by the Secured Party in connection therewith shall be deemed indebtedness secured by this Agreement and shall be repaid by the Pledgor, on demand, together with interest thereon from the date of expenditure at the Default Rate.

6.     **Events of Default.**

(a)     In the case of the occurrence of any of the following events, for any reason whatsoever and whether such occurrence be voluntary or involuntary (each herein sometimes called an "**Event of Default**"): (i) a default as defined in Schedule D occurs, (ii) the Collateral or any part thereof is encumbered by any additional lien; (iii) subject to the terms of this Agreement, if the Pledgor permits the Collateral or any part thereof, or the Property (including, but not limited to, the development rights appurtenant to the Property, if any) or any interest therein to be sold, transferred or conveyed to any other person or entity, except as otherwise specifically permitted herein, or in the Loan Agreement, (v) subject to the terms of this Agreement, the sale, conveyance, transfer, pledge or encumbrance of any interest of the Pledgor in the Lessee. Then and in any connection with any such Event of Default, and at any time thereafter, the Secured Party shall have the right from time to time, upon ten (10) business days' written notice by ordinary mail to the Pledgor as provided for herein to designate the time and place of any private sale (or public sale if same shall be required by applicable statute which cannot be waived) at its option to sell, re-sell, assign, transfer and deliver any of the Collateral, in such order and at such price and on such terms, as the Secured Party, in its sole discretion shall determine, for cash, on credit or for future delivery, in the County and State where the Collateral is situated. Upon such sale, the Secured Party, unless prohibited by a provision of any applicable statute which cannot be waived, may purchase the Collateral being sold, or assign, transfer and deliver the same to any other purchaser or purchasers thereof, and the Secured Party or such purchaser or purchasers (as the case may be) shall hold the same free from and discharged of all trusts claims, right of redemption, stay or appraisal and equities of the Pledgor except for surplus money proceedings. The Secured Party shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of such sale of the Collateral may have been given. The Secured Party may adjourn any public sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice,

be made at the time and place to which the same was so adjourned.  In case of the sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Secured Party until the sale price is paid by the purchase or purchasers thereof, but the Secured Party shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold, and, in case of any such failure, such Collateral may be sold again upon like notice.  As an alternative to exercising the power of sale herein conferred upon it, the Secured Party may proceed by a suit or suits at law or in equity to foreclose the Collateral and to sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

(b)     The Secured Party shall have such other rights with respect to the Collateral as shall be afforded to secured parties by the Uniform Commercial Code.

(c)     The Pledgor hereby waives any right to require that the Secured Party proceed against any real or personal property or any guaranty given as security for the Note, whether or not existing or hereafter given, before exercising its rights and remedies with respect to the Collateral.

(d)     No remedy herein conferred upon or reserved to the Secured Party is intended to be exclusive of any other remedy, and such remedies shall be cumulative and shall be in addition to every other remedy given hereunder.

(e)     The Pledgor agrees that, in the event that the Pledgor or the Lessee shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any voluntary petition under Title 11 of the U.S. Code, as amended ("**Bankruptcy Code**"), (ii) be the subject of any order for relief issued under the Bankruptcy Code, (iii) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (iv) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (v) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, the Secured Party shall thereupon be entitled and the Pledgor and the Lessee irrevocably consent to immediate and unconditional relief from any automatic stay imposed by Section 362 of the Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies otherwise available to the Secured Party as provided for herein, in the Note, the Documents and all other documents delivered in connection herewith and as otherwise provided by law, and the Pledgor and the Lessee hereby irrevocably waive any right to object to such relief and will not contest any motion by the Secured Party seeking relief from the automatic stay.

(f)     The Secured Party, in any action to enforce, foreclose or protect the security interest created and granted hereby, shall be entitled, without notice and without regard to the adequacy of any security held by the Secured Party to the appointment of a receiver and the Pledgor and the Lessee shall immediately after demand is made turnover all records relating to the Property.

7.    **Proceeds of Sale.**  The proceeds received from said public or private sale shall be applied in the following order:

(a)    to pay all costs and expenses of collection and of the public or private sale (including, without limitation, reasonable attorneys' fees, advertising costs, brokerage commissions, late charges and stock transfer stamps); and

(b)    to pay to the Secured Party all sums due the Secured Party pursuant to the Note, and this Agreement including, but not limited to late charges, default interest, advances, costs and fees etc.

Any surplus realized after said deductions shall be turned over to the Pledgor.

8.    **Appointment.**  The Pledgor Parties hereby irrevocably constitute and appoint the Secured Party, its successors and assigns, and any agent or designee thereof, as their true and lawful attorney-in-fact with power of substitution and full irrevocable power and authority, coupled with an interest and for a valuable consideration, upon the occurrence and during the continuance of an Event of Default, in the place and stead of, and in the name of, the Pledgor Parties, or in its own name, to take any and all action and to execute any and all agreements, certificates, documents and instruments which may be necessary or desirable, in its sole discretion, to realize upon the Collateral, including, without limiting the generality of the foregoing, to ask, demand, collect, receive and give acquittances and receipts for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of with respect to the Collateral; to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to the Collateral; to direct any party liable for any payment with respect to the Collateral to make payment of any and all moneys due and to become due thereunder directly to the Secured Party or as the Secured Party shall direct; to sign and endorse any assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; to file any claim or to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect any and all moneys due with respect to the Collateral whenever payable or any part thereof and to enforce any other right in respect to the Collateral; to collect and enforce the payment of any amounts due with respect to the collateral by suit, proof of debt or claim or otherwise in any proceeding under the Federal Bankruptcy Code, or in any dissolution, insolvency, liquidation or other proceeding involving an adjustment of the indebtedness or interests in any obligor upon the Collateral or application of any assets of such obligor to the payment in liquidation thereof, or otherwise; to accept or reject any plan of reorganization, readjustment or compromise in its discretion, whether in any such proceedings, by agreement of compromise or otherwise; and generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with the Collateral as fully and completely as though the Secured Party was the absolute owner thereof for all purposes, and to do, at the Secured Party's option and at the expense of the Pledgor, at any time, or from time to time, all acts and things which the Secured Party deems necessary or desirable to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as the Pledgor might do.  This power of attorney, being coupled with an interest and being granted for a valuable consideration, is irrevocable until the date the Obligations are paid in full.  The powers conferred on the Secured Party hereunder are solely to protect its interests in the other Collateral and shall not impose any duty upon it to

exercise any such powers, nor shall the Secured Party be responsible for or be deemed to have assumed any of the Pledgor Parties' liabilities or obligations with respect to the Collateral. The Secured Party shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Secured Party nor any of its trustees, agents or designees shall be responsible to any Pledgor Party for any act or failure to act, or for any error of judgment or mistake of fact or law, except for its own willful default hereunder. The Pledgor Parties agree to indemnify, defend and hold harmless the Secured Party from and against all claims and demand by any person claiming an interest in any of the Collateral other than claims resulting solely from the willful default of the Secured Party.

9.   **Further Assurances.**

(a)   The Pledgor shall, at any time on request of the Secured Party, sign financing statements and other instruments, in forms acceptable to the Secured Party, and do such further acts and things, as it may reasonably request or as are reasonably necessary in the Secured Party's opinion to establish and maintain a valid first lien and security interest in the Collateral in accordance with the terms of the Note and this Agreement or to effectuate the purposes of this Agreement. Upon the Pledgor's failure to do so, the Secured Party is authorized as attorney-in-fact of the Pledgor to sign any such instrument. The Pledgor agrees to pay all filing fees and to reimburse the Secured Party for all costs and expenses of any kind incurred in any way in connection with such financing statements or other instruments. The Pledgor's refusal or failure to comply with the Secured Party's request in accordance with the provision of this Article shall constitute a default hereunder.

(b)   The Pledgor shall pay, when due, all charges, costs and expenses of any kind related to the Collateral and shall keep the Collateral free and clear of all liens.

10.   **No Waiver.** The Secured Party shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder or under the Note and no waiver whatever shall be valid unless in writing, signed by the Secured Party, and the only to the extent therein set forth. This Agreement may not be changed, modified or discharged in whole or in part unless set forth in a writing signed on behalf of the Secured Party by one of its duly authorized officers. A waiver by the Secured Party of any default, right or remedy hereunder on any one occasion shall not be construed as a waiver of any other default or a bar to any right or remedy the Secured Party would otherwise have on any future occasion. All rights and remedies of the Secured Party hereunder, or any agreement or instrument executed in connection herewith, or under the terms of the Collateral, shall be cumulative and be exercised singly or concurrently, and such rights shall be in addition to any other rights and powers which the Secured Party may now or hereafter have as a Secured Party under the New York Uniform Commercial Code or under any other applicable law.

11.   **Reimbursement of Secured Party's Expenses.**   In the case of an Event of Default hereunder, and in the case of each sale, or of any other proceeding to collect any of the Obligations by enforcement of the Secured Party's lien and security interest in the Collateral, the Secured Party shall be reimbursed for all costs and expenses of every kind reasonably incurred in connection therewith, including reasonable attorney's fees, plus interest thereon at the "Default Rate" (as defined in the Note) (but not in excess of the highest rate permitted by law).

242583v1

8

12. **Irrevocability of Pledge.** The security interest herein granted is irrevocable and shall continue so long as any of the Obligations remain unpaid. Upon payment in full of all of the Obligations, the Secured Party shall transfer its then interest in the Collateral to the Pledgor without recourse, representation or warranty whatsoever and deliver to the Pledgor all of the Documents and other instruments held by the Secured Party which evidence or constitute the Collateral, together with a UCC-3 termination statement with respect to any financial statements previously filed with respect to the Collateral.

13. **Notices.** Any notice to either party to this Agreement shall be deemed effective only if sent by a recognized overnight courier after three (3) days, registered or certified mail, return receipt requested after five (5) days, to the following address, or at such other address which either party shall hereafter notify the other party in the same manner:

To Secured Party:

**INSTITUTIONAL LEASING 1, LLC**
P.O. Box 402401
Miami Beach, Florida 33140

with copy to:

**SILLER WILK LLP**
675 Third Avenue, 9th Floor
New York, New York 10017-5704
Attention: Aaron C. Kinderlehrer, Esq.

To Pledgor:

Mr. Timothy P. Reardon
2627 South Bay Shore Drive
Suite 2506
Miami, Florida 33133

The Pledgor will promptly deliver to the Secured Party all notices and other documents, and will promptly give the Secured Party notice of any notices and documents, received by the Pledgor and/or the Lessee with respect to any of the Collateral.

14. **Reliance.** The Pledgor acknowledges that the Loan would not have been made to the Lessee if the Collateral had not been pledged to the Secured Party pursuant to this Agreement, and that the Secured Party is making the Loan to the Lessee in reliance upon this Agreement.

15. **No Oral Modification.** Neither this Agreement, nor any of the documents delivered pursuant hereto may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

16. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without the application of any conflict of law principles. The Pledgor Parties agree that they shall not raise any defense or make any claim in any action or proceeding brought under this Agreement, the Note or any other documents executed and delivered in connection with any of the foregoing that this clause is invalid or that the law of any other jurisdiction should apply.

242583v1

9

17.   __Jurisdiction__.  With respect to any claim or cause of action in connection with the execution or performance of, or arising under, this Agreement, the Collateral and/or the Documents, the Pledgor Parties (a) irrevocably submit to the nonexclusive personal jurisdiction of the courts of the State of Florida; (b) irrevocably waive any objection which it may have to the laying on of venue of any suit, action or proceeding arising out of or relating to this Agreement or said documents brought in any such court; (c) irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum; (d) irrevocably waive the right to object, with respect to such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over it; (e) irrevocably waive any right to a trial by jury with respect to any issue arising with respect to such claim, suit action or proceeding.

18.   __Severability__.  If any provision of this Agreement or the application thereof to any person or circumstances shall for any reason or to any extent be invalid and unenforceable, the remaining provisions of this Agreement and the application of those provisions to other persons or circumstances or the same persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

19.   __Binding Effect and Assignment__.   This Agreement (i) creates a continuing security interest in the Collateral, (ii) shall be binding on Pledgor and the legal representatives, successors and assigns of Pledgor, and (iii) shall inure to the benefit of Secured Party and the heirs, executors, administrators, legal representatives, successors and assigns of Secured Party. Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Note and it's rights under this Agreement to any other party. Pledgor's rights and obligations hereunder may not be assigned or otherwise transferred without the prior written consent of Secured Party.

20.   __Miscellaneous__.

(a)   Whenever, in this Agreement, either of the parties hereto is referred to, such references shall be deemed to include the successors and assigns of such party.

(b)   All covenants, agreements and representations herein made by the Pledgor and/or the Lessee shall inure to the benefit of the successors and assigns of the Secured Party and any holder of the Note.  The liability of the Pledgor and the Lessee hereunder shall be joint and several.

(c)   The recitals contained in this Agreement and each of the Exhibits referred to herein and attached hereto are incorporated herein by this reference.

(d)   Any date specified in this Agreement which falls on a Saturday, Sunday or legal holiday shall automatically be extended until the first regular business day after such date.

(e)   All capitalized terms used in this Agreement that are defined in any of the paragraphs hereof, will have the meanings ascribed to them in such paragraphs unless the context otherwise requires.

(f)     A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural and vice versa, unless the context otherwise requires.

(g)     The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provisions in which the term is used.   Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

(h)     The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

(i)     This Agreement may be executed in counterparts which, when taken together, shall constitute one and the same original.

21.     **Costs and Expenses**.  The Pledgor will pay to the Secured Party all costs and expenses reasonably incurred and sums paid by the Secured Party (including without limitation reasonable attorneys' fees, insurance premiums and sales commissions) in connection with the custody, care and collection, for or any actual or attempted disposition of any of the Collateral, the collection of any proceeds of insurance with respect to the Collateral or otherwise in connection with this Agreement.

22.     **Waiver of Defenses**.  In any litigation or legal proceeding arising out of or relating to, this Agreement or any of the Obligations or the Collateral, in which the Secured Party and the Pledgor shall be adverse parties, the Pledgor waives the right to interpose any defense, set-off or counterclaim of any kind not directly arising herefrom or therefrom, as the case may be, and also waive the right to a trial by jury.

23.     **Waiver of Presentment, Etc.**  The Pledgor hereby waives presentment, notice of dishonor and protest with respect to all instruments included in or evidencing the Obligations or the Collateral and, except as specified herein, any and all other notices and demands whatsoever, whether or not relating to such instruments.

*[Signature Page to Follow]*

**IN WITNESS WHEREOF**, this Pledge and Security Agreement has been executed as of the day and year first written above.

_____
Timothy Reardon

**W.B. CARE CENTER, LLC**
a Florida limited liability company

By: _____
Name:
Title:

**INSTITUTIONAL LEASING 1, LLC**
a Florida limited liability company

By: _____
Name: Abraham Shaulson
Title: Manager

242583v1

12

STATE OF *Florida* )
)ss.:
COUNTY OF *Palm Beach* )

On the 17th day of *July*, 2008 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

TANDEBIE T. FRATER
MY COMMISSION # DD577943
EXPIRES: July 25, 2010
(407) 398-0153   Florida Notary Service.com

STATE OF *Florida* )
)ss.:
COUNTY OF *Palm Beach* )

On the 17th day of *July*, 2008 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

TANDEBIE T. FRATER
MY COMMISSION # DD577943
EXPIRES: July 25, 2010
(407) 398-0153   Florida Notary Service.com

STATE OF )
)ss.:
COUNTY OF )

On the 17 day of *July*, 2008 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

JACK HEINEY
MY COMMISSION #DD375158
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

_____
Notary Public

242583v1

13

**EXHIBIT A**
**The Property**

[See Attached Property Description]

## SCHEDULE A

The Pledgor shall not take any of the following actions or permit the Lessee to take any of the following actions unless approved or authorized by the Secured Party:

(i)     Cause the Lessee or the Pledgor to file for Bankruptcy or make any assignment of the assets of the Lessee or the Pledgor in trust for creditors or on the assignee's promise to pay the debts of the Lessee or the Pledgor.

(ii)    Any sale or other disposition (directly or indirectly) of all or a substantial portion of the Lessee's or the Pledgor's assets or merger or consolidation of the Lessee with or into any other person or convert into another form of entity;

(iii)   Consenting to or acquiescing in any judgment against the Lessee or the Pledgor;

(iv)    Redeeming all or any portion of the Interest of a member in the Lessee.

(v)     Determining whether to make in-kind distributions to partners or members, and if so determined, determine which assets are to be distributed to each partner or member.

(vi)    Admit any new members to the Lessee.

(vii)   Grant a security interest in any part of Lessee's property, incurring indebtedness for borrowed money and refinancing or increasing existing indebtedness, whether secured or unsecured, for borrowed money unless such borrowing or refinancing, or increasing of existing debt results in the payment in full of all amounts due to Secured Party.

## SCHEDULE B

Notwithstanding anything to the contrary in this Agreement, the Pledgor shall give the Secured Party advance written notice (including copies of the relevant documents) of at least ten (10) business days of the following actions, decisions or events:

(i)      Commencing any litigation where the amount at issue exceeds $25,000;

(ii)     The Pledgor or any of its affiliates guaranteeing any indebtedness of the Lessee or the Pledgor.

242583v1

## SCHEDULE C

I.  An Event of Default will exist upon the occurrence of any of the following events, as reasonably determined by Secured Party:

(i) The Pledgor or the Lessee fail to comply with the terms of this Agreement, misappropriate any funds, commit any other fraudulent act or commit any other grossly negligent acts with respect to the Lessee;

(ii)   Payment of any of the amounts due under the Loan is not timely made in accordance with the Loan;

(iii)   The occurrence of any voluntary or involuntary bankruptcy filing with respect to the Lessee or the Pledgor; provided that the filing of an involuntary bankruptcy will not constitute an event of default if the case is dismissed within ninety (90) days of its filing.

(iv)   The Lessee, the Pledgor or any of their affiliates takes any action described in Schedule A without first obtaining the consent of the Secured Party.

(v)   The Lessee or the Pledgor fails in a material way to comply with their obligations under Schedule B.

(vi)   Any representation, warranty, covenant or written statement made in this Agreement or any other instrument executed in connection therewith shall prove to have been false or misleading when made, or shall be materially breached.

II.   The Secured Party shall give notice to the Pledgor if it becomes aware of any Event of Default; provided that the failure to give notice will in no way excuse such Event of Default or prevent the Secured Party from exercising any of its remedies under this Agreement.

III.   Notwithstanding the other provisions of this Schedule C, the Lessee and the Pledgor shall not be deemed to be in default under Sections I (ii) or (viii) if the Lessee or the Pledgor cure any monetary default within ten (10) days after notice from the Secured Party, (ii) the Lessee or the Pledgor cure any non-monetary curable default within thirty (30) days after notice from the Secured Party, or if such Event of Default is not capable of being cured within such thirty (30) day period, for such reasonable time as necessary so long as the Lessee or Pledgor proceed with due diligence to cure such Event of Default, or (iii) such Event of Default is noncurable, but such Event of Default does not have an adverse effect on the Lessee in an amount exceeding $50,000;   provided however, the Pledgor and the Lessee shall not have the right to cure or claim lack of material adverse effect if the same Event of Default has occurred twice and the Secured Party has given notice thereof during any twelve (12) month period. On monetary defaults for non-Secured Party matters, the Pledgor shall pay any late fees, interest or any other penalties related to the default.

{00214941v1}

242583v1

## NOTE GUARANTY

This Guaranty, dated as of the 30th day of June, 2008 made by TIMOTHY PATRICK REARDON, having an address at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Guarantor") in favor of INSTITUTIONAL LEASING 1 LLC having an address at P.O.B. 402401 Miami Beach, Florida 33140 ("Landlord").

WHEREAS, simultaneously herewith Landlord has entered into an Agreement of Lease (the "Lease"), dated as of the date hereof, with W.B. Care Center, a Florida limited liability company having an office at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Tenant") for the building known as West Broward Care Center, Broward Florida ("Premises", as more particularly described in the Lease), which Lease is hereby incorporated in this Guaranty by reference and

WHEREAS, in addition in connection with such Lease, Tenant, as Maker, signed a $2,500,000 Promissory Note, made payable to Landlord, as Payee, (the "Note"); and

WHEREAS, Guarantor owns a 100% portion of the membership interests of Tenant and Guarantor will derive substantial benefit from the Lease; and

WHEREAS, Guarantor acknowledges that Landlord would not enter into the Lease unless Guarantor enters into this Guaranty and this Guaranty accompanies the execution and delivery of such Note and Lease by Tenant.

NOW, THEREFORE, in consideration of the execution and delivery of the Lease by Landlord, for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by Guarantor, Guarantor does hereby covenant and agree with Landlord as follows:

1.      Unless otherwise specifically noted, all capitalized terms used in this Guaranty shall have the same meaning as are ascribed to such terms in the Note.

2.      Guarantor hereby absolutely, unconditionally and irrevocably guaranties, as principal and not as indemnitor, to Landlord, in accordance with and pursuant to this Guaranty, payment and timely performance of all obligations, now or hereafter existing, of Tenant under the Note.

3.      (A)     Guarantor acknowledges that its liability hereunder is primary and that Landlord may, at Landlord's option, join Guarantor in any action or proceeding commenced by Landlord against Tenant in connection with or based upon the Note and/or Lease or any term, covenant or condition thereof, and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant.

235675v2

(B) . Guarantor acknowledges that this Guaranty is an absolute and unconditional guaranty of payment and performance and not merely of collection.

4.   (A)   All payments due hereunder shall be made in lawful money of the United States of America in immediately available funds free and clear of, and without deduction or withholding for or on account of, any taxes, levies, fees, imposts, duties, expenses, commissions, withholdings, assessments or other charges, or any penalties, fines, additions to tax or interest thereon (collectively, "Taxes") to the extent that any such Taxes would reduce the amount Landlord would otherwise have received had Tenant made such payment. If any Taxes shall be required by law to be deducted or withheld from any payment hereunder and as a result thereof the amount Landlord would otherwise have received had Tenant made such payment is reduced, Guarantor shall increase the amount paid so that Landlord receives, after deduction or withholding on account of taxes, the full amount of the payment provided for in this Guaranty.

(B)   If Landlord shall be obligated by any bankruptcy, insolvency or other legal proceedings to repay to Guarantor or to Tenant, or to any trustee, receiver or other representative of any of them, any amounts previously paid by Guarantor pursuant to this Guaranty, this Guaranty shall be deemed reinstated to the extent of that repayment made by Landlord. Landlord shall not be required to litigate or otherwise dispute its obligation to make such repayments if, in good faith and on the advice of counsel, Landlord believes that such obligation exists.

5.   This Guaranty shall be a continuing guarantee and the liability of Guarantor hereunder shall in no way be affected, modified, diminished, impaired or terminated by reason of any of the following, whether or not notice thereof is given to or consent is obtained from Guarantor: (i) any consent, approval, waiver or other action, inaction or omission under or concerning the Note, (ii) any dealings or transactions or matter or thing occurring between Landlord and Tenant, (iii) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Tenant or its successors or assigns, (iv) any change in relationship between Guarantor and Tenant, (v) the default or failure of Guarantor to perform any of its obligations set forth in this Guaranty, (vi) any action which Landlord may take or fail to take against Tenant by reason of any waiver of, or failure to enforce, any of the rights or remedies reserved to Landlord under the Note, or otherwise and (vii) any other circumstance or condition that may result in a discharge, limitation or reduction of liability of a surety or guarantor.

6.   (A)   Guarantor hereby waives notice of the acceptance of this Guaranty and presentment and demand for payment, notice of non-payment, notice of dishonor, protest, notice of protest, non-performance, non-observance and any other notice or demand to which Guarantor might otherwise be entitled.

(B)    Guarantor hereby waives trial by jury of any and all issues arising in any action or proceeding between the parties, upon, under or in connection with this Guaranty or of any of its provisions, directly or indirectly, or any and all negotiations in connection therewith.

7.    Guarantor's obligations hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim of waiver, release, surrender, attention or compromise and shall not be subject to, and Guarantor hereby irrevocably waives, any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of Guarantor's obligations hereunder or otherwise.

8.    Guarantor hereby irrevocably:

(A)    submits to the jurisdiction of the state courts of the State of Florida, for the purposes of each and every suit, action or other proceeding arising out of or based upon this Guaranty or the subject matter hereof brought by Landlord, it being expressly understood and agreed that this consent to jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Guaranty or as otherwise permitted by such law, shall be necessary in order to confer jurisdiction upon Guarantor in any such court; and

(B)    waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any suit, action or proceeding brought in any such court, any claim that Guarantor is not subject personally to the jurisdiction of the above-named courts, that Guarantor's property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Guaranty or the subject matter hereof may not be enforced in or by such court, and further agrees to waive, to the fullest extent permitted under applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which Landlord or its successors or assigns are entitled pursuant to the final judgment of any court having jurisdiction.

9.    Guarantor hereby consents to service of process by certified or registered mail at address for Guarantor as set forth in Paragraph 14 hereof, or in any other manner permitted by law.  Guarantor agrees that service in the foregoing manner shall be deemed, in every respect, effective service of process upon Guarantor and be taken and held to be valid personal service upon, and personal delivery to, Guarantor. Guarantor agrees that Guarantor's submission to jurisdiction and consent to service of process by mail is made for the express benefit of Landlord.

10.    Final judgment against Guarantor in any such action, suit or proceeding shall be conclusive, and may be enforced in other jurisdictions:

[00235675v1]

235675v2

3

(A)   by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of Guarantor therein described; or

(B)   in any other manner provided by or pursuant to the laws of such other jurisdiction; provided, however, that Landlord may at its option bring suit, or institute other judicial proceedings against Guarantor or any of the Guarantor's assets in any state or federal court of the United States or of any country or place where either Guarantor or such assets may be found.

11.   Guarantor represents and warrants to Landlord that:

(A)   Guarantor has full power, authority and legal right to cause this Guaranty to be signed and delivered, and to perform and observe the provisions of this Guaranty, including, without limitation, the payment of all moneys hereunder.

(B)   This Guaranty constitutes the legal, valid and binding obligation of Guarantor, and is enforceable in accordance with its terms.

(C)   Guarantor, as of the date hereof, is not in violation of any decree, ruling, judgment, order or injunction applicable to it nor any law, ordinance, rule or regulation of whatever nature, nor are there any actions, proceedings or investigations pending or threatened against or affecting Guarantor (or any basis therefor known to Guarantor) before or by any court, arbitrator, administrative agency or other governmental authority or entity, any of which, if adversely decided, would materially or adversely affect its ability to carry out any of the terms, covenants and conditions of this Guaranty.

(D)   No authorization, approval, consent or permission (governmental or otherwise) of any court, agency, commission or other authority or entity is required for the due execution, delivery, performance or observance by Guarantor of this Guaranty or for the payment of any sums hereunder.

(E)   Neither the execution and delivery of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof, conflict or will conflict with or result in a breach of any of the terms, conditions or provisions of any order, writ, injunction or decree of any court or governmental authority, or of any agreement or instrument to which Guarantor is a party or by which it is bound, or constitutes or will constitute a default thereunder.

12.   Nothing herein contained is intended or shall be construed to give to Guarantor any right of subrogation under the Note or any right to participate in any way therein or in Landlord's right, title and interest in the Note. Notwithstanding any payments made under this Guaranty, all rights of subrogation and participation are expressly waived and released by Guarantor.

[00235675v1]

235675v2

4

13.    If Landlord shall employ counsel to enforce Guarantor's obligations under this Guaranty or any part thereof, Guarantor agrees to pay on demand all of Landlord's costs in connection therewith, whether or not suit be brought including, without limitation, reasonable attorneys' fees and disbursements.

14.    All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") desired or required to be given under this Guaranty shall be in writing, and, any law or statute to the contrary notwithstanding, shall be effective for any purpose if sent by registered or certified mail, return receipt requested, prepaid, addressed as follows:

> If to Guarantor, to him at the
> address first set forth above
>
> If to Landlord, to it at its address
> first set forth above:
>
> with a copy to:
>
> Siller Wilk LLP
> 675 Third Avenue
> New York, New York  10017
> Attention:  Aaron C. Kinderlehrer, Esq.

All Notices shall be deemed given or served on the third (3rd) day after the date on which such Notice has been sent.  Any party to this Guaranty may change the address to which Notices shall be delivered to it and its representatives by notice in accordance with this Paragraph 14.

15.    (A)    The provisions of this Guaranty shall be binding upon and shall inure to the benefit of Landlord and Guarantor and their respective successors and assigns.  All references in this Guaranty to Landlord and Tenant shall be deemed to mean Landlord's and Tenant's respective permitted successors and assigns.

(B)    No delay on the part of Landlord in exercising any right, power or privilege under this Guaranty, nor any failure to exercise the same, shall operate as a waiver of, or otherwise affect, any right, power or privilege of Landlord under this Guaranty, nor shall any single or partial exercise thereof preclude the further exercise of, or the exercise of any other, right, power or privilege of Landlord under this Guaranty.

(C)    Neither any waiver or modification of any provision of this Guaranty, nor any termination of this Guaranty, shall be effective unless in writing and signed by the party against which the waiver, modification or termination is sought to be

5

[00235675v1]

235675v2

enforced, nor shall any waiver be applicable except in the specific instance for which it is given.

(D)     The validity and enforcement of this Guaranty shall be governed by and construed in accordance with the internal laws of the State of Florida without regard to principles of conflicts of law, and such laws shall apply in any action or proceeding arising out of or under this Guaranty.

(E)     All remedies afforded to Landlord by reason of this Guaranty are separate and cumulative remedies and it is agreed that no one remedy, whether exercised by Landlord or not, shall be deemed to be in exclusion of any other remedy available to Landlord and shall not limit or prejudice any other legal or equitable remedy which Landlord may have.

(F)     If any provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Guaranty or the application of such provision to persons or circumstances other than those as to which it is held void, unenforceable or invalid, shall not be affected thereby and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

16.     Joint and Several Liability:

If there is more than one guarantor of the Note, each such guarantor, including, but not limited to, Guarantor hereunder shall be jointly and severally liable for the full and timely performance of all obligations, new or hereafter existing, of Tenant under the Note.  Further, each such guarantor, including, but not limited to, Guarantor hereunder agrees that Landlord need not seek payment from any other person or source other than the undersigned Guarantor.

[00235675v1]

235675v2

6

IN WITNESS WHEREOF, Guarantor have signed this Guaranty as of the date first above written.

TIMOTHY PATRICK REARDON

STATE OF _____        )
                        ss.:
COUNTY OF _____       )

On the 15 day of July in the year 2008 before me, the undersigned, personally appeared TIMOTHY PATRICK REARDON, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



JACK HEINEY
MY COMMISSION #DD375158
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

Notary Public

[00235675v1]

7

235675v2

## GUARANTY OF LEASE

This Guaranty of Lease, dated as of the 30th day of June, 2008 made by TIMOTHY PATRICK REARDON, having an address at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Guarantor") in favor of INSTITUTIONAL LEASING 1 LLC having an address at P.O.B. 402401 Miami Beach, Florida 33140 ("Landlord").

WHEREAS, simultaneously herewith, Landlord has entered into an Agreement of Lease (the "Lease"), dated as of the date hereof, with W.B. Care Center, a Florida limited liability company having an office at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Tenant") for the building known as West Broward Care Center, Broward Florida ("Premises", as more particularly described in the Lease), which Lease is hereby incorporated in this Guaranty by reference; and

WHEREAS, Guarantor owns a 100% portion of the membership interests of Tenant and Guarantor will derive substantial benefit from the Lease; and

WHEREAS, Guarantor acknowledges that Landlord would not enter into the Lease unless Guarantor enters into this Guaranty and this Guaranty accompanies the execution and delivery of such Lease by Tenant.

NOW, THEREFORE, in consideration of the execution and delivery of the Lease by Landlord, for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by Guarantor, Guarantor does hereby covenant and agree with Landlord as follows:

1.   Unless otherwise specifically noted, all capitalized terms used in this Guaranty shall have the same meaning as are ascribed to such terms in the Lease.

2.   Guarantor hereby absolutely, unconditionally and irrevocably guaranties, as principal and not as indemnitor, to Landlord, in accordance with and pursuant to this Guaranty, the full and timely performance of all obligations, now or hereafter existing, of Tenant under the Lease.

3.   (A)   Guarantor acknowledges that its liability hereunder is primary and that Landlord may, at Landlord's option, join Guarantor in any action or proceeding commenced by Landlord against Tenant in connection with or based upon the Lease or any term, covenant or condition thereof, and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant.

(B)   Guarantor acknowledges that this Guaranty is an absolute and unconditional guaranty of payment and performance and not merely of collection.

1

4.    (A)    All payments due hereunder shall be made in lawful money of the United States of America in immediately available funds free and clear of, and without deduction or withholding for or on account of, any taxes, levies, fees, imposts, duties, expenses, commissions, withholdings, assessments or other charges, or any penalties, fines, additions to tax or interest thereon (collectively, "Taxes") to the extent that any such Taxes would reduce the amount Landlord would otherwise have received had Tenant made such payment. If any Taxes shall be required by law to be deducted or withheld from any payment hereunder and as a result thereof the amount Landlord would otherwise have received had Tenant made such payment is reduced, Guarantor shall increase the amount paid so that Landlord receives, after deduction or withholding on account of taxes, the full amount of the payment provided for in this Guaranty.

(B)    If Landlord shall be obligated by any bankruptcy, insolvency or other legal proceedings to repay to Guarantor or to Tenant, or to any trustee, receiver or other representative of any of them, any amounts previously paid by Guarantor pursuant to this Guaranty, this Guaranty shall be deemed reinstated to the extent of that repayment made by Landlord. Landlord shall not be required to litigate or otherwise dispute its obligation to make such repayments if, in good faith and on the advice of counsel, Landlord believes that such obligation exists.

5.    (A)    This Guaranty shall be a continuing guarantee and the liability of Guarantor hereunder shall in no way be affected, modified, diminished, impaired or terminated by reason of any of the following, whether or not notice thereof is given to or consent is obtained from Guarantor: (i) any subletting of all or any portion of the Premises or any assignment or other transfer of Tenant's interest in the Lease, (ii) any consent, approval, waiver or other action, inaction or omission under or concerning the Lease, (iii) any modifications, renewals, extensions or amendments of the Lease, (iv) any dealings or transactions or matter or thing occurring between Landlord and Tenant, (v) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Tenant or its successors or assigns, (vi) the release or discharge of Tenant from the performance or observance of any of the terms, covenants or conditions contained in the Lease pursuant to the terms thereof, by operation of law, by reason of any of the events described in subsection (v) of this Paragraph 5 hereof, or otherwise, (vii) any change in relationship between Guarantor and Tenant, (viii) the default or failure of Guarantor to perform any of its obligations set forth in this Guaranty, (ix) any action which Landlord may take or fail to take against Tenant by reason of any waiver of, or failure to enforce, any of the rights or remedies reserved to Landlord in the Lease, or otherwise, (x) any failure or refusal of Landlord to re-let the Premises or any part or parts thereof in the event that Landlord shall obtain possession of the Premises after Tenant's insolvency or default, (xi) any failure to collect rent thereof under any such re-letting, (xii) any alterations, repairs, replacements and/or decorations in the Premises as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of re-letting the Premises, and (xiii) any other circumstance or condition that may result in a discharge, limitation or reduction of liability of a surety or guarantor.

2

(B)     Any suit or proceedings brought against Guarantor to collect the amount of any deficiency referred to in Section 8.2 of the Lease for any month or months shall not prejudice in any way the rights of Landlord to collect any such deficiency for any subsequent month or months in any similar suit or proceeding.

6.     (A)     Guarantor hereby waives notice of the acceptance of this Guaranty and presentment and demand for payment, notice of non-payment, notice of dishonor, protest, notice of protest, non-performance, non-observance and any other notice or demand to which Guarantor might otherwise be entitled.

(B)     Guarantor hereby waives trial by jury of any and all issues arising in any action or proceeding between the parties, upon, under or in connection with this Guaranty or of any of its provisions, directly or indirectly, or any and all negotiations in connection therewith.

7.     Guarantor's obligations hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim of waiver, release, surrender, attention or compromise and shall not be subject to, and Guarantor hereby irrevocably waives, any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of Guarantor's obligations hereunder or otherwise.

8.     Guarantor hereby irrevocably:

(A)     submits to the jurisdiction of the state courts of the State of Florida, for the purposes of each and every suit, action or other proceeding arising out of or based upon this Guaranty or the subject matter hereof brought by Landlord, it being expressly understood and agreed that this consent to jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Guaranty or as otherwise permitted by such law, shall be necessary in order to confer jurisdiction upon Guarantor in any such court; and

(B)     waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any suit, action or proceeding brought in any such court, any claim that Guarantor is not subject personally to the jurisdiction of the above-named courts, that Guarantor's property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Guaranty or the subject matter hereof may not be enforced in or by such court, and further agrees to waive, to the fullest extent permitted under applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which Landlord or its successors or assigns are entitled pursuant to the final judgment of any court having jurisdiction.

9.     Guarantor hereby consents to service of process by certified or registered mail at address for Guarantor as set forth in Paragraph 14 hereof, or in any

3

other manner permitted by law. Guarantor agrees that service in the foregoing manner shall be deemed, in every respect, effective service of process upon Guarantor and be taken and held to be valid personal service upon, and personal delivery to, Guarantor. Guarantor agrees that Guarantor's submission to jurisdiction and consent to service of process by mail is made for the express benefit of Landlord.

10. Final judgment against Guarantor in any such action, suit or proceeding shall be conclusive, and may be enforced in other jurisdictions:

(A) by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of Guarantor therein described; or

(B) in any other manner provided by or pursuant to the laws of such other jurisdiction; provided, however, that Landlord may at its option bring suit, or institute other judicial proceedings against Guarantor or any of the Guarantor's assets in any state or federal court of the United States or of any country or place where either Guarantor or such assets may be found.

11. Guarantor represents and warrants to Landlord that:

(A) Guarantor has full power, authority and legal right to cause this Guaranty to be signed and delivered, and to perform and observe the provisions of this Guaranty, including, without limitation, the payment of all moneys hereunder.

(B) This Guaranty constitutes the legal, valid and binding obligation of Guarantor, and is enforceable in accordance with its terms.

(C) Guarantor, as of the date hereof, is not in violation of any decree, ruling, judgment, order or injunction applicable to it nor any law, ordinance, rule or regulation of whatever nature, nor are there any actions, proceedings or investigations pending or threatened against or affecting Guarantor (or any basis therefor known to Guarantor) before or by any court, arbitrator, administrative agency or other governmental authority or entity, any of which, if adversely decided, would materially or adversely affect its ability to carry out any of the terms, covenants and conditions of this Guaranty.

(D) No authorization, approval, consent or permission (governmental or otherwise) of any court, agency, commission or other authority or entity is required for the due execution, delivery, performance or observance by Guarantor of this Guaranty or for the payment of any sums hereunder.

(E) Neither the execution and delivery of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof, conflict or will conflict with or result in a breach of any of the terms, conditions or provisions of any order, writ, injunction or decree of any court or

4

234122v3

governmental authority, or of any agreement or instrument to which Guarantor is a party or by which it is bound, or constitutes or will constitute a default thereunder.

12.     Nothing herein contained is intended or shall be construed to give to Guarantor any right of subrogation under the Lease or any right to participate in any way therein or in Landlord's right, title and interest in the Lease. Notwithstanding any payments made under this Guaranty, all rights of subrogation and participation are expressly waived and released by Guarantor.

13.     If Landlord shall employ counsel to enforce Guarantor's obligations under this Guaranty or any part thereof, Guarantor agrees to pay on demand all of Landlord's costs in connection therewith, whether or not suit be brought including, without limitation, reasonable attorneys' fees and disbursements.

14.     All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") desired or required to be given under this Guaranty shall be in writing, and, any law or statute to the contrary notwithstanding, shall be effective for any purpose if sent by registered or certified mail, return receipt requested, prepaid, addressed as follows:

> If to Guarantor, to him at the
> address first set forth above
>
> If to Landlord, to it at its address
> first set forth above:
>
> with a copy to:
>
> Siller Wilk LLP
> 675 Third Avenue
> New York, New York  10017
> Attention:  Aaron C. Kinderlehrer, Esq.

All Notices shall be deemed given or served on the third (3rd) day after the date on which such Notice has been sent.  Any party to this Guaranty may change the address to which Notices shall be delivered to it and its representatives by notice in accordance with this Paragraph 14.

15.     (A)     The provisions of this Guaranty shall be binding upon and shall inure to the benefit of Landlord and Guarantor and their respective successors and assigns.  All references in this Guaranty to Landlord and Tenant shall be deemed to mean Landlord's and Tenant's respective permitted successors and assigns.

(B)     No delay on the part of Landlord in exercising any right, power or privilege under this Guaranty, nor any failure to exercise the same, shall operate as a waiver of, or otherwise affect, any right, power or privilege of Landlord under this

5

234122v3

Guaranty, nor shall any single or partial exercise thereof preclude the further exercise of, or the exercise of any other, right, power or privilege of Landlord under this Guaranty.

(C)   Neither any waiver or modification of any provision of this Guaranty, nor any termination of this Guaranty, shall be effective unless in writing and signed by the party against which the waiver, modification or termination is sought to be enforced, nor shall any waiver be applicable except in the specific instance for which it is given.

(D)   The validity and enforcement of this Guaranty shall be governed by and construed in accordance with the internal laws of the State of Florida without regard to principles of conflicts of law, and such laws shall apply in any action or proceeding arising out of or under this Guaranty.

(E)   All remedies afforded to Landlord by reason of this Guaranty are separate and cumulative remedies and it is agreed that no one remedy, whether exercised by Landlord or not, shall be deemed to be in exclusion of any other remedy available to Landlord and shall not limit or prejudice any other legal or equitable remedy which Landlord may have.

(F)   If any provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Guaranty or the application of such provision to persons or circumstances other than those as to which it is held void, unenforceable or invalid, shall not be affected thereby and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

16.   Joint and Several Liability:

If there is more than one guarantor of the Lease, each such guarantor, including, but not limited to, Guarantor hereunder shall be jointly and severally liable for the full and timely performance of all obligations, new or hereafter existing, of Tenant under the Lease.  Further, each such guarantor, including, but not limited to, Guarantor hereunder agrees that Landlord need not seek payment from any other person or source other than the undersigned Guarantor.

6

234122v3

IN WITNESS WHEREOF, Guarantor have signed this Guaranty as of the
date first above written.

TIMOTHY PATRICK REARDON

STATE OF _____            )
                            ss.:
COUNTY OF _____           )

On the 18 day of July in the year 2008 before me, the undersigned, personally
appeared TIMOTHY PATRICK REARDON, personally known to me or proved to me
on the basis of satisfactory evidence to be the individual whose name is subscribed to the
within instrument and acknowledged to me that he executed the same in his capacity, and
that by his signature on the instrument, the individual, or the person upon behalf of which
the individual acted, executed the instrument.



JACK HEINEY
MY COMMISSION #DD375156
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

Notary Public

7

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Security Agreement") is made as of the 30th day of June, 2008, by W.B. CARE CENTER, LLC, a Florida limited liability company ("Debtor") and INSTITUTIONAL LEASING 1, LLC, a Florida limited liability company (the "Secured Party").

WHEREAS, the Secured Party has on this date made a loan of two million five hundred thousand dollars and 00/100 ($2,500,000) Dollars (the "Loan") to Debtor, as evidenced by both a Promissory Note given by Debtor of this date to the order of the Secured Party calling for repayment of the principal sum evidenced by said note on or before the Maturity Date (as defined in the Note) together with the payments required under said note and at maturity of said principal sum (as said note may be hereinafter modified, amended, extended, renewed or substituted for, the "Note"); and

WHEREAS, in order to induce the Secured Party to make the Loan, and to secure payment of the Note, Debtor hereby assigns to the Secured Party, as security, and hereby grants a security interest in all of Debtor's right, title and interest in the Collateral, and all rights appurtenant thereto and interest therein, upon and subject to the terms and conditions hereafter in this Agreement set forth.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Security Interest.

(a)    In order to secure the prompt and unconditional performance and indefeasible payment of the Obligations (as defined in Section 1(b) below), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a first, prior and continuing security interest in, to and under all of the Collateral as described in Exhibit A hereto (the "Collateral").

(b)    "Obligations" shall mean the unpaid principal and interest on the Note and all other obligations and liabilities of Debtor to Secured Party, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, which may arise under, out of, or in connection with, the Note or otherwise.

(c)    The continuing security interest in the Collateral granted in this Security Agreement shall remain in full force and effect until the indefeasible payment in full of the Obligations.

2.    Covenants With Respect To The Collateral.  Debtor hereby covenants and agrees with Secured Party that Debtor will, (a) at Debtor's sole cost and expense, defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (b) pay all taxes, assessments and governmental charges upon the

Collateral except to the extent that such taxes, assessments and charges shall be contested in good faith by Debtor; (c) immediately notify Secured Party of any event causing a substantial loss or diminution in the value of all or any material part of the Collateral and the amount or an estimate of the amount of such loss or diminution; (d) maintain adequate insurance at all times with respect to the Collateral, for such risks as are customary in Debtor's industry for the respective items included in the Collateral, and shall provide for a minimum of ten (10) days prior written notice to Secured Party of cancellation, and Debtor shall furnish Secured Party with certificates or other evidence satisfactory to Secured Party of compliance with the foregoing insurance provisions upon request therefor; (e) not sell or offer to sell or otherwise assign, transfer or dispose of the Collateral or any interest therein, other than in the ordinary course of business, without the prior written consent of Secured Party; (f) keep the Collateral free from any adverse lien, claim, security interest or encumbrance and in good order and repair, reasonable wear and tear excepted, and will not waste or destroy the Collateral or any part thereof; and (g) not use the Collateral in violation of any statute or ordinance the violation of which could materially and adversely affect Debtor's business.

       3.    <u>Records Relating to Collateral</u>.  Debtor will keep adequate records concerning the Collateral and will permit Secured Party and all representatives and agents appointed by Secured Party to inspect any of the Collateral and the books and records of or relating to the Collateral at any time during normal business hours and upon reasonable notice, to make and take away photocopies, photographs and printouts thereof and to write down and record any such information.

       4.    <u>Event of Default; Rights and Remedies</u>.

       (a)    An "Event of Default" shall exist hereunder: (1) (x) if Debtor shall fail to make any payments in accordance with the provision of the Note within ten (10) days from the date of such demand, provided however, that Secured Party shall not make any such demands until the expiration of the Forbearance Period or (y) if Debtor shall fail to keep, observe or perform any provision of the Security Documents, the Note, the Forbearance Agreement or any other instrument or agreement between Debtor and Secured Party relating to the Obligations; or (2) if bankruptcy or insolvency proceedings shall be instituted by or against Debtor; or (3) if Debtor shall dissolve, terminate, cease to do business, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets; or (4) the Collateral shall be attached, levied upon, seized in any legal proceedings, or held by virtue of any lien or distress; or (5) if Debtor shall make any assignment for the benefit of creditors; or (6) if Secured Party with reasonable cause determines that its interest in the Collateral is in jeopardy.

       (b)     If an Event of Default shall have occurred and be continuing, then and in any such event, and at any time thereafter, the Secured Party shall have the right from time to time, upon ten (10) business days' written notice by ordinary mail to Debtor as provided for herein, to designate the time and place of any private sale (or public sale if the same shall be required by applicable statute which cannot be waived) at her option to sell, re-sell, assign, transfer and deliver any of the Collateral, in such order and at such price and on such terms, as the Secured Party, in her sole discretion shall determine, for

cash, on credit or for future delivery, and upon such other terms as Secured Party may deem commercially reasonable. Upon such sale, Secured Party, unless prohibited by a provision of any applicable statute which cannot be waived, may purchase the Collateral being sold, or assign, transfer and deliver the same to any other purchaser or purchasers thereof, and Secured Party or such purchaser or purchasers (as the case may be) shall hold the same free from and discharged of all trusts claims, right of redemption, stay or appraisal and equities of Debtor except for surplus money proceedings. Secured Party shall not be obligated to make any sale of Collateral if she shall determine not to do so, regardless of the fact that notice of such sale of the Collateral may have been given. Secured Party may adjourn any public sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case of the sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the sale price is paid by the purchase or purchasers thereof, but Secured Party shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold, and, in case of any such failure, such Collateral may be sold again upon like notice. As an alternative to exercising the power of sale herein conferred upon her, Secured Party may proceed by a suit or suits at law or in equity to foreclose the Collateral and to sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

(c)     Secured Party shall have such other rights with respect to the Collateral as shall be afforded to secured parties by the Uniform Commercial Code as in effect in the State of Florida at such time ("UCC").

(d)     No remedy herein conferred upon or reserved to Secured Party is intended to be exclusive of any other remedy, and such remedies shall be cumulative and shall be in addition to every other remedy given hereunder.

5.     Proceeds of Sale.     The proceeds received from said public or private sale shall be applied in the following order:

(a)     to pay all costs and expenses of collection and of the public or private sale (including, without limitation, reasonable attorneys' fees, advertising costs, brokerage commissions and late charges);

(b)     to pay to Secured Party all sums due Secured Party pursuant to the Note, this Security Agreement and the Forbearance Agreement including, but not limited to outstanding principal of the Note, accrued and unpaid interest on the Note, late charges, default interest, advances, costs and fees, etc.; and

(c)     any surplus realized after said deductions shall be turned over to Debtor.

6.     Other Recourse.

(a)     Debtor waives any right to require Secured Party to proceed against any third party, exhaust any Collateral or other security for the Obligations, or to

242634v1                                        3

have any third party joined with Debtor in any suit arising out of the Obligations, or pursue any other remedy available to Secured Party. Debtor further waives any and all notice of acceptance of this Security Agreement and of the creation, modification, rearrangement, renewal or extension of the Note. Until all of the Obligations shall have been paid in full, Debtor shall have no right of subrogation and Debtor waives the right to enforce any remedy which Secured Party has or may hereafter have against any third party, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Secured Party.

(b)     Nothing contained in this Security Agreement shall be construed as requiring Secured Party to take any action at any time. All of Secured Party's rights and remedies, whether provided under law, this Security Agreement or otherwise shall be cumulative and none is exclusive. Such rights and remedies may be enforced alternatively, successively, or concurrently.

7.     Financing Statement Filings. To the extent reasonably necessary in order to maintain Secured Party's perfected security interest in the Collateral, Debtor hereby authorizes Secured Party to file, without the signature of Debtor, one or more financing or continuation statements, and amendments thereto, relating to the Collateral. Debtor further agrees that a photographic or other reproduction of this Security Agreement or any financing statement describing any Collateral is sufficient as a financing statement and may be filed in any jurisdiction that Secured Party may deem appropriate.

8.     Further Assurances. Debtor hereby agrees to execute and deliver such further instruments and documents as may be reasonably requested by Secured Party in order to carry out fully the intent and accomplish the purposes of this Security Agreement. Debtor agrees to take any action which Secured Party may reasonably request in order to obtain and enjoy the full rights and benefits granted to Secured Party by this Agreement.

9.     Appointment. Debtor hereby irrevocably constitutes and appoints Secured Party, it's successors and assigns, and any agent or designee thereof, as its true and lawful attorney-in-fact with power of substitution and full irrevocable power and authority, coupled with an interest and for a valuable consideration, upon the occurrence and during the continuance of an Event of Default, in the place and stead of, and in the name of, Debtor, or in its own name, to take any and all action and to execute any and all agreements, certificates, documents and instruments which may be necessary or desirable, in it's sole discretion, to realize upon the Collateral, including, without limiting the generality of the foregoing, to ask, demand, collect, receive and give acquittances and receipts for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of with respect to the Collateral; to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to the Collateral; to direct any party liable for any payment with respect to the Collateral to make payment of any and all moneys due and to become due thereunder directly to Secured Party or as Secured Party shall direct; to sign and endorse any assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; to file any claim or to commence and

prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect any and all moneys due with respect to the Collateral whenever payable or any part thereof and to enforce any other right in respect to the Collateral; to collect and enforce the payment of any amounts due with respect to the Collateral by suit, proof of debt or claim or otherwise in any proceeding under the Federal Bankruptcy Code, or in any dissolution, insolvency, liquidation or other proceeding involving an adjustment of the indebtedness or interests in any obligor upon the Collateral or application of any assets of such obligor to the payment in liquidation thereof, or otherwise; to accept or reject any plan of reorganization, readjustment or compromise in her discretion, whether in any such proceedings, by agreement of compromise or otherwise; and generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with the Collateral as fully and completely as though Secured Party was the absolute owner thereof for all purposes, and to do, at Secured Party's option and at the expense of Debtor, at any time, or from time to time, all acts and things which Secured Party deems necessary or desirable to protect, preserve or realize upon the Collateral and Secured Party's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as Debtor might do. This power of attorney, being coupled with an interest and being granted for a valuable consideration, is irrevocable until the date the Note is paid in full. The powers conferred on Secured Party hereunder are solely to protect her interests in the Collateral and shall not impose any duty upon her to exercise any such powers, nor shall Secured Party be responsible for or be deemed to have assumed any of Debtor's liabilities or obligations with respect to the Collateral. Secured Party shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither Secured Party nor any of it's trustees, agents or designees shall be responsible to Debtor for any act or failure to act, or for any error of judgment or mistake of fact or law, except for it's own willful default hereunder.

          10.    <u>Miscellaneous</u>.

          (a)    <u>Entire Agreement</u>.    This Agreement and the Note contain the entire agreement of Secured Party and Debtor with respect to the Collateral. If the parties hereto are parties to any prior agreement, either written or oral, relating to the Collateral, the terms of this Agreement shall amend and supersede the terms of such prior agreement, but all security agreements, financing statements, guaranties, other contracts and notices for the benefit of Secured Party shall continue in full force and effect to secure the Note unless Secured Party specifically releases her rights thereunder by separate release.

          (b)    <u>Amendment</u>.    No modification, consent or amendment of any provision of this Security Agreement shall be valid or effective unless the same is in writing and signed by Debtor and Secured Party.

          (c)    <u>Actions by Secured Party</u>.    The lien, security interest and other rights of Secured Party hereunder shall not be impaired by (i) any renewal, extension, increase or modification with respect to the Note, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Secured Party may grant with respect to the Collateral or any portion thereof, (iii) any release or indulgence granted to any

endorser, guarantor or surety of the Note, or any conversion of any part of the Note into an equity interest in securities issued by Debtor. The taking of additional security by Secured Party shall not release or impair the lien, security interest or other security rights of Secured Party hereunder or affect the obligations of Debtor hereunder.

(d)     Waiver by Secured Party.  Secured Party may waive any Event of Default without waiving any other prior or subsequent Event of Default.  Secured Party may remedy any default without waiving the Event of Default remedied.  Neither the failure by Secured Party to exercise, nor the delay by Secured Party in exercising, any right or remedy upon any Event of Default shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right or remedy at a later date. No single or partial exercise by Secured Party of any right or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right or remedy hereunder, under any statute, or at law or equity, may be exercised at any time.  No waiver of any provision hereof or consent to any departure by Debtor therefrom shall be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified.  No notice to or demand on Debtor in any case shall of itself entitle Debtor to any other or further notice or demand in similar or other circumstances.

(e)     Costs and Expenses.  Debtor will upon demand pay to Secured Party the amount of any and all costs and expenses (including without limitation, attorneys' fees and expenses), which Secured Party may incur in connection with (i) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, (ii) the exercise or enforcement of any of the rights of Secured Party under the Note, or (iii) the failure by Debtor to perform or observe any of the provisions hereof.

(f)     Governing Law.     This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without the application of any conflict or choice of law of law principles.

(g)     Jurisdiction.     With respect to any claim or cause of action in connection with the execution or performance of, or arising under this Security Agreement, Debtor (a) irrevocably submits to the nonexclusive personal jurisdiction of the courts of the State of Florida; (b) irrevocably waives any objection which it may have to the laying on of venue of any suit, action or proceeding arising out of or relating to this Security Agreement brought in any such court; (c) irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum; (d) irrevocably waives the right to object, with respect to such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over it; and (e) IRREVOCABLY WAIVES ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING WITH RESPECT TO SUCH CLAIM, SUIT, ACTION OR PROCEEDING.

(h)   Severability.   If any provision of this Security Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, shall not impair or invalidate the remainder of this Agreement, and the effect thereof shall be confined to the provision held to be illegal, invalid or unenforceable.

(i)   No Obligation.   Nothing contained herein shall be construed as an obligation on the part of Secured Party to extend or continue to extend credit or loans to Debtor.

(j)   Binding Effect and Assignment.   This Security Agreement (i) creates a continuing security interest in the Collateral, (ii) shall be binding on Debtor and the legal representatives, successors and assigns of Debtor, and (iii) shall inure to the benefit of Secured Party and the heirs, executors, administrators, legal representatives, successors and assigns of Secured Party. Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Note and it's rights under this Security Agreement to any other party. Debtor's rights and obligations hereunder may not be assigned or otherwise transferred without the prior written consent of Secured Party.

(k)   Termination.   Upon payment in full of the Note, this Security Agreement and the security interests created hereby shall terminate. Upon termination of this Agreement and with Debtor's written request, Secured Party will, at Debtor's sole cost and expense, return to Debtor such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof, and execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

(l)   Cumulative Rights.   All rights and remedies of Secured Party hereunder are cumulative of each other and of every other right or remedy which Secured Party may otherwise have at law or in equity, and the exercise of one or more of such rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of any other rights or remedies.

(m)   Gender and Number.   Within this Security Agreement, words of any gender shall be held and construed to include the other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless in each instance the context requires otherwise.

(n)   Descriptive Headings.   The headings in this Security Agreement are for convenience only and shall in no way enlarge, limit or define the scope or meaning of the various and several provisions hereof.

(o)   Counterparts.   This Security Agreement may be executed and delivered (including by facsimile or other electronic transmission) in one or more counterparts, each of which when executed shall be deemed to be an original but all of which when taken together shall constitute one and the same agreement.

242634v1                                7

**IN WITNESS WHEREOF**, this Security Agreement has been executed as of the day and year first written above.

**DEBTOR:**

W.B. CARE CENTER, LLC

By:
      Name:
      Title:

**SECURED PARTY:**

INSTITUTIONAL LEASING 1, LLC

By:
      Name: Abraham Shawlson
      Title: Manager

## PROMISSORY NOTE

**$2,500,000**

Miami, Florida
June 30, 2008

FOR VALUE RECEIVED, the undersigned, W.B. Care Center LLC, a Florida limited liability company with offices c/o 2627 South Bayshore Drive, Suite 2506, Miami, Florida 33133 (the "Maker"), hereby promises to pay to INSTITUTIONAL LEASING 1 LLC, a Florida limited liability company, having an address at P.O.B. 402401, Miami Beach, Florida 33140, its successors, assigns or designees (collectively, the "Payee") the principal sum of TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 ($2,500,000) DOLLARS, payable as follows: the principal sum of $2,500,000 and 00/100 ($2,500,000), with interest at the Interest Rate (as hereinafter defined) from the date of this Note, shall be paid on or before the fifth (5th) anniversary of the date hereof (the "Maturity Date"). All payments shall be applied first to accrued and unpaid interest, then to principal.

1.     The "Interest Rate" as used here shall mean a variable interest rate per annum equal to the Lender's Base Rate, as hereinafter defined, plus six (6 %) percent, but in no event will the interest rate be less than 10.5% per annum (the "Floor Rate") on the unpaid balance from time to time outstanding until the entire principal balance of the indebtedness evidenced by this Note and all interest and other amounts from time to time payable under this Note shall have been paid in full. The term "Lender's Base Rate" as referred to in this Note is the interest rate published in the Eastern Edition of THE WALL STREET JOURNAL in the "Money Rates" table as the "Prime Rate" in effect from time to time computed daily and payable monthly on the basis of a three hundred and sixty (360) day year and actual days elapsed for JP Morgan/Chase Bank. If the said Prime Rate is published as a range, with a high and a low interest rate, the Lender's Base Rate shall be the highest rate on corporate loans posted by at least 75% of the USA's 30 largest banks known as The Wall Street Journal Prime Rate and is published in THE WALL STREET JOURNAL. The rate of interest under this note will change as of the effective date of each change in such Prime Rate. If THE WALL STREET JOURNAL shall cease to publish the Prime Rate in the Money Rates table of its Eastern Edition, the Lender shall choose an interest rate that in the sole and absolute discretion of Lender most closely approximates said Prime Rate and Lender may notify Borrower in writing of such designation, which rate shall be Lender's Base Rate from and after the date on which THE WALL STREET JOURNAL shall have ceased to so publish the Prime Rate. Lender's Base Rate may not be the lowest or most favorable rate charged by Lender.

2.     **REPAYMENT.** The entire outstanding principal balance of this Promissory Note, together with all unpaid and accrued interest and all other amounts due and owing pursuant to the terms of this Promissory Note shall be due and payable without notice or demand on the Maturity Date. The annual Interest Rate for this Promissory Note is computed on a 360/365 basis; that is, by applying the ratio of the

1

annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

All payments of principal and interest shall be made in lawful money of the United States that shall be legal tender in payment of all debts at the time of payment. Any check, draft or money order remitted in settlement of this note, may be handled for collection in accordance with the practice of the collecting bank or banks and shall not be deemed payment until the money is actually received by the holder of this note.

3.   **DEFAULT.** Upon the occurrence of any Event of Default (as hereinafter defined), the entire outstanding balance of this Promissory Note shall, at the option of the holder, become immediately due and payable without notice or demand, and in any event, interest shall immediately accrue at a "default rate" which means the rate of interest which is Eighteen (18%) percent per annum, but in no event to exceed the maximum rate allowed by law.

4.   The occurrence of any of the following events shall be deemed an Event of Default hereunder:

(a)   Maker shall default in making payment of the principal, interest or any other amount due and payable under this Promissory Note when due, provided however that Payee shall be required to send Maker one ten (10) day notice to cure during any 12 month period for any default in payment before the same shall be deemed an Event of Default;

(b)   (i) Maker commences any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or the relief of debtors, seeking to adjudicate it a bankrupt or insolvent, or seeking an arrangement, adjustment, composition or other relief with respect to it or its debts, or (B) seeking the appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or making a general assignment for the benefit of creditors; or (ii) there is commenced against Maker any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order or judgment for relief or any such adjudication or appointment, or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (iii) Maker takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (i) and (ii) above; or

(c)   A default or an Event of Default by Maker under the Lease (as hereinafter defined) as set forth in Paragraph 8 hereof.

Upon the occurrence of (i) any Event of Default hereunder under clause (a), Payee may declare the unpaid principal amount of this Promissory Note and accrued unpaid interest to be due and payable by giving written notice of such declaration to Maker, and upon the giving of such notice, such principal amount and interest shall become

235660v2

immediately due and payable without any further notice or demand upon the Maker, (ii) any Event of Default under clause (b) above, the outstanding principal amount of this Promissory Note and accrued unpaid interest shall become immediately due and payable hereunder without any notice or demand upon the Maker, and (iii) any Event of Default hereunder, and continuing thereafter (including after the entry of judgment on this Promissory Note), interest on the unpaid principal balance of this Promissory Note shall accrue at the highest per annum interest rate permitted by law (the "Default Rate") until this Promissory Note is paid in full.

5.    Any notice required or permitted to be given hereunder shall be deemed to have been duly given when delivered, if sent by national overnight courier (such as Federal Express, or similar), or three (3) days after being sent by United States registered or certified mail, return receipt requested, with postage prepaid, addressed to Maker at the address set forth above. Any notice required or permitted to be given hereunder by Payee maybe given by an attorney on behalf of Payee.

6.    Maker hereof expressly waives the right to trial by jury.

7.    Maker hereby waives presentment for payment, demand, notice of nonpayment, protest of any dishonor, notice of protest and protest of this Promissory Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Promissory Note. In addition, Maker hereby also expressly waives the right to (i) interpose counterclaims or (ii) assert any and all defenses, counterclaims, set-off and reductions for any reason whatsoever against any other parties identified as Plaintiffs in the action referred to in the Stipulation of Settlement hereafter defined, except as set forth therein.

8.    This Promissory Note is the Note referred to in that certain Lease of even date herewith between Maker, as Tenant, and Payee, as Landlord (the "Lease"). A default or an Event of Default under the Lease shall also be deemed an Event of Default under this Promissory Note.

9.    In the event that (i) the indebtedness evidenced by this Promissory Note, or any part thereof, is collected in any proceeding at law, or (ii) this Promissory Note is submitted to attorneys for collection after the failure of Maker to make payment of any principal or interest when due and payable, Maker shall pay all reasonable costs of collecting this Promissory Note, including, without limitation, reasonable attorney's fees and expenses and court costs, if any.

10.   **DELAY IN ENFORCEMENT**. The liability of Maker and any subsequent endorser, guarantor or other accommodation maker under this Promissory Note is unconditional and shall not be affected by an extension of time, renewal, waiver or any other modification whatsoever, granted or consented to by the holder. Any failure by the holder to exercise any right it may have under this Promissory Note is not a waiver of the holder's right to exercise the same or any other right at any other time.

3

11.    All rights and remedies provided in this Promissory Note or by law shall be available to Payee hereof and shall be cumulative, and any delay in exercising, or failure to exercise, aright or remedy shall not constitute a waiver thereof.

12.    This Promissory Note may be changed, amended or modified only by an agreement in writing signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

13.    Maker represents that it has full power and authority and legal right to execute and deliver this Promissory Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Maker.

14.    This Promissory Note shall be governed by and construed in accordance with the laws of the State of Florida without giving effect to the choice of law rules thereof.

15.    This Promissory Note shall be binding on the successors and assigns of Maker and shall inure to the benefit of the successors and assigns of Payee.

16.    **PREPAYMENT.**  The debt evidenced by this Promissory Note may be prepaid, in whole or in part, at any time, without premium or penalty upon five (5) days written notice to Payee. All prepayments of principal shall be accompanied by and applied first to the payment of costs and expenses, then to unpaid late charges, then to accrued and unpaid interest and the balance on account of the unpaid principal.

17.    **INTERPRETATION.** Captions and headings used in this Note are for convenience only.  The term "Maker" and any pronoun referring thereto as used herein shall be construed in the masculine, feminine or neuter as the context may require.  The singular includes the plural and the plural includes the singular.  The term "any" means any and all.

18.    **INVALIDITY.** If any provision of this Promissory Note or the application of any provision to any person or circumstance shall be invalid or unenforceable, neither the balance of this Promissory Note nor the application of the provision to other persons or circumstances shall be affected.

IN WITNESS WHEREOF, the undersigned has duly executed this Promissory Note as of the date first above written:

W.B. CARE CENTER, LLC

By: _____

Name: Timothy Reardon
Title: _____

JACK HEINEY
MY COMMISSION #DD375158
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

7/15/08

235660v2

4

## ASSIGNMENT OF MEMBERSHIP INTERESTS

KNOW THAT, TIMOTHY P. REARDON, an individual having an address at 2627 South Bay Shore Drive, Suite 2506, Miami, Florida 33133 (the "Assignor"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by INSTITUTIONAL LEASING 1, LLC, a limited liability company organized under the laws of the State of Florida (the "Assignee"), hereby assigns unto the Assignee all of its right, title and interest in and to its one hundred percent (100%) membership interest in W.B. Care Center LLC, a Florida limited liability company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment as of the ___ day of July, 2008.

ASSIGNOR:

Timothy P. Reardon

242651v1

STATE OF              )
                         )ss.:

COUNTY OF         )

On the _15_ day of _July_, 200_8_ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

JACK HEINEY
MY COMMISSION #DD375158
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

Notary Public _____

242651v1

Exhibit E

Lease Agreement between Institutional Leasing 1, LLC and
W.B. Care Center, LLC d/b/a West Broward Care Center

With attached Note Guaranty

# LEASE AGREEMENT

between

### Institutional Leasing 1
a Florida limited liability limited company

"Landlord"

and

**W.B. Care Center LLC, a Florida limited liability company**

"Tenant"

Dated: as of June 30, 2008

232657v6

ARTICLE 1:  LEASED PROPERTY, TERM AND DEFINITIONS. .........................1
   1.1.   Leased Property ........................................................................1
   1.2.   Term.........................................................................................1
   1.3.   Definitions................................................................................1
ARTICLE 2:  RENT ..............................................................................................7
   2.1.   Rent..........................................................................................7
   2.2.   Sales and Use Tax and No Offset ...........................................8
   2.3.   Intentionally Deleted...............................................................8
   2.4.   Additional Rent.......................................................................8
   2.5.   Mode of Payment of Rent .......................................................8
   2.6.   Net Lease.................................................................................9
   2.7.   No Termination, Abatement, Etc..............................................9
ARTICLE 3:  IMPOSITIONS AND UTILITIES....................................................9
   3.1.   Payment of Impositions...........................................................9
   3.2.   Definition of Impositions.......................................................10
   3.3.   Escrow of Impositions and Insurance ....................................11
   3.4.   Utilities..................................................................................11
   3.5.   Discontinuance of Utilities ....................................................12
   3.6.   Business Expenses .................................................................12
   3.7.   Permitted Contests ................................................................12
ARTICLE 4:  INSURANCE ...............................................................................13
   4.1.   Property Insurance ...............................................................13
   4.2.   Liability Insurance ................................................................14
   4.3.   Landlord Right to Carry Insurance .......................................14
   4.4.   Insurance Requirements ........................................................15
   4.5.   Replacement Value ...............................................................15
   4.6.   Blanket Policy .......................................................................15
   4.7.   No Separate Insurance ..........................................................16
   4.8.   Waiver of Subrogation...........................................................16
   4.9.   Mortgages .............................................................................16
   4.10.  Escrows..................................................................................16
   4.11. Lender Insurance Requirements ............................................16
ARTICLE 5:  INDEMNITY ................................................................................17
   5.1.   Tenant's Indemnification .......................................................17
   5.2.   Environmental Indemnity; Audits..........................................18
   5.3.   Limitation of Landlord's Liability ........................................18
ARTICLE 6:  USE AND ACCEPTANCE OF PREMISES ....................................19
   6.1.   Use of Leased Property..........................................................19
   6.2.   Acceptance of Leased Property ..............................................20
   6.3.   Conditions of Use and Occupancy.........................................20
   6.4.   Preservation of Facility Values .............................................20
ARTICLE 7:  MAINTENANCE AND MECHANICS' LIENS ...............................21
   7.1.   Maintenance ..........................................................................21
   7.2.   Required Alterations .............................................................21
   7.3.   Mechanic's Liens...................................................................22

ii

7.4.    Replacements of Fixtures and Landlord's Personal Property...........................22
ARTICLE 8:  DEFAULTS AND REMEDIES ..............................................................22
8.1.    Events of Default ...............................................................................................22
8.2.    Remedies..............................................................................................................25
8.3.    Right of Setoff ...................................................................................................28
8.4.    Performance of Tenant's Covenants ................................................................28
8.5.    Late Payment Charge ........................................................................................28
8.6.    Default Rent .......................................................................................................28
8.7.    Cost and Expenses ............................................................................................29
8.8.    Escrows and Application of Payments ............................................................29
8.9.    Remedies Cumulative .......................................................................................29
8.10.   Waivers ...............................................................................................................29
8.11.   Obligations under the Bankruptcy Code.........................................................30
ARTICLE 9:  DAMAGE AND DESTRUCTION .........................................................30
9.1.    Notice of Casualty .............................................................................................30
9.2.    Substantial Destruction ....................................................................................31
9.3.    Partial Destruction ............................................................................................31
9.4.    Restoration .........................................................................................................31
9.5.    Insufficient Proceeds........................................................................................32
9.6.    Not Trust Funds ................................................................................................32
9.7.    Landlord's Inspection .......................................................................................32
9.8.    Landlord's Costs ...............................................................................................33
9.9.    No Rent Abatement; Waiver.............................................................................33
ARTICLE 10:  CONDEMNATION ..............................................................................33
10.1.   Total Taking .......................................................................................................33
10.2.   Partial Taking.....................................................................................................33
10.3.   Condemnation Proceeds Not Trust Funds; Waver........................................34
ARTICLE 11:  TENANT'S PROPERTY ......................................................................34
11.1.   Tenant's Property ..............................................................................................34
11.2.   Requirements for Tenant's Property ...............................................................34
ARTICLE 12:  RENEWAL TERM ...............................................................................36
12.1.   Renewal Term.....................................................................................................36
12.2.   Exercise of Option for Renewal Term ............................................................36
12.3.   Terms and Conditions for the Renewal Term ................................................36
12.4.   Rent for Renewal Term.....................................................................................36
ARTICLE 13:  RESERVED .........................................................................................37
ARTICLE 14:  NEGATIVE COVENANTS ...................................................................37
14.1.   No Debt...............................................................................................................37
14.2.   No Liens..............................................................................................................38
14.3.   No Guaranties ....................................................................................................38
14.4.   No Transfer.........................................................................................................38
14.5.   No Dissolution ...................................................................................................38
14.6.   Note Payment......................................................................................................38
14.7.   Change of Location or Name.............................................................................38
14.8.   License ................................................................................................................39
14.9.   Management.........................................................................................................39

232657v6

ARTICLE 15:  AFFIRMATIVE COVENANTS ................................................39
  15.1.  Perform Obligations.............................................................39
  15.2.  Proceedings to Enjoin or Prevent Construction ................................39
  15.3.  Documents and Information. ...................................................39
  15.4.  Compliance with Laws ........................................................41
  15.5.  Broker's Commission .........................................................41
  15.6.  Existence and Change in Ownership ...........................................42
  15.7.  RESERVED.....................................................................42
  15.8.  Facility Licensure and Certification.........................................42
  15.9.  Transfer of License and Facility Operations..................................42
  15.10. Bed Operating Rights.........................................................43
  15.11. Power of Attorney............................................................43
  15.12. Compliance with Loan Documents...............................................43
ARTICLE 16:  ALTERATIONS, CAPITAL IMPROVEMENTS, AND SIGNS ...........44
  16.1.  Prohibition on Alterations and Improvements..................................45
  16.2.  Approval of Alterations .....................................................45
  16.3.  Permitted Alterations .......................................................45
  16.4.  Requirements for Permitted Alterations ......................................45
  16.5.  Ownership and Removal of Permitted Alterations ..............................46
  16.6.  Capital Expenditures ........................................................46
  16.7.  Signs........................................................................47
ARTICLE 17:  SECURITY DEPOSIT .......................................................47
  17.1.  Security Deposit.............................................................47
ARTICLE 18:  ASSIGNMENT AND SALE OF LEASED PROPERTY .....................47
  18.1.  Prohibition on Assignment and Subletting ....................................47
  18.2.  Requests for Landlord's Consent to Assignment, Sublease or Management
         Agreement....................................................................48
  18.3.  Agreements with Residents....................................................49
  18.4.  Sale of Leased Property .....................................................49
  18.5.  Assignment by Landlord ......................................................49
ARTICLE 19:  HOLDOVER AND SURRENDER .......................................49
  19.1.  Holding Over.................................................................49
  19.2.  Surrender....................................................................50
  19.3.  Indemnity ...................................................................50
ARTICLE 20:  [RESERVED] .............................................................50
ARTICLE 21:  QUIET ENJOYMENT, SUBORDINATION, ATTORNMENT AND
ESTOPPEL CERTIFICATES ...............................................................50
  21.1.  Quiet Enjoyment .............................................................51
  21.2.  Subordination................................................................51
  21.3.  Attornment ..................................................................51
  21.4.  Estoppel Certificates .......................................................51
ARTICLE 22:  REPRESENTATIONS AND WARRANTIES.............................52
  22.1.  Organization and Good Standing...............................................52
  22.2.  Power and Authority .........................................................52
  22.3.  Enforceability...............................................................52
  22.4.  RESERVED.....................................................................53

iv

22.5.  Financial Statements ............................................................53
22.6.  RESERVED ........................................................................53
22.7.  RESERVED ........................................................................53
22.8.  RESERVED ........................................................................53
22.9.  Consents ..........................................................................53
22.10. No Violation .......................................................................53
22.11. Reports and Statements ......................................................53
22.12. ERISA ...............................................................................53
22.13. Intentionally deleted ...........................................................54
22.14. Intentionally deleted ...........................................................54
22.15. No Default .........................................................................54
ARTICLE 23:  [RESERVED] ..............................................................54
ARTICLE 24:  SECURITY INTEREST .................................................54
24.1.  Collateral ..........................................................................54
24.2.  Additional Documents .........................................................55
24.3.  Notice of Sale ....................................................................56
24.4.  Subordination ....................................................................56
ARTICLE 25:  MISCELLANEOUS .......................................................56
25.1.  Notices .............................................................................56
25.2.  Advertisement of Leased Property .........................................57
25.3.  Entire Agreement ...............................................................57
25.4.  Severability .......................................................................57
25.5.  Captions and Headings .......................................................57
25.6.  Governing Law ...................................................................57
25.7.  Memorandum of Lease .........................................................57
25.8.  Waiver ..............................................................................58
25.9.  Binding Effect ....................................................................58
25.10. No Offer ............................................................................58
25.11. Modification .......................................................................58
25.12. Landlord's Modification .......................................................58
25.13. No Merger .........................................................................59
25.14. Laches ..............................................................................59
25.15. Limitation on Tenant's Recourse ...........................................59
25.16. Construction of Lease ..........................................................59
25.17. Counterparts ......................................................................59
25.18. Custody of Escrow Funds .....................................................59
25.19. RESERVED ........................................................................59
25.20. Exhibits .............................................................................60
25.21. WAIVER OF JURY TRIAL .......................................................60
25.22. CONSENT TO JURISDICTION .................................................60
25.23. Reserved [See Section 8.7] ..................................................61
25.24. Survival .............................................................................61
25.25. Time .................................................................................61
25.26. Transition of Operations ......................................................61
25.27. Non-Recourse ....................................................................62
25.28. Risk of Loss .......................................................................62

v

25.29. No Joint Venture ................................................................................63
25.30. Depreciation ....................................................................................63
25.31. Ownership of name "West Broward Care Center" ..........................63
ARTICLE 26:  GUARANTIES .........................................................................63
26.1.  Lease Guaranty .................................................................................63
26.2.  Note Guaranty ..................................................................................63


EXHIBIT  A:          LEGAL  DESCRIPTION
EXHIBIT B:           PERMITTED EXCEPTIONS
EXHIBIT C:           LEASE GUARANTY
EXHIBIT D:           NOTE GUARANTY
EXHIBIT E:           LIST OF PERSONAL PROPERTY

232657v6

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of this 30th day of June, 2008 between **Institutional Leasing 1 LLC**, a Florida limited liability company having an address at P.O.B. 402401 Miami Beach, Florida 33140 ("Landlord"), and  W.B. Care Center LLC, a Florida limited liability company, having an address at 2627 South Bayshore Drive, Suite 2506, Miami, Florida 33133 ("Tenant").

## RECITALS:

A.     Landlord is the owner of (i) a 120 bed skilled nursing home located in City of Plantation, Broward County, Florida, doing business as West Broward Care Center, located on land more particularly described in Exhibit A attached hereto,  and (ii) certain personal property consisting of furniture, fixtures, furnishings and equipment located thereon ("collectively referred to as the "Leased Property)".

B.     Landlord wishes to lease to the Tenant and Tenant wishes to lease the Leased Property under the terms and conditions set forth below.

**NOW, THEREFORE,** Landlord and Tenant, intending to be legally bound do hereby agree as follows:

## ARTICLE 1: LEASED PROPERTY, TERM AND DEFINITIONS.

1.1.     Leased Property.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Leased Property, subject, however, to the Permitted Exceptions and subject to the terms and conditions of this Lease.

1.2.     Term.  The term of this Lease (the "Lease Term") commences on the Effective Date and expires at 12:00 Midnight Eastern Time on June 29, 2013 (the "Lease Expiration Date"), subject to the provisions for extensions of the Lease Term as provided in Article 12 of this Agreement.  The Tenant shall have certain rights regarding renewal of this Lease as set forth in Article 12 below.

1.3.     Definitions.  Except as otherwise expressly provided, [i] the terms defined in this section have the meanings assigned to them in this section and include the plural as well as the singular; [ii] all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as of the time applicable; and [iii] the words "herein", "hereof" and "hereunder" and similar words refer to this Lease as a whole and not to any particular section.

"ADA" means the federal statute entitled Americans with Disabilities Act, 42 U.S.C. 12101, et seq.

"Additional Rent" has the meaning set forth in 2.4.

"Affiliate" means any person, corporation, partnership, limited liability company, trust, or other legal entity that, directly or indirectly, controls, or is controlled by, or is under common control with Tenant.

"Alterations" has the meaning set forth in 16.1.

"Annual Company Budget" means Tenant's projection of its financial statement for the next fiscal year (or the 12-month rolling forward period, if applicable), which shall include the balance sheet, statement of income, and statement of capital expenditures for the applicable period.

"Annual Financial Statements" means an "reviewed" or audited Facility Financial Statement for the most recent fiscal year.

"Article 9" means Article 9 of the Uniform Commercial Code as adopted in Florida.

"Authorizations" has the meaning set forth in 25.26.

"Bankruptcy Code" means the United States Bankruptcy Code set forth in 11 U.S.C. 101, et seq., as amended from time to time.

"Biological Toxants" means mold, fungus or other potentially dangerous organisms.

"Builder's Risk Coverage" has the meaning set forth in 4.3.

"Business Day" means any day other than a Saturday, Sunday, a national holiday or any Jewish holiday.

"Casualty" has the meaning set forth in 9.1.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"Closing" means the closing of the lease of the Facility to Tenant.

"Collateral" has the meaning set forth in 24.1.

"Commencement Date" means the Effective Date if such date is the first day of a month, and if it is not, the first day of the first month following the Effective Date.

2

"Default Rent" has the meaning set forth in 8.6.

"Effective Date" means June 30, 2008.

"Environmental Laws" means all federal, state, and local laws, ordinances and policies the purpose of which is to protect human health and the environment, as amended from time to time, including, but not limited to, [i] CERCLA; [ii] the Resource Conservation and Recovery Act; [iii] the Hazardous Materials Transportation Act; [iv] the Clean Air Act; [v] Clean Water Act; [vi] the Toxic Substances Control Act; [vii] the Occupational Safety and Health Act; [viii] the Safe Drinking Water Act; [ix] Florida Health and Safety Code Section 25316 and [x] analogous state laws and regulations.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended or supplemented from time to time.

"Event of Default" has the meaning set forth in 8.1.

"Expiration Date" has the meaning set forth in 1.2.

"Facility" means the Facility located on the Land, including the Leased Property.

"Facility Financial Statement" means a financial statement for the Facility which shall be "reviewed" or audited, and shall include the balance sheet, statement of income, occupancy census data (including payor mix), statement of capital expenditures and a comparison of the actual financial data versus the Annual Company Budget for the applicable period.

"Facility Name" means the name under which the Facility has done business during the Lease Term. The Facility Name in use by the Facility on the Effective Date is "West Broward Care Center."

"Facility Termination" has the meaning set forth in 25.26.

"Financial Statements" means [i] the annual, quarterly and year to date financial statements of Tenant; and [ii] all operating statements for the Facility, that were submitted to Landlord prior to the Effective Date.

"Renewal Term" has the meaning set forth in 12.1.

"Fixtures" means all permanently affixed equipment, machinery, fixtures and other items of real and/or personal property (excluding Landlord's Personal Property), including all components thereof, now and hereafter located in, on or used in connection with, and permanently affixed to or incorporated into the Improvements, including, without limitation, all furnaces, boilers, heaters, electrical equipment, heating, plumbing, lighting, ventilating, refrigerating, incineration, air and water pollution

3

232657v6

control, waste disposal, air-cooling and air-conditioning systems and apparatus, sprinkler systems and fire and theft protection equipment, built-in oxygen and vacuum systems, towers and other devices for the transmission of radio, television and other signals, all of which, to the greatest extent permitted by law, are hereby deemed by the parties hereto to constitute real estate, together with all replacements, modifications, alterations and additions thereto.

"Government Authorizations" means all permits, licenses, approvals, consents, and authorizations required to comply with all Legal Requirements, including, but not limited to, [i] zoning permits, variances, exceptions, special use permits, conditional use permits, and consents; [ii] the permits, licenses, provider agreements and approvals required for licensure and operation of the Facility in accordance with the Facility Uses and, if applicable, certified as a provider under the federal Medicare and state Medicaid programs; [iii] environmental, ecological, coastal, wetlands, air, and water permits, licenses, and consents; [iv] curb cut, subdivision, land use, and planning permits, licenses, approvals and consents; [v] building, sign, fire, health, and safety permits, licenses, approvals, and consents; and [vi] architectural reviews, approvals, and consents required under restrictive covenants.

"Gross Revenues" shall have the meaning defined in 2.3.

"Guarantor" shall mean Timothy Patrick Reardon.

"Hazardous Materials" means any substance [i] the presence of which poses a hazard to the health or safety of persons on or about the Land, including, but not limited to, asbestos containing materials; [ii] which requires removal or remediation under any Environmental Law, including, without limitation, any substance which is toxic, explosive, flammable, radioactive, or otherwise hazardous; or [iii] which is regulated under or classified under any Environmental Law as hazardous or toxic, including, but not limited to, any substance within the meaning of "hazardous substance", "hazardous material", "hazardous waste", "toxic substance", "regulated substance", "solid waste" or "pollutant" as defined in any Environmental Law.

"Impositions" has the meaning set forth in 3.2.

"Improvements" means all buildings, structures, Fixtures and other improvements of every kind on any portion of the Land, including, but not limited to, alleys, sidewalks, utility pipes, conduits and lines (on-site and off-site), parking areas and roadways appurtenant to such buildings and structures, now or hereafter situated upon any portion of the Land.

"Indemnified Party" has the meaning set forth in 5.1.

"Land" means the real property described in Exhibit A attached hereto.

"Landlord" means Institutional Leasing 1, LLC, a Florida limited liability company.

4

232657v6

"Landlord Affiliate" means any person, corporation, partnership, limited liability company, trust, or other legal entity that, directly or indirectly, controls, or is controlled by, or is under common control with Landlord, including, without limitation, Institutional Leasing 1, LLC, a Florida limited liability company.

"Landlord's Personal Property" means all Personal Property owned by Landlord on the Effective Date and located at the Facility, a Schedule of which Personal Property is attached as Exhibit F annexed hereto and made a part hereof, including, without limitation, all personal property, together with any and all replacements thereof, and all Personal Property that pursuant to the terms of this Lease becomes the property of Landlord during the Term.

"Lease" means this Lease Agreement, as amended from time to time.

"Lease Documents" means this Lease and all documents executed by Landlord and Tenant relating to this Lease or the Facility.

"Lease Guarantee" has the meaning set forth in 26.01.

"Lease Term" has the meaning set forth in 1.2.

""Lease Payments" means the sum of the Rent payments (as increased from time to time) for the applicable period.

"Leased Property" means all of the Land, Improvements, Related Rights and Landlord's Personal Property.

"Legal Requirements" means all laws, regulations, rules, orders, writs, injunctions, decrees, certificates, requirements, agreements, conditions of participation and standards of any federal, state, county, municipal or other governmental entity, administrative agency, insurance underwriting board, architectural control board, accreditation organization, or any restrictive covenants applicable to the development, construction, condition and operation of the Facility by Tenant for Facility uses, including, but not limited to, [i] zoning, building, fire, health, safety, sign, and subdivision regulations and codes; [ii] certificate of need laws (if applicable); [iii] licensure to operate as the Facility; [iv] Medicare and Medicaid certification requirements; [v] the ADA; [vi] any Environmental Laws; and [vii] requirements, conditions and standards for participation in third-party payor insurance programs.

"Lender" means the existing holder of the Mortgage or any subsequent entity that holds a mortgage on the Facility.

"Loan Documents" as used herein means any and all loan documents by and between the Lender and the Landlord, including but not limited to the Mortgage and the Mortgage Note.

5

"Manager" has the meaning set forth in 14.9.

"Mortgage" means the mortgage on the Leased Property that secures the promissory note made payable to the holder of the Mortgage ("Mortgage Note," a copy of which has been furnished to Tenant).

"Note" has the meaning set forth in 14.6.

"Note Guarantee" has the meaning set forth in 26.02.

"Periodic Financial Statements" means a Facility Financial Statement for the most recent month.

"Permitted Exceptions" means all easements, liens, encumbrances, restrictions, agreements and other title matters existing as of the Effective Date, and any sublease of any portion of the Leased Property made in complete accordance with Article 18, a list of the Permitted Exceptions being attached hereto as Exhibit B.

"Permitted Liens" means [i] liens granted to Landlord; [ii] liens customarily incurred by Tenant in the ordinary course of business for items not delinquent, including mechanic's liens and deposits and charges under worker's compensation laws; [iii] liens for taxes and assessments not yet due and payable; [iv] any lien, charge, or encumbrance which is being contested in good faith pursuant to this Lease; [v] the Permitted Exceptions; and [vi] purchase money financing and capitalized equipment leases for the acquisition of personal property.

"Personal Property" means all machinery, equipment, furniture, furnishings, movable walls or partitions, computers (and all associated software), trade fixtures and other personal property (but excluding consumable inventory and supplies owned by Tenant) used in connection with the Leased Property, together with all replacements and alterations thereof and additions thereto, except items, if any, included within the definition of Fixtures or Improvements.

"Plans and Specifications" has the meaning set forth in 16.2.

"Qualified Capital Expenditures" means the expenditures capitalized on the books of Tenant for any of the following: replacement of furniture, fixtures and equipment, including refrigerators, ranges, major appliances, bathroom fixtures, doors (exterior and interior), central air conditioning and heating systems (including cooling towers, water chilling units, furnaces, boilers and fuel storage tanks) and replacement of siding; roof replacements, including replacements of gutters, downspouts, eaves and soffits; major repairs and replacements of plumbing and sanitary systems; overhaul of elevator systems; repaving, resurfacing and sealcoating of sidewalks, parking lots and driveways; repainting of entire building exterior and normal maintenance and repairs needed to

6

maintain the quality and condition of the Facility in the market in which it operates, but excluding Alterations.

"Receivables" means [i] all of Tenant's rights to receive payment for providing resident care and services as set forth in any accounts, contract rights, and instruments, and [ii] those documents, chattel paper, inventory proceeds, provider agreements, participation agreements, ledger sheets, files, records, computer programs, tapes, and agreements relating to Tenant's rights to receive payment for providing resident care services.

"Receiver" has the meaning set forth in 8.2.

"Related Rights" means all easements, rights (including bed operating rights) and appurtenances relating to the Land and the Improvements.

"Rent" has the meaning set forth in Section 2.1.

"Rent Schedule" means the schedule issued by Landlord to Tenant showing the Rent to be paid by Tenant pursuant to the terms of this Lease.

"Replacement Operator" has the meaning set forth in 15.9.1.

"Secured Party" has the meaning set forth in 24.1.

"Security Deposit" has the meaning set forth in 17.1.

"Taking" has the meaning set forth in 10.1.

"Tenant" has the meaning set forth in the introductory paragraph of this Lease.

"Tenant's Certification" has the meaning set forth in 2.3.

"Tenant's Property" has the meaning set forth in 11.1.


## ARTICLE 2: RENT

2.1.     Rent.  Tenant shall pay to Landlord rent as provided in this Article 2.1 (hereafter the "Rent") from the Effective Date through the Expiration Date as follows:

(A)             On the first day of July, 2008 Tenant shall pay the sum of $103,287.67.

(B)             On the first day of August, 2008 and every calendar month thereafter through December, 2008, Tenant shall pay to Landlord a monthly payment of $100,000 per month.

7

232657v6

(C)    On the first day of January, 2009 and on the first day of every calendar month thereafter through June, 2008, Tenant shall pay to Landlord a monthly payment of $125,000 per month.

(D)    For the period July, 2009 through June, 2010, Tenant shall pay to Landlord an annual rent of $1,545,000 payable on the first day of each month the sum of $128,750.

(E)    For the period July, 2010 through June, 2011, Tenant shall pay to Landlord an annual rent of $1,591,350 payable in equal monthly installments of $132,612.50 on the first day of each and every month in advance.

(F)    For the period July, 2011 through June, 2012, Tenant shall pay to Landlord an annual rent of $1,639,090.50 payable in equal monthly installments of $136,590.88 in advance on the first day of each month.

(G)    For the period July, 2012 through June, 2013, Tenant shall pay to Landlord an annual rent equal to $1,688,263.22 payable in equal monthly installments in advance on the first day of each month of $140,688.60.

Notwithstanding anything herein contained to the contrary in the event Tenant is in compliance with the "Gold Seal" program for nursing homes adopted by the State of Florida then for each month that Tenant is in such program Tenant will be entitled to a 10% reduction of the Rent for each such month.

2.2.    <u>Sales and Use Tax and No Offset</u>.  Tenant shall pay all sales and use tax that may be charged by the State of Florida or any other taxing authority on the Rent if such sales or use tax is applicable or unless an exemption from such sales or use tax is in effect. Such payments of sales tax shall be payable to Landlord along with the monthly payment of Rent.

2.3.    <u>Intentionally Deleted</u>.

2.4.    <u>Additional Rent</u>.  In addition to Rent, Tenant shall pay all other amounts, liabilities, obligations and Impositions, which Tenant assumes or agrees to pay under this Lease, including any fine, penalty, interest, charge and cost which may be added for nonpayment or late payment of such items, including without limitation, real estate taxes, property insurance and reserve for replacement (collectively the "Additional Rent").

2.5.    <u>Mode of Payment of Rent</u>.  Tenant shall pay all monthly installments of Rent to Landlord by electronic wire transfer in accordance with the wiring instructions to be furnished by Landlord to Tenant from time to time.

8

232657v6

2.6.   Net Lease. This Lease shall be deemed and construed to be an absolute "net net net" lease, and Tenant shall pay all Rent and other charges and expenses in connection with the Leased Property throughout the Lease Term, without abatement, deduction, recoupment or setoff. Landlord shall have all legal, equitable and contractual rights, powers and remedies provided either in this Lease or by statute or otherwise in the case of nonpayment of the Rent.

2.7.   No Termination, Abatement, Etc. Except as otherwise specifically provided in this Lease, Tenant shall remain bound by this Lease in accordance with its terms. Tenant shall not, without the consent of Landlord, modify, surrender or terminate the Lease, nor seek nor be entitled to any abatement, deduction, deferment or reduction of any and all Rent, or setoff or recoupment against the Rent. Except as expressly provided in this Lease, the obligations of Landlord and Tenant shall not be affected by reason of [i] any damage to, or destruction of, the Leased Property or any part thereof from whatever cause or any Taking (as hereinafter defined) of the Leased Property or any part thereof; [ii] any claim which Tenant has or might have against Landlord or by reason of any default or breach of any warranty by Landlord under this Lease or any other agreement between Landlord and Tenant, or to which Landlord and Tenant are parties; [iii] any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceeding affecting Landlord or any assignee or transferee of Landlord; or [iv] any other cause, whether similar or dissimilar to any of the foregoing, other than a discharge of Tenant from any such obligations as a matter of law. Except as otherwise specifically provided in this Lease, Tenant hereby specifically waives all rights, arising from any occurrence whatsoever, which may now or hereafter be conferred upon it by law [a] to modify, surrender or terminate this Lease or quit or surrender the Leased Property or any portion thereof; or [b] entitling Tenant to any abatement, reduction, suspension or deferment of the Rent or other sums payable by Tenant hereunder. The obligations of Landlord and Tenant hereunder shall be separate and independent covenants and agreements and the Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events unless the obligations to pay the same shall be terminated pursuant to the express provisions of this Lease or by termination of this Lease other than by reason of an Event of Default. Nothing in this 2.7 shall be construed to limit any right which Tenant may have to bring a separate action against Landlord for any claim which Tenant may have or allege to have against Landlord.

## ARTICLE 3: IMPOSITIONS AND UTILITIES

3.1.   Payment of Impositions. Tenant shall pay, as Additional Rent, all Impositions that may be levied or become a lien on the Leased Property or any part thereof at any time before any fine, penalty, interest, or cost is incurred; provided, however, Tenant may contest any Imposition in accordance with 3.7. Tenant shall deliver to Landlord [i] not more than five days after the due date of each Imposition, copies of the invoice for such Imposition and the check delivered for payment thereof; and [ii] not more than 30 days after the due date of each Imposition, a copy of the official receipt evidencing

9

such payment or other proof of payment satisfactory to Landlord. Tenant's obligation to pay such Impositions shall be deemed absolutely fixed upon the date such Impositions become a lien upon the Leased Property or any part thereof. Tenant, at its expense, shall prepare and file all tax returns and reports in respect of any Imposition as may be required by governmental authorities. Tenant shall be entitled to any refund due from any taxing authority in and thereafter during the Lease Term if no Event of Default shall have occurred hereunder and be continuing and if Tenant shall have paid all Impositions due and payable as of the date of the refund. Landlord shall be entitled to any refund from any taxing authority if an Event of Default has occurred and is continuing. Any refunds retained by Landlord due to an Event of Default shall be applied as provided in 8.8. Landlord and Tenant shall, upon request of the other, provide such data as is maintained by the party to whom the request is made with respect to the Leased Property as may be necessary to prepare any required returns and reports. In the event governmental authorities classify any property covered by this Lease as personal property, Tenant shall file all personal property tax returns in such jurisdictions where it may legally so file. Landlord, to the extent it possesses the same, and Tenant, to the extent it possesses the same, will provide the other party, upon request, with cost and depreciation records necessary for filing returns for any property so classified as personal property. Where Landlord is legally required to file personal property tax returns, Tenant will be provided with copies of assessment notices indicating a value in excess of the reported value in sufficient time for Tenant to file a protest. Tenant may, at Tenant's option and at Tenant's sole cost and expense, protest, appeal, or institute such other proceedings as Tenant may deem appropriate to effect a reduction of real estate or personal property assessments and Landlord, at Tenant's expense as aforesaid, shall fully cooperate with Tenant in such protest, appeal, or other action. Tenant shall reimburse Landlord for all personal property taxes paid by Landlord within 30 days after receipt of billings accompanied by copies of a bill therefore and payments thereof which identify the personal property with respect to which such payments are made. Impositions imposed in respect to the tax-fiscal period during which the Term terminates shall be adjusted and prorated between Landlord and Tenant as of the termination date, whether or not such Imposition is imposed before or after such termination, and Tenant's obligation to pay its prorated share thereof shall survive such termination.

3.2.   Definition of Impositions. "Impositions" means, collectively, [i] taxes (including, without limitation, all real estate and personal property ad valorem, sales and use, business or occupation, single business, gross receipts, transaction privilege, rent or similar taxes; [ii] assessments (including, without limitation, all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term); [iii] water, sewer or other rents and charges, excises, tax levies, and fees (including, without limitation, license, permit, inspection, authorization and similar fees); [iv] all taxes imposed on Tenant's operations of the Leased Property, including, without limitation, employee withholding taxes, income taxes, sales taxes and intangible taxes; and [v] all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Leased

10

Property or any part thereof and/or the Rent (including all interest and penalties thereon due to any failure in payment by Tenant), which at any time during or in respect of the Term hereof may be assessed or imposed on or in respect of or be a lien upon [a] Landlord or Landlord's interest in the Leased Property or any part thereof; [b] the Leased Property or any part thereof or any rent therefrom or any estate, right, title or interest therein; or [c] any occupancy, operation, use or possession of, or sales from, or activity conducted on, or in connection with the Leased Property or the leasing or use by Tenant of the Leased Property or any part thereof. Tenant shall not, however, be required to pay any capital gains tax or any tax based on net income imposed on Landlord by any governmental entity or any tax resulting from the transfer of ownership of the Facility.

3.3.   Escrow of Impositions and Insurance. Tenant shall deposit with Landlord or with Lender, as directed by Landlord, on the first day of each month a sum equal to 1/12th of the Impositions assessed against the Leased Property for the preceding tax year for real estate taxes and for the cost of all insurance carried on the Leased Property as required under Article 4 hereof, which sums shall be used toward payment of Impositions and insurance policy premiums. Tenant, on demand, shall pay to Landlord any additional funds which Landlord or Lender deems may be necessary to pay and discharge the obligations of Tenant pursuant to the provisions of this section prior to the expiration of the calendar year for which such obligations are assessed. In particular, with real estate taxes, Tenant shall pay to Landlord any additional amount which may be required to pay real estate taxes for each year prior to November 1st of such year. The receipt by Landlord of the payment of such Impositions by and from Tenant shall only be as an accommodation to Tenant, the mortgagees, and the taxing authorities, and shall not be construed as rent or income to Landlord, Landlord serving, if at all, only as a conduit for delivery purposes.

3.4.   Utilities. Tenant shall pay, as Additional Rent, all taxes, assessments, charges, deposits, and bills for utilities, including, without limitation, charges for water, gas, oil, sanitary and storm sewer, electricity, telephone service, and trash collection, which may be charged against the occupant of the Improvements during the Term. If an Event of Default occurs and while it remains uncured, Tenant shall, at Landlord's election, deposit with Landlord on the first day of each month a sum equal to 1/12th of the amount of the annual utility expenses for the preceding Lease Year, which sums shall be used by Landlord to pay such utilities. Tenant shall, on demand, pay to Landlord any additional amount needed to pay such utilities. Landlord's receipt of such payments shall only be an accommodation to Tenant and the utility companies and shall not constitute rent or income to Landlord. Absent circumstances beyond Tenant's reasonable control, Tenant shall at all times maintain that amount of heat necessary to ensure against the freezing of water lines. Tenant hereby agrees to indemnify and hold Landlord harmless from and against any liability or damages to the utility systems and the Leased Property that may result from Tenant's failure to maintain sufficient heat in the Improvements absent circumstances beyond Tenant's reasonable control.

11

232657v6

3.5..   <u>Discontinuance of Utilities</u>.  Landlord will not be liable for damages to person  or property or for  injury to, or interruption of, business for any discontinuance of utilities nor will such discontinuance in any way be construed as  an  eviction of  Tenant or cause an abatement of rent or operate to release Tenant  from  any  of  Tenant's  obligations under this Lease.

3.6.   <u>Business Expenses</u>.  Tenant shall promptly pay all expenses and costs incurred in  connection  with  the  operation  of  the Leased Property,  including,  without limitation, employee benefits, employee vacation and sick pay, consulting fees, and expenses  for  inventory  and supplies that accrue during the term of the Lease of this Facility.

3.7.   <s>Permitted Contests</s>. <s>Tenant, on its own or on Landlord's behalf (or in Landlord's</s> name), but at Tenant's expense, may contest, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any Imposition or any Legal Requirement or insurance requirement or any lien, attachment, levy, encumbrance, charge or claim provided that [i] in the case of an unpaid Imposition, lien, attachment, levy, encumbrance, charge or claim, the commencement and continuation of such proceedings shall suspend the collection thereof from Landlord and from the Leased Property; [ii] neither the Leased Property nor any Rent therefrom nor any part thereof or interest therein would be in any immediate danger of being sold, forfeited, attached or lost; [iii] in the case of a Legal Requirement, Landlord would not be in any immediate danger of civil or criminal liability for failure to comply therewith pending the outcome of such proceedings; [iv] in the event that any such contest shall involve a sum of money or potential loss in excess of $10,000.00, Tenant shall deliver to Landlord and its counsel an opinion of Tenant's counsel to the effect set forth in clauses [i], [ii] and [iii], to the extent applicable; [v] in the case of a Legal Requirement and/or an Imposition, lien, encumbrance or charge, Tenant shall give such reasonable security as may be demanded by Landlord to insure ultimate payment of the same and to prevent any <s>sale or forfeiture of the affected Leased Property or the Rent by reason of such</s> nonpayment or noncompliance; provided, however, the provisions of this section shall not be construed to permit Tenant to contest the payment of Rent (except as to contests concerning the method of computation or the basis of levy of any Imposition or the basis for the assertion of any other claim) or any other sums payable by Tenant to Landlord hereunder; [vi] in the case of an insurance requirement, the coverage required by Article 4 shall be maintained; and [vii] if such contest be finally resolved against Landlord or Tenant, Tenant shall, as Additional Rent due hereunder, promptly pay the amount required to be paid, together with all interest and penalties accrued thereon, or comply with the applicable Legal Requirement or insurance requirement. Landlord, at Tenant's expense, shall execute and deliver to Tenant such authorizations and other documents as may be reasonably required in any such contest, and, if reasonably requested by Tenant or if Landlord so desires, Landlord shall join as a party therein. Tenant hereby agrees to indemnify and save Landlord harmless from and against any

12

liability, cost or expense of any kind that may be imposed upon Landlord in connection with any such contest and any loss resulting therefrom.

## ARTICLE 4: INSURANCE

4.1.   Property Insurance.   At Tenant's expense, Tenant shall maintain in full force and effect a property insurance policy or policies insuring the Leased Property against the following:

(a)   Loss or damage commonly covered by a "all risk" or "special form", as the case may be, policy insuring against physical loss or damage to the Improvements and Personal Property, including, but not limited to, risk of loss from fire and other hazards, collapse, transit coverage, vandalism, malicious mischief, theft, earthquake (including earth movement) and sinkholes. The policy shall be in the amount of the full replacement value (as defined in 4.5) of the Improvements and Personal Property and shall contain a deductible amount not to exceed $25,000 or such other amounts provided Landlord has approved such amount in writing. Landlord shall be named as an additional insured. The policy shall include a stipulated value endorsement or agreed amount endorsement and endorsements for contingent liability for operations of building laws, demolition costs, and increased cost of construction.

(b)   Loss or damage by explosion of steam boilers, pressure vessels, or similar apparatus, now or hereafter installed on the Leased Property, in commercially reasonable amounts acceptable to Landlord and with a deductible of no more than $1,000.

(c)   Consequential loss of rents and income coverage insuring against all "all risk" or "special form", as the case may be, risk of physical loss or damage with limits and deductible amounts acceptable to Landlord covering risk of loss during the course of reconstruction, and containing an endorsement for extended period of indemnity of at least 365 days, and shall be written with a stipulated amount of coverage if available at a reasonable premium.

(d)   If the Leased Property is located, in whole or in part, in a federally designated 100-year flood plain area, flood insurance for the Improvements in an amount equal to the lesser of [i] the full replacement value of the Improvements; or [ii] the maximum amount of insurance available for the Improvements under all federal and private flood insurance programs.

(e)   Loss or damage caused by the breakage of plate glass in commercially reasonable amounts acceptable to Landlord.

(f)   Loss or damage commonly covered by blanket crime insurance, including employee dishonesty, loss of money orders or paper currency, depositor's forgery,

13

232657v6

and loss of property of patients accepted by Tenant for safekeeping, in commercially reasonable amounts acceptable to Landlord.

(g)   Rent interruption insurance, rental value insurance or other insurance against loss of rent due to fire and risks now or hereafter embraced by "Extended Coverage", so called. Such rent interruption insurance, rental value insurance or other insurance shall be written and maintained throughout the Term of this Lease in an amount at least equal to the then annual Rent, Additional Rent, Impositions, as defined in herein, and premiums necessary to maintain all the insurance required by this Article 4 (such premiums to be estimated for one year's coverage, if any of the applicable policies are written to cover a longer period).  Such rent or rental value insurance shall name the Tenant and Landlord as their interest may appear, shall be made payable solely to the Landlord, and the original policies (or certificates thereof in the event of blanket coverage) delivered to the Landlord. In the event that the Facility shall be destroyed or damaged, the proceeds of such rent or rental value insurance shall be applied periodically by the Landlord to the payment of the Rent until the restoration of the Facility at which time, provided Tenant is not then in default in the payment of the Rent, any balance of such proceeds shall be returned by Landlord to Tenant; Landlord agrees to allow a reasonable time frame up to 90 days from the date of the Lease to allow tenant to obtain said coverage.

4.2.   Liability Insurance.   At Tenant's expense, Tenant shall maintain liability insurance against the following:

(a)   Claims for personal injury or property damage commonly covered by comprehensive general liability insurance, to Landlord, but with a combined single limit of not less than $1,000,000.00 per claim and $3,000,000 in the aggregate for each occurrence.

(b)   Medical Malpractice, professional liability insurance and personal injury (covered by medical malpractice or professional liability insurance) in amounts and standard at a minimum to be in compliance with Florida law.

(c)   Claims commonly covered by workers' compensation insurance for all persons employed by Tenant on the Leased Property.  Such workers' compensation insurance shall be in accordance with the requirements of all applicable local, state, and federal law.

4.3.   Landlord Right to Carry Insurance.   Notwithstanding anything herein contained Landlord shall have the option to obtain all insurance required to be carried by Tenant hereunder and which coverage can be obtained under a master or blanket policy obtained by Landlord and Tenant shall pay the cost (or allocable cost) of such insurance obtained by Landlord, provided that Landlord furnish Tenant with an invoice or bill for the cost or allocable cost of such insurance.

14

4.4.    Insurance Requirements.   The following provisions shall apply to all insurance coverages required hereunder:

(a)    The form and substance of all policies shall be subject to the approval of Landlord, which approval will not be unreasonably withheld.

(b)    The carriers of all policies shall have an AM Best's Rating of "A" or better and a Best's Financial Category of XII or higher and shall be authorized to do insurance business in the State of Florida.

(c)    Tenant shall be the "named insured" and Landlord shall be an "additional insured" on each policy.   Lender shall be an "additional insured" on all property insurance policies.

(d)     Tenant shall deliver to Landlord certificates or policies showing the required coverages and endorsements.  The policies of insurance shall provide that the policy may not be canceled or not renewed, and no material change or reduction in coverage may be made, without at least 30 days' prior written notice to Landlord.

(e)    The policies shall contain a severability of interest and/or cross-liability endorsement, provide that the acts or omissions of Tenant or Landlord will not invalidate the coverage of the other party, and provide that Landlord shall not be responsible for payment of premiums.

(f)    All loss adjustment shall require the written consent of Landlord and Tenant, as their interests may appear.

(g)    At least 30 days prior to the expiration of each insurance policy, Tenant shall deliver to Landlord a certificate showing renewal of such policy and payment of the annual premium therefore and a current Certificate of Compliance (in the form delivered at the time of Closing) completed and signed by Tenant's insurance agent.

4.5.    Replacement Value.   The term "full replacement value" means the actual replacement cost thereof from time to time, including increased cost of construction endorsement, with no reductions or deductions. Tenant shall, in connection with each annual policy renewal, deliver to Landlord a redetermination of the full replacement value by the insurer or an endorsement indicating that the Leased Property is insured for its full replacement value. If Tenant makes any Permitted Alterations (as hereinafter defined) to the Leased Property, Landlord may have such full replacement value redetermined at any time after such Permitted Alterations are made, regardless of when the full replacement value was last determined.

4.6.    Blanket Policy.   Notwithstanding  anything to the contrary contained in this Article 4, Tenant may carry the insurance required by this Article under a blanket policy of insurance, provided that the coverage afforded Tenant will not be   reduced   or

15

diminished or otherwise be different from that which would exist under a separate policy meeting all of the requirements of this Lease.

4.7.    No Separate Insurance. Tenant shall not take out separate insurance concurrent in form or contributing in the event of loss with that required in this Article, or increase the amounts of any then existing insurance, by securing an additional policy or additional policies, unless all parties having an insurable interest in the subject matter of the insurance, including Landlord and any mortgagees, are included therein as additional insureds or loss payees, the loss is payable under said insurance in the same manner as losses are payable under this Lease, and such additional insurance is not prohibited by the existing policies of insurance. Tenant shall immediately notify Landlord of the taking out of such separate insurance or the increasing of any of the amounts of the existing insurance by securing an additional policy or additional policies.

4.8.    Waiver of Subrogation. Each party hereto hereby waives any and every claim which arises or may arise in its favor and against the other party hereto during the Term for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Leased Property, which loss or damage is covered by valid and collectible insurance policies, to the extent that such loss or damage is recoverable under such policies. Said mutual waiver shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss or damage to property of the parties hereto. Inasmuch as the said waivers will preclude the assignment of any aforesaid claim by way of subrogation (or otherwise) to an insurance company (or any other person), each party hereto agrees immediately to give each insurance company which has issued to it policies of insurance, written notice of the terms of said mutual waivers, and to have such insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverage by reason of said waivers, so long as such endorsement is available at a reasonable cost.

4.9.    Mortgages. Tenant shall obtain a standard form of Lender's loss payable clause insuring the interest of the Lender or any other mortgagee. Tenant shall deliver evidence of insurance to the Lender or any other mortgagee. Any loss adjustment shall require the consent of the Lender or any other mortgagee. Tenant shall provide such other insurance information and documents as may be required by the Lender or any other mortgagee.

4.10.    Escrows. After an Event of Default occurs hereunder, Tenant shall make such periodic payments of insurance premiums in accordance with Landlord's requirements after receipt of notice thereof from Landlord.

4.11.    Lender Insurance Requirements. Tenant agrees to comply with all the insurance requirements of Lender.

16

## ARTICLE 5: INDEMNITY

5.1.    Tenant's Indemnification.  Tenant hereby indemnifies and agrees to hold harmless Landlord   and   it's officers, directors and shareholders   (jointly   and severally, "Indemnified Party"), any successors or assigns of Indemnified Party, and Indemnified Party's and such successor's and assign's directors, officers, employees and agents from and against any and all demands, claims, causes of action, fines, penalties, damages (including   consequential   damages),   losses, liabilities (including strict liability), judgments,  and expenses (including, without limitation, reasonable attorneys' fees, court costs; and the costs set forth in  8.7) incurred in connection with or arising from: [i] the use or occupancy of the Leased Property by Tenant or any persons claiming under Tenant; [ii] any activity, work, matter or cause, or permitted or suffered by Tenant in or about the Leased Property; [iii] any acts, omissions, or negligence of Tenant or any person claiming under Tenant, or the contractors, agents, employees, invitees, or visitors of Tenant or any such person; [iv] any breach, violation, or nonperformance  by  Tenant or any person claiming under Tenant or the employees, agents, contractors, invitees, or visitors of Tenant or of any such person, of any term, covenant, or provision of this Lease or any law, ordinance, or governmental requirement of any kind, including, without limitation, any failure to comply with any applicable requirements under the ADA; [v] any injury or damage to the person, property or business of Tenant, its employees, agents, contractors, invitees, visitors, or any other person entering upon the Leased Property; [vi] any construction, alterations, changes or demolition of the Facility performed by or contracted for by Tenant or its employees, agents or contractors; [vii] any obligations, costs or expenses arising under any Permitted Exceptions; and [viii] any claim under a Loan Document arising from the acts or omissions of Tenant, including, but not limited to, (a) any claim against Landlord under an Indemnity Agreement granted by Landlord to Lender; and (b) any applicable make-whole premium payable to Lender as a result of an acceleration of the Loan. If any action or proceeding is brought against Landlord, its employees, or agents by reason of any such claim, Tenant, upon notice from Landlord, will defend the claim at Tenant's expense with counsel reasonably satisfactory to Landlord. All amounts payable to Landlord under this section shall be payable on written demand and any such amounts which are not paid within 10 days after demand therefore by Landlord shall bear interest at Landlord's rate of return as provided in the Commitment. In case any action, suit or proceeding is brought against Tenant by reason of any such occurrence, Tenant shall use its commercially reasonable efforts to defend such action, suit or proceeding.  Nothing in this  5.1 shall be construed as requiring Tenant to indemnify Landlord with respect to Landlord's own gross negligence or willful misconduct or with respect to any claim under the Loan Documents arising from the acts or omissions of Landlord.

5.1.1.    Notice of Claim.  Landlord shall notify Tenant in writing of any claim or action brought against Landlord in which indemnity may be sought against Tenant pursuant to this section.  Such notice shall be given in sufficient time to allow Tenant to

17

defend or participate in such claim or action, but the failure to give such notice in sufficient time shall not constitute a defense hereunder nor in any way impair the obligations of Tenant under this section unless the failure to give such notice precludes Tenant's defense of any such action.

5.1.2.   Survival of Covenants.  The covenants of Tenant contained in this section shall remain in full force and effect after the termination of this Lease until the expiration of the period stated in the applicable statute of limitations during which a claim or cause of action may be brought and payment in full or the satisfaction of such claim or cause of action and of all expenses and charges incurred by Landlord relating to the enforcement of the provisions herein specified.

5.1.3.   Reimbursement of Expenses.  Unless prohibited by law, Tenant hereby agrees to pay to Landlord all of the reasonable fees, charges and reasonable out-of-pocket expenses related to the Facility and required hereby, or incurred by Landlord in enforcing the provisions of this Lease.

5.2.   Environmental Indemnity; Audits.  Tenant hereby indemnifies and agrees to hold harmless Landlord, any successors to Landlord's interest in this Lease, and Landlord's and such successors' directors, officers, employees and agents from and against any losses, claims, damages (including consequential damages), penalties, fines, liabilities (including strict liability), costs (including cleanup and recovery costs), and expenses (including expenses of litigation and reasonable consultants' and attorneys' fees) incurred by Landlord or any other indemnitee or assessed against any portion of the Leased Property by virtue of any claim or lien by any governmental or quasi-governmental unit, body, or agency, or any third party, for cleanup costs or other costs pursuant to any Environmental Law. Tenant's indemnity shall survive the termination of this Lease. Provided, however, Tenant shall have no indemnity obligation with respect to [i] Hazardous Materials first introduced to the Leased Property prior to the Effective Date or subsequent to the date that Tenant's occupancy of the Leased Property shall have fully terminated; or [ii] Hazardous Materials introduced to the Leased Property by Landlord, its agent, employees, successors or assigns or any third party. If at any time during the Term of this Lease any governmental authority notifies Landlord or Tenant of a violation of any Environmental Law or Landlord reasonably believes that a Facility may violate any Environmental Law, Landlord may require one or more environmental audits of such portion of the Leased Property, in such form, scope and substance as specified by Landlord, at Tenant's expense. Tenant shall, within 30 days after receipt of an invoice from Landlord, reimburse Landlord for all costs and expenses incurred in reviewing any environmental audit, including, without limitation, reasonable attorneys' fees and costs.

5.3.   Limitation of Landlord's Liability.  Landlord, its agents, and employees, will not be liable for any loss, injury, death, or damage (including consequential damages) to persons, property, or Tenant's business occasioned by theft, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, requisition, order of

18

governmental body or authority, fire, explosion, falling objects, steam, water, rain or snow, leak or flow of water (including water from the elevator system), rain or snow from the Leased Property or into the Leased Property or from the roof, street, subsurface or from any other place, or by dampness or from the breakage, leakage, obstruction, or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning, or lighting fixtures of the Leased Property, or from construction, repair, or alteration of the Leased Property or from any acts or omissions of any other occupant or visitor of the Leased Property, or from any other cause beyond Landlord's control.

## ARTICLE 6:  USE AND ACCEPTANCE OF PREMISES

6.1.   Use of Leased Property.   Tenant shall use and occupy the Leased Property exclusively for a 120 bed long-term skilled nursing care and rehabilitative facility and all lawful and licensed ancillary uses and for no other purpose without the prior written consent of Landlord which consent may be given or withheld in Landlord's sole and absolute discretion. Tenant shall obtain and maintain, at it's cost, all approvals, licenses, and consents needed to use and operate the Leased Property as herein permitted. Tenant shall deliver to Landlord complete copies of surveys, examinations, certification and licensure inspections, compliance certificates, and other similar reports issued to Tenant by any governmental agency within 10 days after Tenant's receipt of each item. No use shall be made or permitted to be made of the Leased Property and the Facility, and no acts shall be done, which will cause the cancellation of any insurance policy covering the Leased Property and the Facility or any part thereof, nor shall Tenant sell or otherwise provide to residents or patients therein, or permit to be kept, used or sold in or about the Leased Property or the Facility any article which may be prohibited by law or by the standard form of fire insurance policies, or any other insurance policies required to be carried hereunder, or fire underwriters regulations. Tenant shall, at its sole cost, comply with all of the requirements pertaining to the Leased Property and the Facility or other improvements of any insurance board, association, organization or company necessary for the maintenance of insurance, as herein provided, covering the Leased Property and the Facility and the Personal Property thereon. Tenant covenants and agrees that during the Term of this Lease, Tenant shall continuously operate the Leased Property and the Facility as a 120 bed long-term skilled nursing care and rehabilitative facility throughout the Lease Term in accordance with all applicable Legal Requirements. Tenant shall maintain its certifications for reimbursement and licensure and its accreditation, if compliance with accreditation standards is required to maintain the operations of the Facility and if a failure to comply would adversely affect operations. Tenant shall not (i) reduce or otherwise "bank" the number of beds of the Facility from those licensed or certified as of the date hereof or (ii) otherwise materially modify the services offered or take any other affirmative action at the Facility which materially reduces the fair market value of the Facility.

19

6.2.   Acceptance of Leased Property.   Tenant acknowledges that [i] Tenant and its agents have had an opportunity to inspect the Leased Property; [ii] Tenant has found the Leased Property fit for Tenant's use; [iii] Landlord will deliver the Leased Property to Tenant in "as-is" condition; [iv] Landlord is not obligated to make any improvements or repairs to the Leased Property; and [v] the roof, walls, foundation, heating, ventilating, air conditioning, telephone, sewer, electrical, mechanical, elevator, utility, plumbing, and other portions of the Leased Property are in good working order. Tenant waives any claim or action against Landlord with respect to the condition of the Leased Property. LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN RESPECT OF THE LEASED PROPERTY OR ANY PART THEREOF, EITHER AS TO ITS FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT, IT BEING AGREED THAT ALL SUCH RISKS ARE TO BE BORNE BY TENANT.

6.3.   Conditions of Use and Occupancy.   Tenant agrees that during the Term it shall use and keep the Leased Property in a careful, safe and proper manner; not commit or suffer waste thereon; not use or occupy the Leased Property for any unlawful purposes; not use or occupy the Leased Property or permit the same to be used or occupied, for any purpose or business deemed extra-hazardous on account of fire or otherwise; keep the Leased Property in such repair and condition as may be required by the Board of Health, or other city, state or federal authorities, free of all cost to Landlord; not permit any acts to be done which will cause the cancellation, invalidation, or suspension of any insurance policy; and permit Landlord and its agents to enter upon the Leased Property at all reasonable times to examine the condition thereof. Landlord shall have the right to have a bi-annual (twice a year) inspection of the Leased Property performed and Tenant shall pay an inspection fee of the lesser of $1,500.00 or Landlord's reasonable out-of-pocket expenses within 30 days after receipt of Landlord's invoice. All of Landlord's inspection rights are subject to the rights of privacy of patients. Without limiting the foregoing or any other provision of this Lease, Tenant shall use commercially reasonable efforts to not create or permit to exist in or about the Leased Property any condition conducive to the growth of Biological Toxins. For this purpose, a condition conducive to the growth of Biological Toxins shall include the presence of wet or damp wood, wet or damp cellulose wallboard or other wet or damp materials which may constitute a food supply for Biological Toxins, including waste food and beverages.

6.4.   Preservation of Facility Values.   Except as required for medically appropriate reasons or for the welfare of a resident or the other residents in the Facility and subject to the legal rights of a patient and other residents, during the Term and 120 days after the expiration or earlier termination of this Lease, Tenant shall not recommend or solicit the removal or transfer of any resident or patient from the Facility to any other facility or institution owned, operated or managed by Tenant or any affiliate of Tenant or in which Tenant or any such affiliate has any direct or indirect economic interest.

20

232657v6

## ARTICLE 7: MAINTENANCE AND MECHANICS' LIENS

7.1.    <u>Maintenance.</u> Tenant shall maintain, repair, and replace the Leased Property, including, without limitation, all structural and nonstructural repairs and replacements to the roof (including a new replacement roof if needed), foundations, exterior walls, HVAC systems, equipment, parking areas, sidewalks, water, sewer and gas connections, pipes and mains. Tenant shall be required to upgrade, repair or replace all structural and nonstructural items as may be required to bring the Leased Property into compliance with any currently existing or to be enacted environmental law (including any existing or new laws enacted during the term of this lease, or any extension as they may relate to global warming). Tenant shall pay, as Additional Rent, the full cost of maintenance, repairs, and replacements. Tenant shall maintain all drives, sidewalks, parking areas, and lawns on or about the Leased Property in a clean and orderly condition, free of accumulations of dirt, rubbish, snow and ice. Tenant shall at all times maintain, operate and otherwise manage the Leased Property on a basis and in a manner consistent with the standards currently maintained by Tenant at the Leased Property. All repairs shall, to the extent reasonably achievable, be at least equivalent in quality to the original work or the property to be repaired shall be replaced. Tenant will not take or omit to take any action the taking or omission of which might materially impair the value or the usefulness of the Leased Property or any parts thereof as a long-term skilled nursing care and rehabilitative facility. Tenant shall permit Landlord to inspect the Leased Property at all reasonable times and on reasonable advance notice, and if Landlord has a reasonable basis to believe that there are maintenance problem areas and gives Tenant written notice thereof setting forth its concerns in reasonable detail, Tenant shall deliver to Landlord a plan of correction within 10 Business Days after receipt of the notice. Thereafter, Tenant shall diligently pursue correction of all problem areas within 30 days after receipt of the notice or such longer period as may be necessary for reasons beyond its reasonable control such as shortage of materials or delays in securing necessary permits, but not caused by lack of diligence by Tenant and, upon expiration of the 30-day period, shall deliver evidence of completion to Landlord or an interim report evidencing Tenant's diligent progress towards completion and, at the end of the next 30-day period, evidence of satisfactory completion. Upon completion, Landlord shall have the right to re-inspect the Facility and Tenant shall pay the Landlord's reasonable out-of-pocket expenses for such inspection costs, presently agreed to be $1,000 per inspection visit within 30 days after receipt of Landlord's invoice, provided that such inspection visits for which Tenant shall be charged an inspection fee shall be no more frequent than twice in any twelve month period. At each inspection of the Leased Property by Landlord, the Facility employee in charge of maintenance shall be available to tour the Facility with Landlord and answer questions.

7.2.    <u>Required Alterations.</u> Tenant shall, at Tenant's sole cost and expense, make any additions, changes, improvements or alterations to the Leased Property, including

21

232657v6

structural alterations, which may be required by any governmental authorities, including those required to maintain licensure or certification under the Medicare and Medicaid programs (if so certified), whether such changes are required by Tenant's use, changes in the law, ordinances, or governmental regulations, defects existing as of the date of this Lease, or any other cause whatsoever. All such additions, changes, improvements or alterations shall be deemed to be Permitted Alterations and shall comply with all laws requiring such alterations and with the provisions of 16.4.

7.3.   Mechanic's Liens.   Tenant shall have no authority to permit or create a lien against Landlord's interest in the Leased Property, and Tenant shall post notices or file such documents as may be required to protect Landlord's interest in the Leased Property against liens. Tenant hereby agrees to defend, indemnify, and hold Landlord harmless from and against any mechanic's liens against the Leased Property by reason of work, labor, services or materials supplied or claimed to have been supplied on or to the Leased Property. Subject to Tenant's right to contest the same in accordance with the terms of this Lease, Tenant shall remove, bond-off, or otherwise obtain the release of any mechanic's lien filed against the Leased Property within 10 days after notice of the filing thereof. Tenant shall pay all expenses in connection therewith, including, without limitation, damages, interest, court costs and reasonable attorneys' fees.

7.4.   Replacements of Fixtures and Landlord's Personal Property.   Tenant shall not remove Fixtures and Landlord's Personal Property from the Leased Property except to replace the Fixtures and Landlord's Personal Property with other similar items of equal quality and value. Items being replaced by Tenant shall be and remain the property of Landlord. Tenant shall execute, upon written request from Landlord, any and all documents necessary to evidence Landlord's ownership of Landlord's Personal Property and replacements therefore.

## ARTICLE 8: DEFAULTS AND REMEDIES

8.1.   Events of Default.   The occurrence of any one or more of the following shall be an event of default ("Event of Default") hereunder without any advance notice to Tenant unless specified herein:

(a)   Tenant fails to pay in full any installment of Rent, any Additional Rent or any other monetary obligation payable by Tenant under this Lease within 5 days after such payment is due.

(b)   Tenant fails to comply with any covenant set forth in Articles 14, 15.6, 15.8 or 15.12 of this Lease.

232657v6

(c)   Tenant fails to observe and perform any other covenant, condition or agreement under this Lease to be performed by Tenant and [i] such failure continues for a period of 15 days after written notice thereof is given to Tenant by Landlord; or [ii] if, by reason of the nature of such default it cannot be remedied within 15 days, Tenant fails to proceed with diligence reasonably satisfactory to Landlord after receipt of the notice to cure the default or, in any event, fails to cure such default within 120 days after receipt of the notice; provided, however, that any such notice shall be in lieu of, and not in addition to, any notice required under Florida law. The foregoing notice and cure provisions do not apply to any Event of Default otherwise specifically described in any other subsection of 8.1.

(d)   Tenant abandons or vacates (except during a period of repair or reconstruction after damage, destruction or a Taking) the Facility Property or any material part thereof, ceases to operate the Facility, ceases to do business or ceases to exist for any reason for any one or more days.

(e)   [i] The filing by Tenant of a petition under the Bankruptcy Code or the commencement of an insolvency or similar proceeding by Tenant; [ii] the failure by Tenant within 90 days to dismiss an involuntary bankruptcy petition or other commencement of a bankruptcy, reorganization or similar proceeding against such party, or to lift or stay any execution, garnishment or attachment of such consequence as will impair its ability to carry on its operation at the Leased Property; [iii] the entry of an order for relief under the Bankruptcy Code in respect of Tenant; [iv] any assignment by Tenant for the benefit of its creditors; [v] the entry by Tenant into an agreement of composition with its creditors; [vi] the approval by a court of competent jurisdiction of a petition applicable to Tenant in any proceeding for its reorganization instituted under the provisions of any state or federal bankruptcy, insolvency, or similar laws; [vii] appointment by final order, judgment, or decree of a court of competent jurisdiction of a receiver of a whole or any substantial part of the properties of Tenant (provided such receiver shall not have been removed or discharged within 60 days of the date of his qualification).

(f)   [i] Any receiver, administrator, custodian or other person takes possession or control of any of the Leased Property and continues in possession for 10 days; [ii] any writ against any of the Leased Property is not released within 30 days; [iii] any judgment is rendered or proceedings are instituted against the Leased Property or Tenant which adversely affect the Leased Property or any part thereof, which is not dismissed for 60 days (except as otherwise provided in this section); [iv] all or a substantial part of the assets of Tenant are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any receiver, trustee, custodian, or assignee for the benefit of creditors; [v] Tenant is enjoined, restrained, or in any way prevented by court order, or any proceeding is filed or commenced seeking to enjoin, restrain or in any way prevent Tenant from conducting all or a substantial part of its business or affairs; or [vi] except as otherwise permitted hereunder, a final notice of lien, levy or assessment is filed of record with respect to all or any part of the Leased Property or

23

any property of Tenant located at the Leased Property and is not dismissed, discharged, or bonded-off within 30 days.

(g)     Any representation or warranty made by Tenant in this Lease or any other document executed in connection with this Lease, any guaranty of or other security for this Lease, or any report, certificate, application, financial statement or other instrument furnished by Tenant pursuant hereto or thereto shall prove to be materially false, misleading or incorrect in any material respect as of the date made.

(h)     Tenant or any of its Affiliates defaults on any indebtedness or obligation to Landlord, or any agreement with Landlord, including, but not limited to a default under the Note referred to in Section 14.6 hereof. This provision applies to all such indebtedness, obligations and agreements as they may be amended, modified, extended, or renewed from time to time.

(i)     Any guarantor of this Lease dies, dissolves, terminates, is adjudicated incompetent, files a petition in bankruptcy, or is adjudicated insolvent under the Bankruptcy Code or any other insolvency law, or fails to comply with any covenant or requirement of such guarantor set forth in this Lease or in the guaranty of such guarantor, which is not cured within any applicable cure period.

(j)     The license for the Facility or any other Government Authorization is canceled, suspended, reduced to provisional or temporary, or otherwise invalidated, or license revocation or decertification proceedings are commenced against Tenant, and in each instance, such action is not stayed pending appeal, or, as a result of the acts or omissions of Tenant, any reduction occurs in the number of licensed beds or units at the Facility, or an admissions ban is issued for the Facility and remains in effect for a period of more than 15 days.

(k)     The occurrence of any change in Tenant's or QIS Management LLC's ownership or management including, without limitation, should Timothy Reardon no longer be an shareholder or officer of Tenant and/or QIS Management LLC.

(l)     The occurrence of any citation in any survey by the state or federal agencies that exceeds a level F as set forth in the CMS Scope and Severity Matrix.

(m)     if the average monthly patient or resident census for the Leased Property falls below 88% in any month;

(n)     if the Leased Property is ever placed on any sort of "watch" list, list of substandard facilities or any other sort or type of list put out by the State of Florida, the Medicaid or Medicare programs for nursing homes whereby nursing home facilities are identified as being below normal or acceptable standards for nursing home facilities in general.

24

232657v6

(o)      If Tenant enters into an agreement with any union without obtaining Landlord's prior written consent.

8.2.    Remedies.  Upon the occurrence of an Event of Default under this Lease or any Lease Document, and at any time thereafter until Landlord waives the default in writing or acknowledges cure of the default in writing, at Landlord's option,  without declaration, notice of nonperformance, protest, notice of protest, notice of default, notice to quit or any other notice or demand of any kind, Landlord may exercise any and all rights and remedies provided in this Lease or any Lease Document or otherwise provided under law or in equity, including, without limitation, any one or more of the following remedies:

(a)      Landlord may re-enter and take possession of the Leased Property without terminating this Lease, and lease the Leased Property for the account of Tenant, holding Tenant liable for all costs of Landlord in reletting the Leased Property and for the difference in the amount received by such reletting and the amounts payable by Tenant under the Lease.

(b)      Landlord may terminate this Lease by written notice to Tenant, exclude Tenant from possession of the Leased Property and use commercially reasonable efforts to lease the Leased Property to others, holding Tenant liable for the difference in the amounts received from such reletting and the amounts payable by Tenant under this Lease.

(c)      Landlord may re-enter the Leased Property and have, repossess and enjoy the Leased Property as if this Lease had not been made, and in such event, Tenant and its successors and assigns shall remain liable for any contingent or unliquidated obligations or sums owing at the time of such repossession.

(d)      Landlord may have access to and inspect, examine and make copies of the books and records and any and all accounts, data and income tax and other returns of Tenant insofar as they pertain to the Leased Property subject to landlord's obligation to maintain the confidentiality of any patient or employee information in accordance with the requirements of applicable State or federal law.

(e)      Landlord may terminate Tenant's right to possession of the Leased Property by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Leased Property to Landlord. In such event Landlord shall be entitled to recover from Tenant all amounts which Landlord is entitled to recover pursuant to Florida law, but not limited to:

(i)      The worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

25

(ii)     The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss Tenant proves reasonably could have been avoided; plus

(iii)     The worth at the time of award of the amount by which the unpaid Rent for the balance of the term of this Lease after the time of award exceeds the amount of such rental loss that Tenant proves reasonably could be avoided; plus

(iv)     any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including any amount expended by Landlord to mitigate damages; plus

(v)     the amount of Rent, if any, that is postponed or abated, as well as the amount of any other rent or operating concession, any lease takeover obligation assumed by Landlord, any lease subsidy paid by Landlord or any other bonus, lease cancellation payment, inducement or concession for Tenant's entering into this Lease; and

(vi)     At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable Florida law.

As used in clauses (i) and (ii) above, the "worth at the time of award" is computed by allowing interest at the lesser of ten percent (10%) per annum or the maximum rate of interest permitted by law. As used in clause (iii) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of Atlanta at the time of award plus one percent (1%).

(f)     Landlord may take whatever action at law or in equity as may appear necessary or desirable to collect the Rent and other amounts payable under this Lease then due and thereafter to become due, or to enforce performance and observance of any obligations, agreements or covenants of Tenant under this Lease.

(g)     With respect to the Collateral or any portion thereof and Secured Party's security interest therein, Secured Party may exercise all of its rights as secured party under Article 9 of the Uniform Commercial Code. Secured Party may sell the Collateral by public or private sale upon five days notice to Tenant. Tenant agrees that a commercially reasonable manner of disposition of the Collateral shall include, without limitation and at the option of Secured Party, a sale of the Collateral, in whole or in part, concurrently with the sale of the Leased Property.

(h)     Reserved.

(i)     Without waiving any prior or subsequent Event of Default, Landlord may waive any Event of Default or, with or without waiving any Event of Default, remedy any default.

26

232657v6

(j)      Landlord may terminate its obligation, if any, to disburse any payments to or on behalf of Tenant.

(k)      Landlord may enter and take possession of the Land and the Facility without terminating this Lease and complete construction and renovation of the Improvements (or any part thereof) and perform the obligations of Tenant under the Lease Documents. Without limiting the generality of the foregoing and for the purposes aforesaid, Tenant hereby appoints Landlord its lawful attorney-in-fact with full power to do any of the following: [i] complete construction, renovation and equipping of the Improvements in the name of Tenant only to the extent Tenant has prepared plans and specifications for such new Improvements; [ii] use funds that may be reserved, escrowed, or set aside for any purposes hereunder at any time to complete the Improvements only to the extent Tenant has prepared plans and specifications for such Improvements; [iii] make changes in the plans and specifications that shall be necessary or desirable to complete the Improvements in substantially the manner contemplated by the plans and specifications; [iv] retain or employ new general contractors, subcontractors, architects, engineers, and inspectors as shall be reasonably required for said purposes; [v] pay, settle, or compromise all existing bills and claims, which may be liens or security interests, or to avoid such bills and claims becoming liens against the Facility or security interest against fixtures or equipment, or as may be necessary or desirable for the completion of the construction and equipping of the Improvements or for the clearance of title; [vi] execute all applications and certificates, in the name of Tenant, that may be required in connection with any such construction; [vii] do any and every act that Tenant might do in its own behalf, to prosecute and defend all actions or proceedings in connection with the Improvements; and [viii] to execute, deliver and file all applications and other documents and take any and all actions necessary to transfer the operations of the Facility to Secured Party or Secured Party's designee. This power of attorney is a power coupled with an interest and cannot be revoked.

(l)      Landlord may apply, with or without notice to Tenant, for the appointment of a receiver ("Receiver") for Tenant or Tenant's business or for the Leased Property. Unless prohibited by law, such appointment may be made either before or after termination of Tenant's possession of the Leased Property, without notice, without regard to the solvency or insolvency of Tenant at the time of application for such Receiver and without regard to the then value of the Leased Property, and Secured Party may be appointed as Receiver. After the occurrence and during the continuance of an Event of Default, Landlord shall be entitled to appointment of a receiver as a matter of right and without the need to make any showing other than the existence of an Event of Default. The Receiver shall have the power to collect the rents, income, profits and Receivables of the Leased Property during the pendency of the receivership and all other powers which may be necessary or are usual in such cases for the protection, possession, control, management and operation of the Leased Property during the whole of said proceeding. All sums of money received by the Receiver from such rents and income, after deducting therefrom the reasonable charges and expenses paid or incurred in connection with the collection and disbursement thereof, shall be applied to the payment of the Rent or any other monetary obligation of Tenant under this Lease,

27

232657v6

including, without limitation, any losses or damages incurred by Landlord under this Lease. Tenant, if requested to do so, will consent to the appointment of any such Receiver as aforesaid.

(m) Landlord may terminate any management agreement with respect to any of the Leased Property and shall have the right to retain one or more managers for the Leased Property at the expense of Tenant, such manager(s) to serve for such term and at such compensation as Landlord reasonably determines is necessary under the circumstances.

8.3. <u>Right of Setoff.</u> Landlord may, and is hereby authorized by Tenant to, at any time and from time to time without advance notice to Tenant (any such notice being expressly waived by Tenant), setoff or recoup and apply any and all sums held by Landlord, any indebtedness of Landlord to Tenant, and any claims by Tenant against Landlord, against any obligations of Tenant hereunder and against any claims by Landlord against Tenant, whether or not such obligations or claims of Tenant are matured and whether or not Landlord has exercised any other remedies hereunder. The rights of Landlord under this section are in addition to any other rights and remedies Landlord may have against Tenant.

8.4. <u>Performance of Tenant's Covenants.</u> Landlord may perform any obligation of Tenant which Tenant has failed to perform within five days after Landlord has sent a written notice to Tenant informing it of its specific failure, except that in case of an emergency, Landlord shall not be required to give advance notice. Tenant shall reimburse Landlord on demand, as Additional Rent, for any expenditures thus incurred by Landlord and shall pay interest thereon at Landlord's rate of return as provided in the Commitment.

8.5. <u>Late Payment Charge.</u> Tenant acknowledges that any default in the payment of any installment of Rent payable hereunder will result in loss and additional expense to Landlord in servicing any indebtedness of Landlord secured by the Leased Property, handling such delinquent payments, and meeting its other financial obligations, and because such loss and additional expense is extremely difficult and impractical to ascertain, Tenant agrees that in the event any Rent payable to Landlord hereunder is not paid within 3 days after the due date, Tenant shall pay a late charge of 5% of the amount of the overdue payment as a reasonable estimate of such loss and expenses, unless applicable law requires a lesser charge, in which event the maximum rate permitted by such law may be charged by Landlord. The 3-day grace period set forth in this section shall not extend the time for payment of Rent or the period for curing any default or constitute a waiver of such default.

8.6. <u>Default Rent.</u> At Landlord's option at any time after the occurrence of an Event of Default and while such Event of Default remains uncured, the Base Rent payable under this Lease shall be increased to a 12% per annum ("Default Rent"); provided, however, that if a court of competent jurisdiction determines that any other amounts

28

payable under this Lease are deemed to be interest, the Default Rent shall be adjusted to ensure that the aggregate interest payable under this Lease does not accrue at a rate in excess of the maximum legal rate.

8.7.    <u>Cost and Expenses</u>. Tenant shall pay all reasonable costs and expenses incurred by Landlord in enforcing or preserving Landlord's rights under this Lease, whether or not an Event of Default has actually occurred or has been declared and thereafter cured, including incurred with respect to any litigation or claims arising with respect to this Lease and the parties performance of its obligations hereunder including without limitation, [i] the fees, expenses, and costs of any litigation, appellate, receivership, administrative, bankruptcy, insolvency or other similar proceeding; [ii] reasonable attorney, paralegal, consulting and witness fees and disbursements; and [iii] the expenses, including, without limitation, lodging, meals, and transportation, of Landlord and its employees, agents, attorneys, and witnesses in preparing for litigation, administrative, bankruptcy, insolvency or other similar proceedings and attendance at hearings, depositions, and trials in connection therewith. All such reasonable costs, expenses, charges and fees payable by Tenant shall be deemed to be Additional Rent under this Lease.

8.8.    <u>Escrows and Application of Payments</u>. As security for the performance of the Tenant hereby assigns to Landlord all its right, title, and interest in and to all monies escrowed with Landlord under this Lease and all deposits with utility companies, taxing authorities and insurance companies; provided, however, that Landlord shall not exercise its rights hereunder until an Event of Default has occurred. Any payments received by Landlord under any provisions of this Lease during the existence or continuance of an Event of Default shall be applied to the Tenants obligations in the order which Landlord may determine.

8.9.    <u>Remedies Cumulative</u>. The remedies of Landlord herein are cumulative to and not in lieu of any other remedies available to Landlord at law or in equity. The use of any one remedy shall not be taken to exclude or waive the right to use any other remedy.

8.10.    <u>Waivers</u>. Tenant waives [i] any notice required by statute or other law as a condition to bringing an action for possession of, or eviction from, any of the Leased Property, [ii] any right of re-entry or repossession, [iii] any right to a trial by jury in any action or proceeding arising out of or relating to this Lease, [iv] any right of redemption whether pursuant to statute, at law or in equity, [v] all presentments, demands for performance, notices of nonperformance, protest, notices of protest, notices of dishonor, notices to quit and any other notice or demand of any kind other than those specifically provided for in this Lease, and [vi] all notices of the existence, creation or incurring of any obligation or advance under this Lease before or after this date. Without limiting the foregoing, Tenant hereby waives any right of redemption or relief from forfeiture under Florida Law, and under any present or future statutes or case

29

decisions to the same effect, in the event Tenant is evicted or Landlord takes possession of the Leased Property by reason of any Event of Default by Tenant hereunder

8.11. <u>Obligations under the Bankruptcy Code</u>. Upon filing of a petition by or against Tenant under the Bankruptcy Code, Tenant, as debtor and as debtor-in-possession, and any trustee who may be appointed with respect to the assets of or estate in bankruptcy of Tenant, agrees to pay monthly in advance on the first day of each month, as reasonable compensation for the use and occupancy of the Leased Property, an amount equal to all Rent due pursuant to this Lease. Included within and in addition to any other conditions or obligations imposed upon Tenant or its successor in the event of the assumption and/or assignment of this Lease are the following: [i] the cure of any monetary defaults and reimbursement of pecuniary loss within not more than five Business Days of assumption and/or assignment; [ii] the deposit of an additional amount equal to not less than three months' Rent, which amount is agreed to be a necessary and appropriate deposit to adequately assure the future performance under this Lease of the Tenant or its assignee; and [iii] the continued use of the Leased Property for the Facility Uses. Nothing herein shall be construed as an agreement by Landlord to any assignment of this Lease or a waiver of Landlord's right to seek adequate assurance of future performance in addition to that set forth hereinabove in connection with any proposed assumption and/or assignment of this Lease.

## ARTICLE 9: DAMAGE AND DESTRUCTION

9.1. <u>Notice of Casualty</u>. If the Leased Property shall be destroyed, in whole or in part, or damaged by fire, flood, windstorm or other casualty in excess of $10,000.00 (a "Casualty"), Tenant shall give written notice thereof to Landlord within two Business Days after the occurrence of the Casualty. Within 15 days after the occurrence of the Casualty or as soon thereafter as such information is reasonably available to Tenant, Tenant shall provide the following information to Landlord: [i] the date of the Casualty; [ii] the nature of the Casualty; [iii] a description of the damage or destruction caused by the Casualty, including the type of Leased Property damaged and the area of the Improvements damaged; [iv] a preliminary estimate of the cost to repair, rebuild, restore or replace the Leased Property; [v] a preliminary estimate of the schedule to complete the repair, rebuilding, restoration or replacement of the Leased Property; [vi] a description of the anticipated property insurance claim, including the name of the insurer, the insurance coverage limits, the deductible amount, the expected settlement amount, and the expected settlement date; and [vii] a description of the business interruption claim, including the name of the insurer, the insurance coverage limits, the deductible amount, the expected settlement amount, and the expected settlement date. Within five days after request from Landlord, Tenant will provide Landlord with copies of all correspondence to the insurer and any other information reasonably requested by Landlord.

30

9.2.   Substantial Destruction.   If the Facility Improvements are substantially destroyed during the Lease Term, Landlord shall have the option to either (i) terminate this Lease or (ii) advise Tenant that it does not want the Facility rebuilt at the Leased Property but will seek to find a replacement site in Broward County, Florida to have the Facility built or opened at such replacement site.   If Landlord does not elect in writing either of the two options in the previous sentence within 120 days after such Casualty, Tenant shall promptly rebuild and restore such Improvements in accordance with Section 9.4 and Landlord shall make the insurance proceeds available to Tenant for such restoration.   The term "substantially destroyed" means any casualty resulting in the loss of use of 50% or more of the licensed beds at the Facility.

9.3.   Partial Destruction.   If the Facility Improvements are not substantially destroyed, and so much of the Leased Property remains that the Leased Property can be used for a 120 bed nursing home, then Tenant shall comply with the provisions of Section 9.4 and Landlord shall make the insurance proceeds available to Tenant for such restoration.

9.4.   Restoration.   Subject to any limitations imposed by law with respect to the rebuilding of the Leased Premises, Tenant shall promptly repair, rebuild, or restore the damaged Leased Property, at Tenant's expense, so as to make the Leased Property at least equal in value to the Leased Property existing immediately prior to such occurrence and as nearly similar to it in character as is practicable and reasonable. Before beginning such repairs or rebuilding with respect to any Casualty, or letting any contracts in connection with such repairs or rebuilding, Tenant will submit for Landlord's approval, which approval Landlord will not unreasonably withhold or delay, plans and specifications meeting the requirements of 16.2 for such repairs or rebuilding. Promptly after receiving Landlord's approval of the plans and specifications, Tenant will begin such repairs or rebuilding and will prosecute the repairs and rebuilding to completion with diligence, subject, however, to strikes, lockouts, acts of God, embargoes, governmental restrictions, and other causes beyond Tenant's reasonable control. Landlord will make available to Tenant the net proceeds of any fire or other casualty insurance paid to Landlord for such repair or rebuilding as the same progresses, after deduction of any costs of collection, including reasonable attorneys' fees.   Payments will be made against properly certified vouchers of a competent architect in charge of the work and approved by Landlord.   Payments for deposits for the repairing or rebuilding or delivery of materials to the Facility will be made upon Landlord's receipt of evidence satisfactory to Landlord that such payments are required in advance. With respect to any Casualty, prior to commencing the repairing or rebuilding, Tenant shall deliver to Landlord for Landlord's approval a schedule setting forth the estimated monthly draws for such work.  Landlord will contribute to such payments out of the insurance proceeds an amount equal to the proportion that the total net amount received by Landlord from insurers bears to the total estimated cost of the rebuilding or repairing, multiplied by the payment by Tenant on account of such work.  Landlord may, however, withhold 10% from each payment until the work is completed and proof has been furnished to Landlord that no lien or liability

31

232657v6

has attached or will attach to the Leased Property or to Landlord in connection with such repairing or rebuilding. Upon the completion of rebuilding and the furnishing of such proof, the balance of the net proceeds of such insurance payable to Tenant on account of such repairing or rebuilding will be paid to Tenant. If required by law as a result of the nature or extent of the damage, Tenant will obtain and deliver to Landlord a temporary or final certificate of occupancy before the damaged Leased Property is reoccupied for any purpose. Tenant shall complete such repairs or rebuilding free and clear of mechanic's or other liens, and in accordance with the building codes and all applicable laws, ordinances, regulations, or orders of any state, municipal, or other public authority affecting the repairs or rebuilding, and also in accordance with all requirements of the insurance rating organization, or similar body. Any remaining proceeds of insurance after such restoration will be Tenant's property.

9.5.    Insufficient Proceeds.   If the proceeds of any insurance settlement are not sufficient to pay the costs of Tenant's repair, rebuilding or restoration under 9.4 in full, Tenant shall deposit with Landlord at Landlord's option, and within 10 days of Landlord's request, an amount sufficient in Landlord's reasonable judgment to complete such repair, rebuilding or restoration or shall provide Landlord with evidence reasonably satisfactory to Landlord that Tenant has available the funds needed to complete such repair, rebuilding or restoration. Tenant shall not, by reason of the deposit or payment, be entitled to any reimbursement from Landlord or diminution in or postponement of the payment of the Rent.

9.6.    Not Trust Funds.   Notwithstanding anything herein or at law or equity to the contrary, none of the insurance proceeds paid to Landlord as herein provided shall be deemed trust funds, and Landlord shall be entitled to dispose of such proceeds as provided in this Article 9. Tenant expressly assumes all risk of loss, including a decrease in the use, enjoyment or value, of the Leased Property from any casualty whatsoever, whether or not insurable or insured against.

9.7.    Landlord's Inspection.  During the progress of such repairs or rebuilding, Landlord and its architects and engineers may, from time to time, inspect the Leased Property and will be furnished, if required by them, with copies of all plans, shop drawings, and specifications relating to such repairs or rebuilding. Tenant will keep all plans, shop drawings, and specifications at the building, and Landlord and its architects and engineers may examine them at all reasonable times and on reasonable notice. If, during such repairs or rebuilding, Landlord and its architects and engineers determine that the repairs or rebuilding are not being done in accordance with the approved plans and specifications, Landlord will give prompt notice in writing to Tenant, specifying in detail the particular deficiency, omission, or other respect in which Landlord claims such repairs or rebuilding do not accord with the approved plans and specifications. Upon the receipt of any such notice, Tenant will cause corrections to be made to any deficiencies, omissions, or such other respect. Tenant's obligations to

32

232657v6

supply insurance, according to Article 4, will be applicable to any repairs or rebuilding under this section.

9.8.   Landlord's Costs. Tenant shall, within 30 days after receipt of an invoice from Landlord,   pay   the reasonable costs, expenses, and fees of any architect or engineer employed by Landlord to review any plans and specifications and to supervise and approve any construction, or for any services rendered by such architect or engineer to Landlord as contemplated by any of the provisions of this   Lease, or for reasonable services performed by Landlord's attorneys in connection therewith.

9.9.   No Rent Abatement; Waiver. Rent   will   not abate pending the repairs or rebuilding of the Leased Property. Tenant waives the provisions of Florida law regarding rent abatement and any present or future laws or case decisions to the same effect

## ARTICLE 10: CONDEMNATION

10.1.   Total Taking. If, by exercise of the right of eminent domain or by conveyance made in response to the threat of the exercise of such right ("Taking"), the entire Leased Property is taken, or so much of the Leased Property is taken that the number of licensed beds/units at the Leased Property is reduced by more than 25% as a result of such Taking, then Landlord shall have the option to either (i) terminate this Lease or (ii) advise Tenant that it does not want the Facility rebuilt at the Leased Property but will seek to find a replacement site in Broward County, Florida to have the Facility built or opened at such replacement site. If Landlord does not elect in writing the second option in the previous sentence within 120 days after such taking, this Lease will end with respect to the Leased Property only on the earlier of the vesting of title to the Leased Property in the condemning authority or the taking of possession of the Leased Property by the condemning authority. If Landlord elects to find a replacement site then this Lease will continue. All damages   awarded   for such Taking under the power of eminent domain shall be the property   of Landlord, whether such damages shall be awarded as compensation for diminution   in value of the   leasehold   or   the fee of the Leased Property, provided, however, nothing herein shall preclude Tenant from pursuing a separate award for the Taking of its Tenant's Property (as defined below) or for relocation costs or expenses.

10.2.   Partial Taking. If, after a Taking, so much of the Leased Property remains that the Leased Property can be used for a 120 bed nursing home, then [i] this Lease will end as to the part taken on the earlier of the vesting of title to such Leased Property in the condemning authority or the taking of possession of the Leased Property by the condemning authority and the Rent will be adjusted accordingly; [ii] at its cost, Tenant

shall restore so much of the Leased Property as remains to a sound architectural unit substantially suitable for the purposes for which it was used immediately before the Taking, using good workmanship and new, first-class materials; [iii] upon completion of the restoration, Landlord will pay Tenant the lesser of the net award made to Landlord on the account of the Taking (after deducting from the total award, reasonable attorneys', appraisers', and other fees and costs incurred in connection with the obtaining of the award and amounts paid to the holders of mortgages secured by the Leased Property), or Tenant's actual out-of-pocket costs of restoring the Leased Property; and [iv] Landlord shall be entitled to the balance of the net award except to the extent specifically allocated to the value of Tenant's Property or any relocation costs or expenses incurred by Tenant as a result of such partial Taking. The restoration shall be completed in accordance with 9.4, 9.5, 9.7, 9.8 and 9.9 with such provisions deemed to apply to condemnation instead of casualty.

10.3.   Condemnation Proceeds Not Trust Funds; Waiver.   Notwithstanding anything in this Lease or at law or equity to the contrary, none of the condemnation award paid to Landlord shall be deemed trust funds, and Landlord shall be entitled to dispose of such proceeds as provided in this Article 10. Tenant expressly assumes all risk of loss, including a decrease in the use, enjoyment, or value, of the Leased Property from any Taking.

## ARTICLE 11:   TENANT'S PROPERTY

11.1.   Tenant's Property.   Tenant shall have the right to install, place, and use on the Leased Property such fixtures, furniture, equipment, inventory and other personal property in addition to Landlord's Personal Property as may be required or as Tenant may, from time to time, deem necessary or useful to operate the Leased Property for its permitted purposes. All fixtures, furniture, equipment, inventory, and other personal property installed, placed, or used on the Leased Property which is owned by Tenant or leased by Tenant from third parties is hereinafter referred to as "Tenant's Property".

11.2.   Requirements for Tenant's Property.   Tenant shall comply with all of the following requirements in connection with Tenant's Property:

(a)     Tenant shall, at Tenant's sole cost and expense, maintain, repair, and replace Tenant's Property.

(b)     Tenant shall, at Tenant's sole cost and expense, keep Tenant's Property insured against loss or damage by fire, vandalism and malicious mischief, sprinkler leakage, earthquake (including earth movement), and other physical loss perils commonly covered

34

232657v6

by fire and extended coverage, boiler and machinery, and difference in conditions insurance in an amount not less than 100% of the then full replacement cost thereof. Tenant shall use the proceeds from any such policy for the repair and replacement of Tenant's Property. The insurance shall meet the requirements of 4.3.

(c)    Tenant shall pay all taxes applicable to Tenant's Property.

(d)    If Tenant's Property is damaged or destroyed by fire or any other cause, Tenant shall have the right, but not the obligation, to repair or replace Tenant's Property (unless the same is required for the operation of the Leased Property in compliance with applicable Legal Requirements, in which case Tenant shall be required to promptly repair or replace the same).

(e)    RESERVED.

(f)    Tenant shall not, without the prior written consent of Landlord or as otherwise provided in this Lease, remove any of Tenant's Property from the Leased Property, except for (i) such property which is being replaced, and (ii) office equipment, computers and computer software paid for by Tenant. Tenant shall, at Landlord's option, remove any of Tenant's Property upon the termination or expiration of this Lease and shall repair any damage to the Leased Property resulting from the removal of Tenant's Property. If Tenant fails to remove Tenant's Property within 30 days after request by Landlord, then Tenant shall be deemed to have abandoned Tenant's Property, Tenant's Property shall become the property of Landlord, and Landlord may remove, store and dispose of Tenant's Property. In such event, Tenant shall have no claim or right against Landlord for such property or the value thereof regardless of the disposition thereof by Landlord. Tenant shall pay Landlord, upon demand, all expenses incurred by Landlord in removing, storing, and disposing of Tenant's Property and repairing any damage caused by such removal. Tenant's obligations hereunder shall survive the termination or expiration of this Lease.

(g)    Tenant shall perform its obligations under any equipment lease or security agreement for Tenant's Property. For equipment loans or leases for critical care equipment and for all other equipment having an original cost in excess of $10,000.00, Tenant shall cause such equipment lessor or lender to enter into a nondisturbance agreement with Landlord upon terms and conditions acceptable to Landlord, including, without limitation, the following: [i] Landlord shall have the right (but not the obligation) to assume such equipment lease or security agreement upon the occurrence of an Event of Default by Tenant hereunder; [ii] such equipment lessor or lender shall notify Landlord of any default by Tenant under the equipment lease or security agreement and give Landlord a reasonable opportunity to cure such default; and [iii] Landlord shall have the right to assign its interest in the equipment lease or security agreement and nondisturbance agreement. Tenant shall, within 30 days after receipt of an invoice from Landlord, reimburse Landlord for all costs and expenses incurred in reviewing and approving the equipment lease, security agreement and

35

nondisturbance agreement, including, without limitation, reasonable attorneys' fees and costs.

## ARTICLE 12: RENEWAL TERM

12.1.   Renewal Term.   Provided that this Lease is in full force and effect and Tenant is not in default beyond any applicable notice and grace period on (i) the date Tenant gives notice to Landlord that it elects to exercise the Renewal Term option, and (ii) the date that the Renewal Term is to commence, this Lease Term may, subject to the terms and conditions set forth in this Article 12, at the option of Tenant, be renewed for one term of three (3) years. The three (3) year renewal term shall commence on June 30, 2013, and expire on midnight June 29, 2016 (the "Renewal Term").

12.2.   Exercise of Option for Renewal Term.   If Tenant wishes to extend the Lease Term for the Renewal Term, then Tenant shall send to Landlord notice that is wishes to extend the Lease Term for the Renewal Term prior to January 1, 2013 ("Renewal Notice").   If Tenant fails to send the Renewal Notice as required by this Section 12.2, including the time limitations contained herein, then Tenant's option to extend the Lease Term for the Renewal Term shall expire and terminate.

12.3.   Terms and Conditions for the Renewal Term.   The Renewal Term shall be on the same terms and conditions as contained in this Lease, except that (i) the provisions of Section 2.1 pertaining to Rent shall not be applicable to the Renewal Term, being replaced by the provisions of Section 12.4 and 12.5 hereof, and (ii) any other provisions of this Lease which are expressly made inapplicable to the Renewal Term.

12.4.   Rent for Renewal Term.

12.4.1 Renewal Term Rent.   The annual Rent payable by Tenant during the first year of the Renewal Term, i.e., June 30, 2013 through June 29, 2014, shall be an amount equal to the greater of (i) a annual Rent of $2,188,263 or (ii) the Rent, as determined pursuant to the provisions of Section 12.4.2 hereof.   The Rent for each succeeding year during the Renewal Term beginning with June 30, 2014 shall equal 103% of the Rent for the preceding twelve month period.

12.4.2 Determination of Renewal Term Rent.   Within thirty (30) days after Landlord's receipt of Tenant's Renewal Notice, Landlord shall submit to Tenant its proposed Rent for the first year of the Renewal Term ("Landlord's Proposed Rent Notice").   If Tenant shall be unwilling to agree to the proposed Rent contained in Landlord's Proposed Rent Notice, then within thirty (30) days after Tenant's receipt of Landlord's Proposed Rent Notice, Tenant shall notify Landlord that (i) it is unwilling to accept the proposed Rent contained therein, and (ii) it shall submit to Landlord its

36

proposed Rent for the first year of the Renewal Term ("Tenant's Proposed Rent Notice").
If Tenant fails to deliver Tenant's Proposed Rent Notice within the time and manner
above provided, then Landlord's proposed Rent for the first year of the Renewal Term set
out in Landlord's Proposed Rent Notice shall be conclusive and binding.  If Tenant shall
send Tenant's Proposed Rent Notice in the time and manner above required, then
Landlord and Tenant shall endeavor in good faith to resolve such dispute on or before the
date which is thirty (30) days after Landlord's receipt of the Tenant's Proposed Rent
Notice.  If Landlord and Tenant shall be unable to resolve such dispute within such thirty
(30) day period, then the Rent the first year of the Renewal Term shall be determined by
arbitration by a single arbitrator in accordance with the Real Estate Valuation Arbitration
Rules of the American Arbitration Association.  The arbitration shall take place in Dade
County, Florida, and the arbitrator appointed shall be an independent real estate appraiser
having not less than ten (10) years experience in appraising the value of interests in
health care facilities and who is a member of the MAI.

   12.4.3  Decision of Arbitrator.  The decision of such arbitrator shall be in writing
and sent to each of Landlord and Tenant in duplicate original counterparts by certified
mail, return receipt requested, or by overnight courier.  The arbitrator, in arriving at his or
her decision, shall be entitled to consider all testimony and documentary evidence that
may be presented at any hearing, as well as facts and data which the arbitrator may
discover by investigation and inquiry outside such hearings.  The arbitrator must select as
the annual Rent for calendar year 2018 either (i) the Rent for the first year of the Renewal
Term contained in Landlord's Proposed Rent Notice, or (ii) the Rent for the first year of
the Renewal Term contained in Tenant's Proposed Rent Notice, whichever, in the
opinion of the arbitrator, is closer to fair market rent for this Lease.  The cost and expense
of such arbitration shall be divided equally between Landlord and Tenant.  The decision
of the arbitrator shall be binding on the parties as to the Rent for the first year of the
Renewal Term, which shall be payable in equal monthly installments in advance on the
first day of each calendar month.  The amount of Rent for each year thereafter during the
Renewal Term shall be 103% of the prior year's annual Rent, payable in equal monthly
installments in advance as of the first day of each month.  The arbitrator's decision must
be rendered at any time prior to the last business day of May, 2013.

## ARTICLE 13: RESERVED

## ARTICLE 14: NEGATIVE COVENANTS

Tenant covenants and agrees that Tenant shall not do any of the following without the
prior written consent of Landlord:

14.1.  No Debt.  Tenant  shall  not create, incur, assume, or permit to exist any
indebtedness  with respect to the Leased Property other than [i] trade debt incurred in

232657v6

the ordinary course of business; and [ii] indebtedness that is secured by any Permitted Lien.

14.2. <u>No Liens</u>. Tenant shall not create, incur, or permit to exist any lien, charge, encumbrance, easement or restriction upon the Leased Property or any lien upon or pledge of any interest in Tenant, except for Permitted Liens.

14.3. <u>No Guaranties</u>. Tenant shall not create, incur, assume, or permit to exist any guarantee of any loan or other indebtedness with respect to the Leased Property except for the endorsement of negotiable instruments for collection in the ordinary course of business.

14.4. <u>No Transfer</u>. Tenant shall not sell, lease, sublease, mortgage, convey, assign or otherwise transfer any legal or equitable interest in the Leased Property or any part thereof.

14.5. <u>No Dissolution</u>. Tenant shall not dissolve, liquidate, merge, consolidate or terminate its existence or sell, other than in a sale/leaseback or sale/manage back transaction, assign, lease, or otherwise transfer (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) unless, in the case of a merger or consolidation by Tenant, the surviving entity in such merger has a net worth immediately after the merger or consolidation at least equal to that of the Tenant immediately prior thereto. Tenant shall maintain its organizational structure as a special purpose, bankruptcy remote entity as required under the Loan Documents.

14.6. <u>Note Payment</u>. In connection with the execution of this Lease, Tenant is also executing a Promissory Note in the amount of $2,500,000 made payable to Landlord (the "Note"). Until the full amount due under the Note is paid in full to Landlord, Tenant and Guarantor shall not make any payments or distributions to Guarantor including, without limitation, salary, bonuses, fees, principal, interest, dividends, liquidating distributions or cash flow distributions but specifically excluding salary paid to employees of the Facility or employees of Tenant in the ordinary course of business. A default in any payment due under the Note shall be deemed an Event of Default under this Lease.

14.7. <u>Change of Location or Name</u>. Tenant shall not, without providing Landlord with 30 days prior notice thereof, change any of the following: [i] the location of the principal place of business or chief executive office of Tenant, or any office where any of Tenant's books and records are maintained; [ii] the name under which Tenant conducts any of its business or operations; or [iii] reorganize or otherwise change its Organization State.

38

232657v6

14.8.   License.  The Tenant shall remain the licensed operator of the Facility.

14.9.   Management.   Tenant intends to enter into a management agreement providing for the management of the Leased Facility with QIS Management, LLC ("Manager") Tenant represents that Guarantor is the chief executive officer of the Manager, and Tenant shall require that Guarantor shall remain the chief executive officer of Manager so long as this Lease shall remain in full force and effect.  Copies of the Management Agreement, and any and all amendments thereto, shall be provided to Landlord.

## ARTICLE 15: AFFIRMATIVE COVENANTS

15.1.   Perform Obligations.  Tenant shall perform all of its obligations under this Lease, the Government Authorizations, the Permitted Exceptions, and all Legal Requirements.

15.2.   Proceedings to Enjoin or Prevent Construction.  If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful Tenant's construction, occupancy, maintenance, or operation of the Facility or any portion thereof, Tenant will cause such proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom, and will, without limiting the generality of the foregoing, resist the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best commercially reasonable efforts to bring about a favorable and speedy disposition of all such proceedings and any other proceedings.

15.3.   Documents and Information.

15.3.1   Furnish Documents.  Tenant shall within 60 days after the end of each fiscal year during the term of this Lease deliver to Landlord Annual Financial Statements and the Annual Company Budget together with a certification regarding the accuracy thereof signed by the Chief Financial Officer or managing member (as applicable) of Tenant.

15.3.2   Furnish Information. Furnish Monthly Information.  Tenant shall also [i] promptly supply Landlord  on a monthly basis, not less than 45 days after the expiration of each month, with such other information concerning its financial condition, affairs and property,  as  Landlord may reasonably request from time to time hereafter, including (a) a balance sheet dated as of the end of such month, (b) a profit and loss statement for such month and for the year to date, and (c) occupancy by payor source for such month and year to date; [ii] promptly notify Landlord in writing of any condition or

39

event that constitutes a breach or event of default of any term, condition, warranty, representation, or provisions of this Lease or any other agreement, and of any material adverse change in its financial condition; [iii] maintain a standard and modern system of accounting; [iv] permit Landlord or any of its agents or representatives to have access to and to examine all of its books and records regarding the financial condition of the Facility at any time or times hereafter during business hours, provided that Landlord shall give notice to Tenant specifying to the extent known to Landlord the financial information to be examined at least 3 days in advance of such visit; and [v] permit Landlord to copy and make abstracts from any and all of said books and records subject to any limitations imposed by State or federal law with respect to the confidentiality of patient and employee records.

15.3.3   Further Assurances and Information.   Tenant shall, on request of Landlord from time to time, execute, deliver, and furnish documents as may be necessary to fully consummate the transactions contemplated under this Lease. Within 15 days after a request from Landlord, Tenant shall provide to Landlord such additional information regarding Tenant, Tenant's financial condition, or the Facility as Landlord, or any existing or proposed creditor of Landlord, or any auditor or underwriter of Landlord, may reasonably require from time to time.. From and after and during the continuance of an Event of Default, Landlord shall have the right to require Tenant to provide to Landlord, at Tenant's expense, an appraisal prepared by an MAI appraiser setting forth the current fair market value of the Leased Property.

15.3.4   Material Communications. Tenant shall transmit to Landlord, within five days after receipt thereof, any material communication affecting a Facility, this Lease, the Legal Requirements or the Government Authorizations, and Tenant will promptly respond to Landlord's inquiry with respect to such information. Tenant shall notify Landlord in writing within five days after Tenant has knowledge of any potential, threatened or existing litigation or proceeding against, or investigation of, Tenant or the Facility that would reasonably be expected to adversely affect the right to operate the Facility or Landlord's title to the Facility or Tenant's interest therein.

15.3.5   Requirements for Financial Statements. Financial Statements need to be furnished on a monthly basis by the 25th day of the following month. These monthly financial statements need not be audited. An annual year-end financial statement must be furnished within ninety (90) days of Tenant's year-end. Such year-end annual financial statement must be reviewed or audited.

Tenant shall meet the following requirements in connection with the preparation of the financial statements: [i] all financial statements shall be prepared in accordance with general accepted accounting principles consistently applied and must be reviewed or audited; [ii] all unaudited financial statements shall be prepared in a manner substantially consistent with prior audited and unaudited financial statements submitted to Landlord; [iii] all financial statements shall fairly present the financial condition and performance for the relevant period in all material respects; and [iv] the reviewed or audited financial statements shall include all notes to the

40

financial statements and a complete schedule of contingent liabilities and transactions with Affiliates.

15.4.    Compliance with Laws.   Tenant shall comply with all Legal Requirements and keep all Government Authorizations substantially in full force and effect.   Subject to Tenant's right to contest the same in accordance with the terms of this Lease, Tenant shall pay when due all taxes and governmental charges of every kind and nature that are assessed or imposed upon Tenant at any time during the term of the Lease, including, without limitation, all income, franchise, capital stock, property, sales and use, business, intangible, employee withholding, and all taxes and charges relating to Tenant's business and operations at the Leased Property.   Tenant shall be solely responsible for compliance with all Legal Requirements, including the ADA, and Landlord shall have no responsibility for such compliance.

15.5.    Broker's Commission.  Tenant shall indemnify Landlord from claims of brokers arising by the execution hereof or the consummation of the transactions contemplated hereby and from expenses incurred by Landlord in connection with any such claims (including reasonable attorneys' fees).

Landlord shall indemnify Tenant from claims of brokers arising by the execution hereof or the consummation of the transactions contemplated hereby and from expenses incurred by Tenant in connection with any such claims (including reasonable attorneys' fees).

41

15.6.   Existence and Change in Ownership.   Except as otherwise specifically provided herein, Tenant shall maintain its existence throughout the term of this Lease, and any change in the ownership of Tenant, directly or indirectly, shall require Landlord's prior written consent.

15.7.   RESERVED.

15.8.   Facility Licensure and Certification.   Tenant shall [i] give written notice to Landlord within five days after an inspection of the Facility with respect to health care licensure or certification has occurred; and [ii] deliver to Landlord copies of the detailed description on form known as CMS Form 2567 within five (5) days after receipt thereof. If Tenant receives a Facility survey or inspection report with material deficiencies, notice of failure to comply with a plan of correction, Tenant shall cure all deficiencies and implement all corrective actions by the date required by the regulatory authority.

15.9.   Transfer of License and Facility Operations.     If this Lease is terminated due to expiration of the Term, pursuant to an Event of Default or for any reason or the Tenant vacates the Leased Property (or any part thereof) without termination of this Lease, the following provisions shall be immediately effective:

    15.9.1 Licensure. If this Lease is terminated due to expiration of the Term, pursuant to an Event of Default or for any reason or if Tenant vacates the Leased Property without termination of this Lease, Tenant shall execute, deliver and file all documents and statements requested by Landlord to effect the transfer of the Facility license and Government Authorizations to a replacement operator designated by Landlord ("Replacement Operator"), subject to any required approval of governmental regulatory authorities, and Tenant shall provide to Landlord all information and records required by Landlord in connection with the transfer of the license and Government Authorizations.

    15.9.2 Facility Operations. In order to facilitate a responsible and efficient transfer of the operations of the Facility, Tenant shall, if and to the extent requested by Landlord, [i] deliver to Landlord the most recent updated reports, notices, schedules and documents listed in this Lease; [ii] continue and maintain the operation of the Facility in the ordinary course of business, including retention of all residents at the Facility to the fullest extent practicable and consistent with applicable laws and regulations, until transfer of the Facility operations to the Replacement Operator is completed; [iii] enter into such management agreements, operations transfer agreements and other types of agreements that may be reasonably requested by Landlord or the Replacement Operator; and [iv] provide reasonable access for Landlord and its agents to show the Facility to potential replacement operators. Tenant consent to the distribution by Landlord to potential replacement operators of Facility financial statements, licensure reports, financial and property due diligence materials and other documents, materials and information relating to the Facility. The provisions of this Section do not create or establish any rights in

42

Tenant or any third party and Landlord reserves all rights and remedies relating to termination of this Lease.

15.9.3 Provider Numbers Use. If permitted by law, in order to facilitate a responsible and efficient transfer of operations of the Facility, Tenant will allow Landlord or its designee to use Tenant's Medicaid and Medicare provider members.

15.9.4 Final Cost Report. Within 120 days after the end of the Lease Term Tenant must file its final "cut-off" cost report with all required government agencies.

15.10. Bed Operating Rights. Tenant acknowledge and agree that the rights to operate the beds located at the Facility as long term care beds under the law of Florida, to relocate such bed operating rights to another location or locations, and to transfer such bed operating rights to third parties, are property of the Landlord and are an integral part of the real and personal property that constitutes the Leased Property. Tenant has only the right to use of such rights during the term of this Lease and subject to its terms and conditions. All operating rights shall automatically revert to Landlord or Landlord's designee upon the expiration or termination of this Lease for any reason whatsoever without any requirement of a transfer or the payment of additional consideration.

15.11. Power of Attorney. Effective upon [i] the occurrence and during the continuance of an Event of Default, or [ii] termination of this Lease for any reason, Tenant hereby irrevocably and unconditionally appoint Landlord, or Landlord's authorized officer, agent, employee or designee, as Tenant's true and lawful attorney-in-fact, to act for Tenant in Tenant's respective name, place, and stead, to execute, deliver and file all applications and any and all other necessary documents and statements to effect the issuance, transfer, reinstatement, renewal and/or extension of the Facility license and all Governmental Authorizations issued to Tenant or applied for by Tenant in connection with Tenant's operation of the Facility, to permit any designee of Landlord or any other transferee to operate the Facility under the Governmental Authorizations, and to do any and all other acts incidental to any of the foregoing. Tenant irrevocably and unconditionally grant to Landlord as their respective attorney-in-fact full power and authority to do and perform every act necessary and proper to be done in the exercise of any of the foregoing powers as fully as Tenant might or could do if personally present or acting, with full power of substitution, hereby ratifying and confirming all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and is irrevocable.

15.12. Compliance with Loan Documents. Tenant acknowledges that [i] Landlord owns the Leased Property subject to the Mortgage; [ii] Landlord has obligations set forth in the Mortgage and the Loan Documents; and [iii] Landlord would not enter into this Lease without Tenant's agreement to comply with the terms and conditions set forth in the Loan Documents as hereinafter set forth. Tenant has reviewed the Loan Documents and is familiar with the terms and conditions thereof. Tenant agrees to comply with the terms and conditions set forth in the Loan Documents to the extent

43

such terms and conditions apply to Tenant, or the operation of the Facility including, but not limited to, satisfying all insurance requirements, maintaining required reserves and escrow accounts, making payments due thereunder other than regularly scheduled payments of principal and interest, and granting access to the Property to the Lender as set forth in the Loan Documents. Tenant shall, in connection with Tenant's compliance with the terms and conditions of the Loan Documents and the operation of the Facility, create or permit any third party (other than Landlord for which Tenant assumes any responsibility hereunder) to create any condition that would cause an Event of Default, as defined in any such Loan Documents. Tenant's failure to comply with the Loan Documents to the extent such terms and conditions apply to Tenant, or the operation of the Facility, and to cure same within any applicable cure period provided for in the Loan Documents shall be an Event of Default under this Lease.

15.12.1   Refinancing Requirements.   Tenant hereby also agrees to cooperate with any refinancing of the existing Mortgage whether such refinancing is made through a HUD insured program or with another lender and in connection with such refinancing Tenant agrees to execute (and to cause Manager to execute) any and all documents that such refinancing lender may require, including but not limited to amendments to this Lease, Regulating Agreements and modifications to the Management Agreement.

15.12.2   Landlord Notices.   Landlord shall, within five Business Days after receipt thereof from Lender, deliver to Tenant all notices received by Landlord from Lender. Tenant shall, within five Business Days after receipt thereof from Lender, deliver to Landlord all notices received by Tenant from Lender.

15.13.   Tenant's Medicaid Obligations.   Tenant agrees to be responsible and to pay to AHCA any amounts owing to AHCA for any Medicaid overpayments made to the Tenant during the Lease Term. Tenant shall have the right, however, to contest any such determination of Medicaid overpayment until there shall be a final determination of such liability and the amount owed. Tenant shall establish and fund a reserve for any anticipated Medicaid liabilities arising during the Lease Term and retain such reserve until AHCA has conducted an audit or audits for the applicable periods of the Lease Term in question. The liability of Tenant pursuant to this Section 15.13 shall survive the expiration of the Lease Term.

## ARTICLE 16: ALTERATIONS, CAPITAL IMPROVEMENTS, AND SIGNS

44

232657v6

16.1.   Prohibition on Alterations and Improvements.  Except for Permitted Alterations (as hereinafter defined), Tenant shall not make any structural or nonstructural changes, alterations, additions and/or improvements (hereinafter collectively referred to as "Alterations") to the Leased Property.

16.2.   Approval of Alterations.  If Tenant desires to perform any Permitted Alterations, Tenant shall deliver to Landlord plans, specifications, drawings, and such other information as may be reasonably requested by Landlord (collectively the "Plans and Specifications") showing in reasonable detail the scope and nature of the Alterations that Tenant desires to perform. It is the intent of the parties hereto that the level of detail shall be comparable to that which is referred to in the architectural profession as "design development drawings" as opposed to working or biddable drawings. Landlord agrees not to unreasonably delay its review or withhold its consent to the Plans and Specifications. Within 30 days after receipt of an invoice, Tenant shall or withhold its consent to reimburse Landlord for all reasonable costs and expenses incurred by Landlord in reviewing and, if required, approving or disapproving the Plans and Specifications, inspecting the Leased Property, and otherwise monitoring compliance with the terms of this Article 16. Tenant shall comply with the requirements of 16.4 in making any Permitted Alterations.

16.3.   Permitted Alterations.  Permitted Alterations means any one of the following: [i] Alterations approved by Landlord; [ii] Alterations required under 7.2; [iii] Alterations affecting the structure of the Leased Property and having a total cost of less than $25,000.00 individually or in the aggregate; [iv] repairs, rebuilding and restoration required or undertaken pursuant to 9.4 or [v] non-structural Alterations such as painting, landscaping, wallpapering, installing new floor coverings, etc. without regard to the cost thereof.

16.4.   Requirements for Permitted Alterations.  Tenant shall comply with all of the following requirements in connection with any Permitted Alterations:

        (a)    The Permitted Alterations shall be made in accordance with the approved Plans and Specifications.

        (b)    The Permitted Alterations and the installation thereof shall comply with all applicable legal requirements and insurance requirements.

        (c)    The Permitted Alterations shall be done in a good and workmanlike manner, shall not impair the value or the structural integrity of the Leased Property, and shall be free and clear of all mechanic's liens.

45

(d)   Tenant shall, at Tenant's expense, obtain a builder's completed value risk policy of insurance insuring against all risks of physical loss, including collapse and transit coverage, in a nonreporting form, covering the total value of the work performed, and equipment, supplies, and materials, and insuring initial occupancy. Landlord and any mortgagee of Landlord shall be additional insureds of such policy. Landlord shall have the right to approve the form and substance of such policy.

(e)   Tenant shall pay the premiums required to increase the amount of the insurance coverage's required by Article 4 to reflect the increased value of the Improvements resulting from installation of the Permitted Alterations, and shall deliver to Landlord a certificate evidencing the increase in coverage.

(f)   Tenant shall, not later than 60 days after completion of the Permitted Alterations, deliver to Landlord a revised "as-built" survey of the Facility if the Permitted Alterations altered the Land or "footprint" of the Improvements and an "as-built" set of Plans and Specifications for the Permitted Alterations in form and substance satisfactory to Landlord.

(g)   Tenant shall, not later than 30 days after Landlord sends an invoice, reimburse Landlord for any reasonable costs and expenses, including reasonable attorneys' fees and architects' and engineers' fees, incurred in connection with reviewing and approving the Permitted Alterations and ensuring Tenant's compliance with the requirements of this section.

16.5.   Ownership and Removal of Permitted Alterations.  The Permitted Alterations shall become a part of the Leased Property, owned by Landlord, and leased to Tenant subject to the terms and conditions of this Lease.   Tenant shall not be required or permitted to remove any Permitted Alterations.

16.6.   Capital Expenditures.  Tenant agrees to spend not less than the following amounts of money on capital expenditures ("Minimum Capital Expenditures") to the Leased Property, including replacing and/or repairing Landlord's Personal Property, as follows:

From the Effective Date through Expiration Date, the Minimum Capital Expenditures shall be $90,000.00 per year.

If the Facility or the Landlord's Personal Property shall require capital expenditures in addition to the Minimum Capital Expenditures in order to properly maintain the Facility or the Landlord's Personal Property, then Tenant shall pay the entire cost thereof.

As used herein, the term "Capital Expenditures" shall mean the costs incurred for repairs, replacements and improvements to the Facility and the Personal Property, including, furniture, fixtures, furnishings and equipment.

46

232657v6

16.7.  Signs.  Tenant may, at its own expense, erect and maintain identification signs at the Leased Property, provided such signs comply with all laws, ordinances, and regulations.  Upon the termination or expiration of this Lease (other than as a result of the exercise by Tenant of its purchase rights), Tenant shall, within 30 days after notice from Landlord, remove the signs and restore the Leased Property to its original condition.

## ARTICLE 17: SECURITY DEPOSIT

17.1.  Security Deposit.  Not Applicable.

## ARTICLE 18: ASSIGNMENT AND SALE OF LEASED PROPERTY

18.1.  Prohibition on Assignment and Subletting.  Tenant acknowledges that Landlord has entered into this Lease in reliance on the personal services and business expertise of Tenant.  Tenant may not assign, sublet, mortgage, hypothecate, pledge, grant a right of first refusal or transfer any interest in this Lease, or in the Leased Property, in whole or in part, without the prior written consent of Landlord, which Landlord may withhold in its sole and absolute discretion.  The following transactions will be deemed an assignment or sublease requiring Landlord's prior written consent:  [i] an assignment by operation of law; [ii] an imposition (whether or not consensual) of a lien, mortgage, or encumbrance upon Tenant's interest in the Lease; [iii] an arrangement which allows the use or occupancy of all or part of the Leased Property by anyone other than Tenant; and [iv] a material change of ownership of Tenant, except that transfers to trusts or immediate family members shall be permissible.  Landlord's consent to any assignment, right of first refusal or sublease will not release Tenant from its payment and performance obligations under this Lease, but rather Tenant, and Tenant's assignee or sublessee will be jointly and severally liable for such payment and performance.  An assignment, right of first refusal or sublease without the prior written consent of Landlord will be void at Landlord's option. Landlord's consent to one assignment, right of first refusal or sublease will not waive the requirement of its consent to any subsequent assignment or sublease. Tenant acknowledges that Tenant has been advised concerning and is aware of Florida law and acknowledges that the rights of Landlord, subject to the forgoing, with respect to a proposed assignment, subletting, other transfer, and change in use are absolute and in the sole discretion of Landlord and may be deemed or construed to constitute prohibitions thereof as permitted by Florida law.  Tenant agrees that there is no implied requirement that Landlord's consent not be unreasonably withheld pursuant to Florida law and that the remedies provided in Florida law regarding assignments shall not

47

be available to Tenant.  Tenant also acknowledges that it is Landlord's practice not to permit hypothecation or pledge of leasehold interests by its tenants.

18.2.   Requests for Landlord's Consent to Assignment, Sublease or Management Agreement.  If  Tenant   is   required   to obtain Landlord's consent to a specific assignment,  sublease,  or management agreement, Tenant shall give Landlord [i] the name and address of the proposed assignee, subtenant or manager; [ii] a copy of the proposed assignment, sublease or management agreement; [iii] reasonably satisfactory information about the nature, business and business history of the proposed assignee, subtenant,  or manager  and its proposed use of the Leased Property;  and [iv] banking, financial, and other credit information, and references about the proposed assignee, subtenant  or manager sufficient to enable  Landlord  to determine the financial responsibility and character of the proposed assignee, subtenant or manager.   Any assignment, sublease or management agreement shall contain provisions to the effect that [a] such assignment, sublease or management agreement is subject and subordinate to all of the terms and provisions of this Lease and to the rights of Landlord and that the assignee, subtenant or manager shall comply with all applicable provisions of this Lease; [b] such assignment, sublease or management agreement may not be modified without  the  prior written consent of Landlord not to be unreasonably withheld  or delayed; [c] if this Lease shall terminate before the expiration of such  assignment, sublease  or management agreement, the assignee, subtenant or manager  thereunder will, solely at Landlord's option and only upon the express written notice of attornment from Landlord, attorn to Landlord and waive any right  the  assignee, subtenant or manager may have to terminate the assignment, sublease  or management agreement or surrender possession thereunder as a result of the termination of this Lease; and [d] if the assignee, subtenant or manager receives  a written notice from Landlord stating that Tenant is in default under this  Lease, the assignee, subtenant or manager shall thereafter pay all rentals or  payments  under the assignment, sublease or management agreement directly to Landlord  until such default has  been cured. Any attempt or offer by an assignee, subtenant  or  manager  to attorn to Landlord shall not be binding or effective without the express written consent of Landlord. Tenant hereby collaterally assigns to Landlord, as security for the performance of its obligations  hereunder, all of Tenant's right, title, and interest in and to any assignment, sublease  or management agreement now or hereafter existing for all or part of the Leased Property. Tenant shall,  at the request of Landlord, execute such other instruments or documents as Landlord may request to evidence this collateral assignment.  If Landlord, in its sole and absolute discretion, consents to such assignment, sublease, or management agreement, such consent shall not be effective until [i] a fully executed copy of the instrument of assignment, sublease or management  agreement has been delivered to Landlord; [ii] in the case of an assignment, Landlord has received a written instrument in which the assignee has assumed and agreed to perform all of Tenant's obligations under the Lease; and [iii] Tenant has paid to Landlord a fee in the amount equal to  the  lesser  of Landlord's actual out-of-pocket costs and expenses and $2,500.00 (applies only to consent requests after the  Closing); and [iv] Landlord has  received  reimbursement from Tenant or the assignee for all attorneys' fees and expenses  and all other reasonable out-of-pocket expenses incurred  in connection with determining whether to

48

give its consent, giving its consent and all matters relating to the assignment (applies only to consent requests after the Closing).

18.3.    Agreements with Residents.  Not withstanding 18.1, Tenant may enter into an occupancy  agreement  with residents of the Leased Property without the prior  written consent of  Landlord  provided  that [i] the agreement does not provide  for lifetime·care services; [ii] the agreement does not contain any type of rate  lock provision or rate guaranty for more than one calendar year; [iii] the agreement  does  not  provide for any rent reduction or waiver other than for an introductory  period not to exceed six months; [iv] Tenant may not collect rent for more than· one month in advance, other than one month of rent collected to be held as security for the performance  of the resident's obligation to Tenant; and [v] all residents of the Leased Property are accurately shown in accounting records  for the Facility.  Without  the prior written consent of Landlord ,Tenant shall  not  change  the  form  of  resident occupancy agreement that was submitted to Landlord prior to the Effective Date.

18.4.    Sale of Leased Property.  If Landlord or any subsequent owner of the Leased Property sells the Leased Property, its liability for the performance of its  agreements  in this Lease  will end on.the date of the sale of the Leased Property,  and  Tenant will look solely to·the purchaser for the performance·of those  agreements.  For  purposes ·of  this section, any holder of a mortgage or·security  agreement  which affects  the  Leased Property  at any time, and any landlord under any lease to which this Lease is subordinate at any time, will be a  subsequent  owner  of the·Leased Property when·it succeeds to the interest of Landlord  or any subsequent owner of the Leased  Property.

18.5.    Assignment by Landlord.  Landlord may transfer, assign, mortgage, collaterally assign,  or otherwise  dispose of  Landlord's  interest  in this Lease or   the   Leased Property.

## ARTICLE 19: HOLDOVER AND SURRENDER

19.1.   Holding Over. If Tenant, with or without  the  express or·implied consent of Landlord, continues to hold and occupy the Leased Property (or any part· thereof) after the expiration of the Term or earlier termination of this Lease (other  than  pursuant  to Tenant's purchase of the Leased Property), such holding over beyond the  Term and the acceptance or collection of Rent in.the amount specified below by Landlord shall operate and be construed as creating a tenancy from month to month and  not  for any other. term whatsoever.  Said month-to-month  tenancy may be terminated by Landlord by giving Tenant five days written notice, and at any  time  thereafter Landlord may re-enter and take possession of· the Leased Property.  If without Landlord's  consent  or at· Landlord's request, and unless required by the Lease, Tenant continues after the expiration of the Term or earlier termination of this Lease to hold and occupy the Leased

49

Property whether as a month-to-month tenant or a tenant at sufferance or otherwise, Tenant shall pay Rent for each month in an amount equal to the sum of [i] one and one-half (1) times the Base Rent payable during the month in which such expiration or termination occurs, plus [ii] all Additional Rent accruing during the month, plus [iii] any and all other sums payable by Tenant pursuant to this Lease. During any continued tenancy after the expiration of the Term or earlier termination of this Lease, Tenant shall be obligated to perform and observe all of the terms, covenants and conditions of this Lease, but shall have no rights hereunder other than the right, to the extent given by applicable law, to continue its occupancy and use of the Leased Property until the tenancy is terminated. Nothing contained herein shall constitute the consent, express or implied, of Landlord to the holding over of Tenant after the expiration or earlier termination of this Lease.

19.2.   Surrender.   Except for [i] Permitted Alterations; [ii] normal and reasonable wear and tear (subject to the obligation of Tenant to maintain the Leased Property in good order and repair during the Term); and [iii] damage and destruction not required to be repaired by Tenant, Tenant shall surrender and deliver up the Leased Property at the expiration or termination of the Term in as good order and condition as of the Commencement Date.

19.3.   Indemnity.   If Tenant fails to surrender the entire Leased Property or any part thereof upon the expiration or termination of this Lease in a timely manner and in accordance with the provisions of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall defend, indemnify and hold Landlord, its principals, officers, directors, agents, and employees harmless from loss or liability resulting from such failure, including, without limiting the generality of the foregoing, loss of rental with respect to any new lease in which the rental payable thereunder exceeds the Rent collected by Landlord pursuant to this Lease during Tenant's holdover and any claims by any proposed new tenant founded on Tenant's failure to surrender the Leased Property.   The provisions of this Article 19 shall survive the expiration or termination of this Lease.   The provisions of this 19.3 shall not apply in the event of the termination of this Lease upon the purchase of the Leased Property by Tenant.

## ARTICLE 20: [RESERVED]

## ARTICLE 21: QUIET ENJOYMENT, SUBORDINATION, ATTORNMENT AND ESTOPPEL CERTIFICATES

21.1.   Quiet Enjoyment.  So long as Tenant performs all of its obligations under this Lease, Tenant's possession of the Leased Property will not be disturbed by Landlord or any party claiming by, through or under Landlord.

21.2.   Subordination.  Tenant's rights under this Lease are junior and subordinate to the rights of the Lender, or the holder of any other first lien against the Leased Property, together with any renewal, consolidation, extension, modification or replacement thereof, which now or at any subsequent time affects the Leased Property or any interest of Landlord in the Leased Property. Tenant shall execute, acknowledge and deliver to Landlord, at any time and from time to time upon demand by Landlord, such documents as may be requested by Landlord, Lender, or any mortgagee or any holder of any mortgage or other instrument described in this section, to confirm or effect any such subordination. If Tenant fails or refuses to execute, acknowledge, and deliver any such document within 20 days after written demand, Landlord may execute acknowledge and deliver any such document on behalf of Tenant as Tenant's attorney-in-fact. Tenant hereby constitutes and irrevocably appoints Landlord, its successors and assigns, as Tenant's attorney-in-fact to execute, acknowledge, and deliver on behalf of Tenant any documents described in this section. This power of attorney is coupled with an interest and is irrevocable.

21.3.   Attornment.  If the Lender or any holder of any mortgage succeeds to Landlord's interest in the Leased Property, Tenant will pay to such holder all Rent subsequently payable under this Lease. Tenant shall, upon request of anyone succeeding to the interest of Landlord, automatically become the tenant of, and attorn to, such successor in interest without changing this Lease. Upon request by Landlord or such successor in interest and without cost to Landlord or such successor in interest, Tenant will execute, acknowledge and deliver an instrument or instruments confirming the attornment. If Tenant fails or refuses to execute, acknowledge, and deliver any such instrument within 20 days after written demand, then Landlord or such successor in interest will be entitled to execute, acknowledge, and deliver any document on behalf of Tenant as Tenant's attorney-in-fact. Tenant hereby constitutes and irrevocably appoints Landlord, its successors and assigns, as Tenant's attorney-in-fact to execute, acknowledge, and deliver on behalf of Tenant any such document. This power of attorney is coupled with an interest and is irrevocable.

21.4.   Estoppel Certificates.  At the request of Landlord, the Lender, or any mortgagee or purchaser of the Leased Property, Tenant shall execute, acknowledge, and deliver an estoppel certificate, in recordable form, in favor of Landlord, the Lender, or any mortgagee or purchaser of the Leased Property certifying the following: [i] that the Lease is unmodified and in full force and effect, or if there have been modifications that the same is in full force and effect as modified and stating the modifications; [ii] the date to which Rent and other charges have been paid; [iii] whether, to its knowledge, Tenant or Landlord is in default or whether there is any fact or condition known to Landlord or Tenant which, with notice or lapse of time, or both, would constitute a default, and

51

specifying any existing default, if any; [iv] that Tenant has accepted and occupies the Leased Property; [v] that Tenant, to its knowledge, has no defenses, setoffs, deductions, credits, or counterclaims against Landlord, if that be the case, or specifying such that exist; and [vi] such other information as may reasonably be requested by Landlord or any mortgagee or purchaser. Any purchaser or mortgagee may rely on this estoppel certificate. If Tenant fails to deliver the estoppel certificates to Landlord within 10 days after the request of Landlord, then Tenant shall be deemed to have certified that [a] the Lease is in full force and effect and has not been modified, or that the Lease has been modified as set forth in the certificate delivered to Tenant; [b] Tenant has not prepaid any Rent or other charges except for the current month; [c] Tenant has accepted and occupies the Leased Property; [d] neither Tenant nor Landlord is in default nor is there any fact or condition which, with notice or lapse of time, or both, would constitute a default; and [e] Tenant has no defenses, setoffs, deductions, credits, or counterclaims against Landlord. Tenant hereby irrevocably appoints Landlord as Tenant's attorney-in-fact to execute, acknowledge, and deliver on Tenant's behalf any estoppel certificate to which Tenant does not object within 10 days after Landlord sends the certificate to Tenant. This power of attorney is coupled with an interest and is irrevocable.

## ARTICLE 22: REPRESENTATIONS AND WARRANTIES

Tenant hereby makes the following representations and warranties, as of the Effective Date, to Landlord and acknowledges that Landlord is granting the Lease in reliance upon such representations and warranties. Tenant's representations and warranties shall survive the Closing and have been performed in full.

22.1.    Organization and Good Standing. Tenant is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida. Tenant is qualified to do business in and is in good standing under the laws of the State of Florida.

22.2.    Power and Authority. Tenant has the power and authority to execute, deliver and perform this Lease. Tenant has taken all requisite action necessary to authorize the execution, delivery and performance of its obligations under this Lease.

22.3.    Enforceability. This Lease constitutes a legal, valid, and binding obligation of Tenant, enforceable in accordance with its terms, except as such enforceability may be limited by creditor's rights laws and general principles of equity.

232657v6

22.4.   RESERVED

22.5.   Financial Statements.   Tenant is a newly formed entity and other than projections that have been prepared there are no current financial statements available.

22.6.   RESERVED

22.7.   RESERVED

22.8.   RESERVED

22.9.   Consents.   The execution, delivery and performance of this Lease will not require any consent, approval, authorization, order, or declaration of, or any filing or registration with, any court, any federal, state, or local governmental or regulatory authority, or any other person or entity, the absence of which would materially impair the ability of Tenant to operate the Facility as a 120 bed long-term skilled nursing care and rehabilitative facility except for the post-acquisition filing for licensure of the Facility.

22.10.   No Violation.   The execution, delivery and performance of this Lease [i] do not and will not conflict with, and do not and will not result in a breach of Tenant's Organizational Documents; [ii] do not and will not conflict with, and do not and will not result in a breach of, and do not and will not constitute a default under (or an event which, with or without notice or lapse of time, or both, would constitute a default under), any of the terms, conditions or provisions of any agreement or other instrument or obligation to which Tenant is a party or by which its assets are bound; and [iii] do not and will not violate any order, writ, injunction, decree, statute, rule or regulation applicable to Tenant or the Facility.

22.11.   Reports and Statements.   All reports, statements, certificates and other data furnished by or on behalf of Tenant to Landlord in connection with this Lease, and all representations and warranties made herein or in any certificate or other instrument delivered in connection herewith and therewith, are true and correct in all material respects and do not omit to state any material fact or circumstance necessary to make the statements contained herein or therein, in light of the circumstances under which they are made, not misleading as of the date of such report, statement, certificate or other data.

22.12.   ERISA.   All plans (as defined in 4021(a) of the Employee Retirement Income Security Act of 1974, as amended or supplemented from time to time ("ERISA")) for which Tenant is an "employer" or a "substantial employer" (as defined in 3(5) and 4001(a)(2) of ERISA, respectively) are in compliance with ERISA and the regulations

53

and published interpretations thereunder. To the extent Tenant maintains a qualified defined benefit pension plan: [i] there exists no accumulated funding deficiency; [ii] no reportable event and no prohibited transaction has occurred; [iii] no lien has been filed or threatened to be filed by the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA; and [iv] Tenant has not been deemed to be a substantial employer.

22.13. Intentionally deleted.

22.14. Intentionally deleted.

22.15. No Default. As of the Effective Date, [i] there is no existing Event of Default under this Lease; and [ii] no event has occurred which, with the giving of notice or the passage of time, or both, would constitute or result in such an Event of Default.

## ARTICLE 23: [RESERVED]

## ARTICLE 24: SECURITY INTEREST

24.1. Collateral. Tenant hereby grants to Landlord ("Secured Party") a security interest in the following described property, whether now owned or hereafter acquired by Tenant (the "Collateral"), to secure the payment and performance of the Tenant to the extent permitted and not granted under the Loan Documents:

(a) All of Tenant's machinery, furniture, equipment, trade fixtures, appliances, inventory and all other goods (as "equipment", "inventory" and "goods" are defined for purposes of Article 9 ("Article 9") of the Uniform Commercial Code as adopted in Florida) and any leasehold interest of Tenant in any of the foregoing, including, without limitation, those items which are to become fixtures or which are building supplies and materials to be incorporated into any improvement or fixture located on or at the Leased Property.

(b) Reserved

(c) All franchises, permits, licenses, operating rights, certifications, approvals, consents, authorizations and other general intangibles, including, without limitation, certificates of need, state health care facility licenses, and Medicare and Medicaid provider agreements, to the extent permitted by law.

54

232657v6

(d)    Unless expressly prohibited by the terms thereof, all contracts, agreements, contract rights and materials relating to the design, construction, operation   or management of any improvements, including, but not limited to, plans, specifications, drawings, blueprints, models, mock-ups, brochures, flyers, advertising and promotional materials and mailing lists.

(e)    All subleases, occupancy agreements, license agreements and concession agreements, written or unwritten, of any nature, now or hereafter entered into, and all right, title and interest of Tenant thereunder, and including, without limitation, Tenant's right, if any, to cash or securities deposited thereunder whether or not the same was deposited to secure performance by the subtenants, occupants, licensees and concessionaires of their obligations thereunder, including the right to receive and collect the rents, revenues, and other charges thereunder.

(f)    All accounts receivable, Receivables, contract rights, instruments, ledger sheets, files, records, computer programs, tapes, other electronic data processing materials, and other applicable or relevant documentation.

(g)    The products and proceeds of the preceding listed property, including, without limitation, cash and non-cash proceeds, proceeds of proceeds, and insurance proceeds.

24.2.   Additional Documents.   At the request of Landlord, Tenant shall execute additional security agreements, financing statements, and such other documents as may be requested by Landlord to maintain and perfect such security interest. Tenant hereby irrevocably appoints Landlord, its successors and assigns, as Tenant's attorney-in-fact to execute, acknowledge, deliver and file such documents on behalf of Tenant. This power of attorney is coupled with an interest and is irrevocable. Tenant authorizes Landlord to file financing statements describing the Collateral to perfect and maintain the security interest granted hereunder without the signature or any further authorization of Tenant.

232657v6

24.3.   Notice of Sale.  With respect to any sale or other disposition of any of the Collateral after the occurrence of an Event of Default, Landlord, Tenant agrees that the giving of five days' notice by Landlord, sent by overnight delivery, postage prepaid, to Tenant's notice address designating the time and place of any public sale or the time after which any private sale or other intended disposition of such Collateral is to be made, shall be deemed to be reasonable notice thereof and Tenant waives any other notice with respect thereto.

24.4.   Subordination.  Landlord acknowledges and agrees that the liens and rights granted to Landlord under this Article 24 are and shall be subordinate to any liens and rights granted by Tenant in favor of Lender with respect to the Collateral.

## ARTICLE 25: MISCELLANEOUS

25.1.   Notices.  Landlord and Tenant hereby agree that all notices, demands, requests, and consents (hereinafter "notices") required to be given pursuant to the terms of this Lease shall be in writing, shall be addressed to the addresses set forth in this Section 25.1 of this Lease, and shall be served by [i] personal delivery; [ii] certified mail, return receipt requested, postage prepaid; or [iii] nationally recognized overnight courier or by telecopy to the telephone numbers for each of the parties.  All notices shall be deemed to be given upon the earlier of actual receipt or three Business Days after mailing, or one Business Day after deposit with the overnight courier. Any notices meeting the requirements of this section shall be effective, regardless of whether or not actually received. Landlord or Tenant may change its notice address at any time by giving the other party notice of such change.

Notices to be sent to the Tenant shall be sent to the following address and telephone number:

Administrator
West Broward Care Center
Telefax Number:

With a Copy To:

Mr. Timothy Reardon
2627 South Bayshore Drive
Suite 2506
Miami, Florida 33133

Notices to be sent to the Landlord shall be sent to the following addressed and telephone number.

56

Institutional Leasing 1
P.O. Box 402401
Miami Beach, Florida 33140

With a copy to :

Aaron C. Kinderlehrer, Esq.
Siller Wilk LLP
675 Third Avenue
New York, New York 10017

25.2.   Advertisement of Leased Property.  Landlord or its agent shall have the right to enter the Leased Property at all reasonable times for the purpose of exhibiting the Leased Property to others and to place upon the Leased Property for and during the period commencing 180 days prior to the expiration of this Lease, "for sale" or "for rent" notices or signs.

25.3.   Entire Agreement.  This Lease contains the entire agreement between Landlord and Tenant with respect to the subject matter hereof. No representations, warranties, and agreements have been made by Landlord except as set forth in this Lease.  No oral agreements or understandings between Landlord and Tenant shall survive execution of this Lease.

25.4.   Severability.   If any term or provision of this Lease is held or deemed by Landlord to be invalid or unenforceable, such holding shall not affect the remainder of this Lease and the same shall remain in full force and effect, unless such holding substantially deprives Tenant of the use of the Leased Property or Landlord of the rents herein reserved, in which event this Lease shall forthwith terminate as if by expiration of the Term.

25.5.   Captions and Headings.  The captions and headings are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease or the intent of any provision hereof.

25.6.   Governing Law.  This Lease shall be governed by and construed in accordance with the laws of the State of Florida.

25.7.   Memorandum of Lease.   Tenant shall not record this Lease nor shall Tenant record a memorandum of lease.

232657v6

25.8.  Waiver.  No  waiver  by  Landlord  of  any  condition  or  covenant  herein contained,  or of any breach of any such condition or covenant, shall be held or taken  to be a waiver of any subsequent breach of such covenant or condition, or to  permit  or excuse  its  continuance  or any future breach thereof or of any condition  or covenant, nor shall the acceptance of Rent by Landlord at any time when  Tenant  is in default in the  performance  or observance  of any condition  or covenant herein be construed as a waiver of such default, or of Landlord's right to  terminate  this Lease or exercise any other remedy granted herein on account of  such  existing  default.

25.9.  Binding Effect.  This Lease  will  be  binding  upon and inure to the benefit  of the  heirs,  successors,  personal  representatives,  and permitted  assigns  of  Landlord and  Tenant.

25.10.  No Offer.  Landlord's submission of this Lease to Tenant is not an offer to lease the Leased Property, or an agreement by Landlord to reserve the Leased Property for Tenant.  Landlord will  not be bound to Tenant until Tenant has  duly executed and delivered duplicate original leases to Landlord, and Landlord has duly executed and delivered one of these duplicate original leases to Tenant.

25.11.  Modification.  This Lease may only be modified by a writing signed by both Landlord and Tenant.  All references to this Lease, whether in this Lease or  in  any other document  or  instrument, shall be deemed to incorporate all amendments, modifications and  renewals of this  Lease, made after the date hereof. If Tenant requests Landlord's consent to  any change in ownership, merger or consolidation of Tenant or Guarantor, any assumption of the Lease, or any modification of the Lease,  Tenant shall provide Landlord all relevant information and documents sufficient to enable Landlord to evaluate the request. In  connection  with any such request, Tenant shall pay to Landlord a fee in the amount  equal to the lesser of  $2,500.00 and Landlord's actual reasonable attorney's fees and  expenses and other reasonable out-of-pocket expenses incurred in  connection  with  Landlord's  evaluation  of Tenant's request, the preparation  of any documents  and amendments, the subsequent amendment of any documents  between Landlord and its collateral pool lenders (if applicable), and all related  matters.

25.12.  Landlord's Modification.  Tenant  acknowledges  that, provided Lender consents or  the Lender has been paid in full, Landlord may mortgage the Leased Property or use the Leased Property as collateral for collateralized mortgage obligations or Real Estate Mortgage  Investment  Companies (REMICS).  If any mortgage lender of Landlord desires any modification of this Lease, Tenant agrees to consider such modification in good faith and to execute an amendment of this Lease if Tenant finds such modification acceptable.  Landlord shall not do anything in connection with its financing of the Leased Property which would limit the rights granted Tenant hereunder.

232657v6

25.13. <u>No Merger</u>.  The surrender of this Lease by Tenant or the cancellation of  this Lease   by   agreement  of Tenant and Landlord or the termination of this Lease   on account of  Tenant's  default  will  not work a merger, and will, at Landlord's  option, terminate  any  subleases  or  operate  as an assignment to Landlord of any subleases. Landlord's option under this paragraph will be exercised by notice to Tenant and all known subtenants of the Leased Property.

25.14. <u>Laches</u>.  No  delay  or omission by either party hereto to exercise any right  or power  accruing  upon any noncompliance or default by the other party with  respect to any of the terms hereof shall impair any such right or power or be  construed  to  be a waiver  thereof.

25.15.  <u>Limitation on Tenant's Recourse</u>.  Tenant's sole recourse against Landlord, and any successor to the interest of Landlord in the Leased Property, is to the interest of Landlord, and any such successor, in the Leased Property. Tenant will not have any right to satisfy any judgment which it may have against Landlord, or any such successor, from any other assets of Landlord, or any such successor. In this section, the terms "Landlord" and  "successor"  include the  shareholders, venturers, and partners of "Landlord" and "successor" and the officers, directors, and employees of the same.  The provisions of this section are not intended to limit Tenant's right to seek injunctive relief or specific performance.

25.16. <u>Construction of Lease</u>.   This Lease has been prepared by Landlord and its professional advisors and reviewed by Tenant and its professional advisors. Landlord, Tenant, and their advisors believe that this Lease is the product of all their efforts, that it expresses their agreement, and agree that it shall not be interpreted in favor of either Landlord or Tenant or against either Landlord or  Tenant  merely  because  of  their efforts in preparing  it.

25.17. <u>Counterparts</u>.  This Lease may be executed in multiple counterparts, each of which shall be deemed an original hereof.

25.18. <u>Custody of Escrow Funds</u>.  Any funds paid to  Landlord  in escrow hereunder may  be  held  by Landlord or, at Landlord's election, by a financial institution,  the deposits  or accounts of which are insured or guaranteed by a federal or state agency. The funds shall not be deemed to be held in trust, may be commingled with the general funds of Landlord or such other institution, and shall not bear interest.

25.19. RESERVED

232657v6

25.20. Exhibits. All of the exhibits referenced in this Lease are attached hereto and incorporated herein.

25.21. WAIVER OF JURY TRIAL. LANDLORD AND TENANT WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THEM AGAINST THE OTHER ON ALL MATTERS ARISING OUT OF THIS LEASE OR THE USE AND OCCUPANCY OF THE LEASED PROPERTY (EXCEPT CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE). IF LANDLORD COMMENCES ANY SUMMARY PROCEEDING FOR NONPAYMENT OF RENT, TENANT WILL NOT INTERPOSE, AND WAIVES THE RIGHT TO INTERPOSE, ANY COUNTERCLAIM IN ANY SUCH PROCEEDING UNLESS SUCH COUNTERCLAIM RELATES SPECIFICALLY TO THE RIGHTS OF INDEMNIFICATION SET FORTH IN THIS LEASE.

25.22. CONSENT TO JURISDICTION. TENANT HEREBY IRREVOCABLY SUBMITS AND CONSENTS TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT HAVING JURISDICTION OVER SARASOTA COUNTY, FLORIDA FOR ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY MATTER ARISING FROM OR RELATED TO THIS LEASE OR ANY DOCUMENT EXECUTED BY TENANT IN CONNECTION WITH THIS LEASE. TENANT HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT TENANT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY SUCH ACTION OR PROCEEDING. TENANT AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. TENANT AGREES NOT TO INSTITUTE ANY LEGAL ACTION OR PROCEEDING AGAINST LANDLORD OR ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, PARTNER OR PROPERTY OF LANDLORD, CONCERNING ANY MATTER ARISING OUT OF OR RELATING TO THIS LEASE OR ANY RELATED DOCUMENT IN ANY COURT OTHER THAN A STATE OR FEDERAL COURT HAVING JURISDICTION OVER SARASOTA COUNTY, FLORIDA UNLESS SUCH COURT LACKS IN PERSONAM OR SUBJECT MATTER JURISDICTION IN WHICH CASE TENANT SHALL HAVE THE RIGHT TO INSTITUTE SUCH ACTION OR PROCEEDING BEFORE ANY COURT HAVING SUCH JURISDICTION. TENANT HEREBY CONSENTS TO SERVICE OF PROCESS BY LANDLORD IN ANY MANNER AND IN ANY JURISDICTION PERMITTED BY LAW. NOTHING HEREIN SHALL AFFECT OR IMPAIR LANDLORD'S RIGHT TO SERVE LEGAL PROCESS IN ANY MANNER PERMITTED BY LAW, OR LANDLORD'S RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST TENANT OR THE PROPERTY OF TENANT IN THE COURTS OF ANY OTHER JURISDICTION.

232657v6

25.23.  Reserved [See Section 8.7]

25.24.  <u>Survival</u>.   The   following   provisions shall survive termination of the Lease: Article 8 (Defaults and Remedies); Article 9 (Damage and Destruction); Article 10 (Condemnation); 15.9 (Transfer of License and Facility Operations); 18.2 (Assignment or Sublease); Article 19 (Holdover and Surrender); Article 24 (Security Interest) and 25.24 (Survival).

25.25.  <u>Time.</u>  Time is of the essence in the performance of this Lease.

25.26.  <u>Transition of Operations.</u>

(a).    Upon the expiration or earlier termination of the Term as to the Leased Property, or any dispossession of Tenant as to the Leased Property, Tenant shall, to the maximum extent permitted by applicable law, transfer to Landlord or Landlord's designee and/or cooperate in all reasonable respects with Landlord or Landlord's designee to enable Landlord or Landlord's designee to apply for and obtain all licenses, operating permits, provider agreements, provider status, certificates of need, certificates of exemption, approvals, waivers, variances and other governmental, quasi-governmental and private authorizations necessary for the operation of the Leased Property as to which the Term is expired or terminated or as to which Tenant has been dispossessed (collectively "Authorizations"); provided that the costs and expenses of any such transfer or obtaining of Authorizations shall be paid by Landlord or Landlord's designee unless such termination or dispossession results from an Event of Default, in which event the costs and expenses of any such transfer or obtaining of Authorizations shall be paid by Tenant. It is the express intention of the parties that at the expiration or earlier termination of the Lease Term or, if applicable, the First Renewal Term and the Second Renewal Term, upon any dispossession of Tenant in connection with any Event of Default as to the Leased Property, any and all Authorizations needed to operate the Leased Property as to which the Lease Term is expired or terminated, or as to which Tenant has been dispossessed, as a 120 bed skilled nursing and rehabilitative facility shall, to the maximum extent permitted by applicable law, remain with such Leased Property and shall be issued or transferred transferred to the name of Landlord or Landlord's designee, and Tenant shall cooperate in all respects to effectuate such transfer or issuance of a license in the name of Landlord or Landlord's designee. Without limiting the generality of the foregoing, Tenant shall furnish to Landlord or its designee complete and accurate documents and information in Tenant's possession, custody or control necessary or reasonably requested by Landlord or its designee in connection with any such transfer or the completion and processing of any applications for Authorizations.

61

(b)     In anticipation of the expiration of this Lease as to the Leased Property, upon the earlier termination of this Lease as to the Leased Property, and/or upon any dispossession of Tenant in connection with any Event of Default as to the Leased Property, Tenant shall cooperate with Landlord in all reasonable respects to facilitate and effectuate the orderly transfer of operations at the Leased Property as a going concern; provided, however, that, unless such termination or dispossession results from an Event of Default by Tenant, notwithstanding anything to the contrary contained in this subsection (b), Tenant shall not be required to incur any out-of-pocket operating losses or costs in so cooperating.  Such cooperation shall include, without limitation: (i) furnishing to Landlord or any prospective successor operator of the Lease Property designated by Landlord complete and accurate books, records, files, documents and information in Tenant's possession, custody or control necessary or reasonably requested by Landlord or its designee in connection with the assessment and/or assumption of the operations of the Leased Property; (ii) facilitating the evaluation and employment by Landlord or its designee of such employees of Tenant as Landlord or its designee may elect to evaluate or employ, including, without limitation, to the extent permitted by law, affording Landlord or its designee access to all relevant personnel files, records, documents and information in Tenant's possession, custody or control; and (iii) assigning to Landlord or its designee such assignable patient, vendor, service provider and other contracts relating to the Leased Property as Landlord or its designee may request; provided, however, that Tenant's cooperation obligation shall not include undertaking primary responsibility for such transfer of operations.

25.27.  Non-Recourse.  Tenant specifically agrees to look solely to Landlord's and any successor owner's interest in the Leased Property together with proceeds and profits from such Leased Property for recovery of any judgment from Landlord, it being specifically agreed that neither Landlord, any such successor owner, nor any officer, director, employee, lender, agent or Affiliate of Landlord or any such successor owner shall ever be personally liable for any such judgment or for the payment of any monetary obligation to Tenant.  Tenant shall have no recourse against any other property or assets of Landlord or any successor owner, or against any property or assets of any officer, director, shareholder, partner, lender, agent or Affiliate of Landlord or any successor owner.  The provision contained in the foregoing sentence is not intended to, and shall not; limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest, or any action not involving the personal liability of Landlord (original or successor).  FURTHERMORE, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, IN NO EVENT SHALL LANDLORD (ORIGINAL OR SUCCESSOR) EVER BE LIABLE TO TENANT FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES SUFFERED BY TENANT FROM WHATEVER CAUSE.

25.28.  Risk of Loss.  Except as otherwise provided herein, during the Term of this Lease, the risk of loss or of decrease in the enjoyment and beneficial use of each Leased Property in consequence of the damage or destruction thereof by fire, the elements,

232657v6

casualties, thefts, riots, wars or otherwise, or in consequence of foreclosures, attachments, levies or executions is assumed by Tenant.

25.29. <u>No Joint Venture</u>.   Nothing contained in this Lease shall be construed to create the relationship of principal and agent, partnership, joint venture or any other relationship between the parties hereto other than the relationship of Landlord and Tenant.

25.30. <u>Depreciation</u>.  Landlord and Tenant agree that <u>Landlord shall be entitled to take on Landlord's tax return all the depreciation from the Landlord's ownership of the Facility and the Landlords Personal Property.</u>

25.31. <u>Ownership of name "West Broward Care Center"</u>.   Landlord shall retain ownership of the name "West Broward Care Center". Landlord grants a non-exclusive license for Tenant to use the name "West Broward Care Center" during the term of this Lease and any extension thereof.

## ARTICLE 26: GUARANTIES

26.1.   <u>Lease Guaranty</u>.   The execution of this Lease by Landlord is subject to and conditioned upon the simultaneous execution of a <u>Guaranty of Lease by Timothy Patrick Reardon</u> ("Guarantor") in the form annexed as <u>Exhibit C</u> annexed hereto and made a part hereof.

26.2.   <u>Note Guaranty</u>.  The execution of this Lease by Landlord is also subject to and conditioned upon the simultaneous execution of the Note and a Guaranty of the Note (the "Note Guaranty") by the Guarantor in the form annexed as <u>Exhibit D</u> annexed hereto and made a part hereof.

## BALANCE OF PAGE INTENTIONALLY BLANK

## -SIGNATURE PAGE TO FOLLOW-

63

232657v6

IN WITNESS WHEREOF, the parties hereto have executed this Lease or caused the same to be executed by their respective duly authorized officers as of the date first set forth above.

Signed and acknowledged in the presence of:

Landlord

INSTITUTIONAL LEASING 1, LLC,

By: _____
Name: Abraham Shawlson
Title: Manager.

Tenant

W.B. Care Center LLC

By: _____
Name: Tim Reardon
Title: Manager

64

232657v6

EXHIBIT A:  LEGAL DESCRIPTION

*[SEE LEGAL DESCRIPTION ATTACHED HERETO]*

232657v6

EXHIBIT A

Tract A, AMERICAN CONVALESCENT CENTER, according to the map or plat thereof as recorded in Plat Book 69, Page(s) 15, Public Records of Broward County, Florida, LESS AND EXCEPT therefrom the following described portion thereof:

Commencing at the Southeast corner of said Tract A; thence South 89° 33' 11" West, a distance of 69.89 feet to the Point of Beginning; thence continue South 89° 33' 11" West, a distance of 255.82 feet to the point of curvature of a circular curve to the right, the last two (2) herein described courses and distances being along the North right-of-way line of West Broward Boulevard, also being along the South line of said Tract A; thence Westerly, Northwesterly and Northerly along the arc of said curve, having a radius of 25.00 feet, a central angle of 88° 19' 43" and an arc distance of 38.54 feet to the point of tangency, said point being on the East right-of-way line of N.W. 78th Avenue, said point also being on the West line of said Tract A; thence North 02° 07' 06" West, along a portion of the said East right-of-way line of N.W. 78th Avenue, also being the said West line of Tract A, a distance of 25.43 feet; thence South 16° 02' 33" East, a distance of 16.95 feet to a point, said point bears South 87° 52' 54" West from the radius point of the next described curve; thence Southerly, Southeasterly and Easterly along the arc of said curve, having a radius of 22.00 feet, a central angle of 88° 19' 43" and an arc distance of 33.92 feet to the point of tangency; thence North 89° 33' 11" East, along a line parallel with and 12.00 feet North of as measured at right angles to the said South line of Tract A, a distance of 75.00 feet; thence South 86° 37' 58" East, a distance of 180.40 feet to the Point of Beginning, and set forth in that Lis Pendens filed in O.R. Book 18442, Page 673, Broward County Circuit Court Case No. 91-16176, and the Order of Taking entered therein, filed April 24, 1992, in O.R. Book 19412, Page 809. Said lands situate, lying and being in Broward County, Florida.

Parcel 2:

A portion of EVERGLADES PLANTATIONS COMPANY AMENDED SUBDIVISION of Section 4, Township 50 South, Range 41 East, according to the map or plat thereof, recorded in Plat Book 2, Page 7, of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

The East 51.00 feet of the North 65.00 feet of the South 493.06 feet of said Section 4, Township 50 South, Range 41 East, Broward County, Florida.

Said lands situate, lying and being in Broward County, Florida.

## EXHIBIT B

### PERMITTED EXCEPTIONS

1.     Taxes for the year 2008 and subsequent years which are not yet due and payable.

2.     Mortgage as defined in the Lease Agreement to which this Exhibit B is attached.

3.     UCC-1 Financing Statement for Mortgage to be inserted.

4.     Such matters as are reflected on that certain survey prepared by David & Purmort, Inc. under Job No. 92-0012.

5.     Restrictions, conditions, reservations, easements, and other matters contained on the Plat of AMERICAN CONVALESCENT CENTER, as recorded in Plat Book 69, Page(s) 15, Public Records of Broward County, Florida.

6.     Cable Service Easement recorded June 23, 1999 in O.R. Book 29583, Page 1868, Public Records of Broward County, Florida.

7.     Easement Agreement recorded June 2, 1992, in O.R. Book 19540, Page 786, Public Records of Broward County, Florida.

8.     Stipulated Final Judgment recorded April 24, 1992 in O.R. Book 19412, Page 809, Public Records of Broward County, Florida.

9.     Utility Easement recorded October 27, 1988 in O.R. Book 15905, Page 474, Public Records of Broward County, Florida.

10.    Florida Power & Light Easement contained in instrument recorded September 6, 1983, in O.R. Book 11115, Page 498, Public Records of Broward County, Florida.

11.    Florida Power & Light Easement contained in instrument recorded May 12, 1983, in O.R. Book 10854, Page 921, Public Records of Broward County, Florida.

12.    Right of Way Easement recorded November 7, 1974 in O.R. Book 6002, Page 520, Public Records of Broward County, Florida.

13.    "Notice" recorded December 20, 1973 in O.R. Book 5589, Page 552, as affected by O.R. Book 19540, Page 783 and O.R. Book 24829, Page 257, Public Records of Broward County, Florida.

14.    Utility Agreement recorded March 26, 1970 in O.R. Book 4173, Page 915, Public Records of Broward County, Florida.

66

232657v6

EXHIBIT C

LEASE GUARANTY

(See Copy attached.)

232657v6

## GUARANTY OF LEASE

This Guaranty of Lease, dated as of the 30th day of June, 2008 made by TIMOTHY PATRICK REARDON, having an address at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Guarantor") in favor of INSTITUTIONAL LEASING 1 LLC having an address at  P.O.B. 402401 Miami Beach, Florida 33140 ("Landlord").

WHEREAS, simultaneously herewith, Landlord has entered into an Agreement of Lease (the "Lease"), dated as of the date hereof, with W.B. Care Center, a Florida limited liability company having an office at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Tenant") for the building known as West Broward Care Center, Broward Florida ("Premises", as more particularly described in the Lease), which Lease is hereby incorporated in this Guaranty by reference; and

WHEREAS, Guarantor owns a 100% portion of the membership interests of Tenant and Guarantor will derive substantial benefit from the Lease; and

WHEREAS, Guarantor acknowledges that Landlord would not enter into the Lease unless Guarantor enters into this Guaranty and this Guaranty accompanies the execution and delivery of such Lease by Tenant.

NOW, THEREFORE, in consideration of the execution and delivery of the Lease by Landlord, for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by Guarantor, Guarantor does hereby covenant and agree with Landlord as follows:

1.    Unless otherwise specifically noted, all capitalized terms used in this Guaranty shall have the same meaning as are ascribed to such terms in the Lease.

2.    ~~Guarantor hereby absolutely, unconditionally and irrevocably~~ guaranties, as principal and not as indemnitor, to Landlord, in accordance with and pursuant to this Guaranty, the full and timely performance of all obligations, now or hereafter existing, of Tenant under the Lease.

3.    (A)    Guarantor acknowledges that its liability hereunder is primary and that Landlord may, at Landlord's option, join Guarantor in any action or proceeding commenced by Landlord against Tenant in connection with or based upon the Lease or any term, covenant or condition thereof, and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant.

(B)    Guarantor acknowledges that this Guaranty is an absolute and unconditional guaranty of payment and performance and not merely of collection.

1

234122v3

4.      (A)     All payments due hereunder shall be made in lawful money of the United States of America in immediately available funds free and clear of, and without deduction or withholding for or on account of, any taxes, levies, fees, imposts, duties, expenses, commissions, withholdings, assessments or other charges, or any penalties, fines, additions to tax or interest thereon (collectively, "Taxes") to the extent that any such Taxes would reduce the amount Landlord would otherwise have received had Tenant made such payment. If any Taxes shall be required by law to be deducted or withheld from any payment hereunder and as a result thereof the amount Landlord would otherwise have received had Tenant made such payment is reduced, Guarantor shall increase the amount paid so that Landlord receives, after deduction or withholding on account of taxes, the full amount of the payment provided for in this Guaranty.

(B)     If Landlord shall be obligated by any bankruptcy, insolvency or other legal proceedings to repay to Guarantor or to Tenant, or to any trustee, receiver or other representative of any of them, any amounts previously paid by Guarantor pursuant to this Guaranty, this Guaranty shall be deemed reinstated to the extent of that repayment made by Landlord. Landlord shall not be required to litigate or otherwise dispute its obligation to make such repayments if, in good faith and on the advice of counsel, Landlord believes that such obligation exists.

5.      (A)     This Guaranty shall be a continuing guarantee and the liability of Guarantor hereunder shall in no way be affected, modified, diminished, impaired or terminated by reason of any of the following, whether or not notice thereof is given to or consent is obtained from Guarantor: (i) any subletting of all or any portion of the Premises or any assignment or other transfer of Tenant's interest in the Lease, (ii) any consent, approval, waiver or other action, inaction or omission under or concerning the Lease, (iii) any modifications, renewals, extensions or amendments of the Lease, (iv) any dealings or transactions or matter or thing occurring between Landlord and Tenant, (v) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Tenant or its successors or assigns, (vi) the release or discharge of Tenant from the performance or observance of any of the terms, covenants or conditions contained in the Lease pursuant to the terms thereof, by operation of law, by reason of any of the events described in subsection (v) of this Paragraph 5 hereof, or otherwise, (vii) any change in relationship between Guarantor and Tenant, (viii) the default or failure of Guarantor to perform any of its obligations set forth in this Guaranty, (ix) any action which Landlord may take or fail to take against Tenant by reason of any waiver of, or failure to enforce, any of the rights or remedies reserved to Landlord in the Lease, or otherwise, (x) any failure or refusal of Landlord to re-let the Premises or any part or parts thereof in the event that Landlord shall obtain possession of the Premises after Tenant's insolvency or default, (xi) any failure to collect rent thereof under any such re-letting, (xii) any alterations, repairs, replacements and/or decorations in the Premises as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of re-letting the Premises, and (xiii) any other circumstance or condition that may result in a discharge, limitation or reduction of liability of a surety or guarantor.

2

(B)     Any suit or proceedings brought against Guarantor to collect the amount of any deficiency referred to in Section 8.2 of the Lease for any month or months shall not prejudice in any way the rights of Landlord to collect any such deficiency for any subsequent month or months in any similar suit or proceeding.

6.     (A)     Guarantor hereby waives notice of the acceptance of this Guaranty and presentment and demand for payment, notice of non-payment, notice of dishonor, protest, notice of protest, non-performance, non-observance and any other notice or demand to which Guarantor might otherwise be entitled.

(B)     Guarantor hereby waives trial by jury of any and all issues arising in any action or proceeding between the parties, upon, under or in connection with this Guaranty or of any of its provisions, directly or indirectly, or any and all negotiations in connection therewith.

7.     Guarantor's obligations hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim of waiver, release, surrender, attention or compromise and shall not be subject to, and Guarantor hereby irrevocably waives, any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of Guarantor's obligations hereunder or otherwise.

8.     Guarantor hereby irrevocably:

(A)     submits to the jurisdiction of the state courts of the State of Florida, for the purposes of each and every suit, action or other proceeding arising out of or based upon this Guaranty or the subject matter hereof brought by Landlord, it being expressly understood and agreed that this consent to jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Guaranty or as otherwise permitted by such law, shall be necessary in order to confer jurisdiction upon Guarantor in any such court; and

(B)     waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any suit, action or proceeding brought in any such court, any claim that Guarantor is not subject personally to the jurisdiction of the above-named courts, that Guarantor's property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Guaranty or the subject matter hereof may not be enforced in or by such court, and further agrees to waive, to the fullest extent permitted under applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which Landlord or its successors or assigns are entitled pursuant to the final judgment of any court having jurisdiction.

9.     Guarantor hereby consents to service of process by certified or registered mail at address for Guarantor as set forth in Paragraph 14 hereof, or in any

other manner permitted by law. Guarantor agrees that service in the foregoing manner shall be deemed, in every respect, effective service of process upon Guarantor and be taken and held to be valid personal service upon, and personal delivery to, Guarantor. Guarantor agrees that Guarantor's submission to jurisdiction and consent to service of process by mail is made for the express benefit of Landlord.

         10.     Final judgment against Guarantor in any such action, suit or proceeding shall be conclusive, and may be enforced in other jurisdictions:

         (A)     by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of Guarantor therein described; or

         (B)     in any other manner provided by or pursuant to the laws of such other jurisdiction; provided, however, that Landlord may at its option bring suit, or institute other judicial proceedings against Guarantor or any of the Guarantor's assets in any state or federal court of the United States or of any country or place where either Guarantor or such assets may be found.

         11.    Guarantor represents and warrants to Landlord that:

         (A)     Guarantor has full power, authority and legal right to cause this Guaranty to be signed and delivered, and to perform and observe the provisions of this Guaranty, including, without limitation, the payment of all moneys hereunder.

         (B)     This Guaranty constitutes the legal, valid and binding obligation of Guarantor, and is enforceable in accordance with its terms.

         (C)     Guarantor, as of the date hereof, is not in violation of any decree, ruling, judgment, order or injunction applicable to it nor any law, ordinance, rule or regulation of whatever nature, nor are there any actions, proceedings or investigations pending or threatened against or affecting Guarantor (or any basis therefor known to Guarantor) before or by any court, arbitrator, administrative agency or other governmental authority or entity, any of which, if adversely decided, would materially or adversely affect its ability to carry out any of the terms, covenants and conditions of this Guaranty.

         (D)     No authorization, approval, consent or permission (governmental or otherwise) of any court, agency, commission or other authority or entity is required for the due execution, delivery, performance or observance by Guarantor of this Guaranty or for the payment of any sums hereunder.

         (E)     Neither the execution and delivery of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof, conflict or will conflict with or result in a breach of any of the terms, conditions or provisions of any order, writ, injunction or decree of any court or

governmental authority, or of any agreement or instrument to which Guarantor is a party or by which it is bound, or constitutes or will constitute a default thereunder.

12.    Nothing herein contained is intended or shall be construed to give to Guarantor any right of subrogation under the Lease or any right to participate in any way therein or in Landlord's right, title and interest in the Lease. Notwithstanding any payments made under this Guaranty, all rights of subrogation and participation are expressly waived and released by Guarantor.

13.    If Landlord shall employ counsel to enforce Guarantor's obligations under this Guaranty or any part thereof, Guarantor agrees to pay on demand all of Landlord's costs in connection therewith, whether or not suit be brought including, without limitation, reasonable attorneys' fees and disbursements.

14.    All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") desired or required to be given under this Guaranty shall be in writing, and, any law or statute to the contrary notwithstanding, shall be effective for any purpose if sent by registered or certified mail, return receipt requested, prepaid, addressed as follows:

If to Guarantor, to him at the
address first set forth above

If to Landlord, to it at its address
first set forth above:

with a copy to:

Siller Wilk LLP
675 Third Avenue
New York, New York 10017
Attention: Aaron C. Kinderlehrer, Esq.

All Notices shall be deemed given or served on the third (3rd) day after the date on which such Notice has been sent. Any party to this Guaranty may change the address to which Notices shall be delivered to it and its representatives by notice in accordance with this Paragraph 14.

15.    (A)    The provisions of this Guaranty shall be binding upon and shall inure to the benefit of Landlord and Guarantor and their respective successors and assigns. All references in this Guaranty to Landlord and Tenant shall be deemed to mean Landlord's and Tenant's respective permitted successors and assigns.

(B)    No delay on the part of Landlord in exercising any right, power or privilege under this Guaranty, nor any failure to exercise the same, shall operate as a waiver of, or otherwise affect, any right, power or privilege of Landlord under this

5

234122v3

Guaranty, nor shall any single or partial exercise thereof preclude the further exercise of, or the exercise of any other, right, power or privilege of Landlord under this Guaranty.

(C)     Neither any waiver or modification of any provision of this Guaranty, nor any termination of this Guaranty, shall be effective unless in writing and signed by the party against which the waiver, modification or termination is sought to be enforced, nor shall any waiver be applicable except in the specific instance for which it is given.

(D)     The validity and enforcement of this Guaranty shall be governed by and construed in accordance with the internal laws of the State of Florida without regard to principles of conflicts of law, and such laws shall apply in any action or proceeding arising out of or under this Guaranty.

(E)     All remedies afforded to Landlord by reason of this Guaranty are separate and cumulative remedies and it is agreed that no one remedy, whether exercised by Landlord or not, shall be deemed to be in exclusion of any other remedy available to Landlord and shall not limit or prejudice any other legal or equitable remedy which Landlord may have.

(F)     If any provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Guaranty or the application of such provision to persons or circumstances other than those as to which it is held void, unenforceable or invalid, shall not be affected thereby and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

16.     Joint and Several Liability:

If there is more than one guarantor of the Lease, each such guarantor, including, but not limited to, Guarantor hereunder shall be jointly and severally liable for the full and timely performance of all obligations, new or hereafter existing, of Tenant under the Lease. Further, each such guarantor, including, but not limited to, Guarantor hereunder agrees that Landlord need not seek payment from any other person or source other than the undersigned Guarantor.

6

234122v3

IN WITNESS WHEREOF, Guarantor have signed this Guaranty as of the date first above written.

TIMOTHY PATRICK REARDON

STATE OF _____ )
                               ) ss.:
COUNTY OF _____ )

On the 15 day of July in the year 2008 before me, the undersigned, personally appeared TIMOTHY PATRICK REARDON, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public

JACK HEINEY
MY COMMISSION #DD375158
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

7

234122v3

## EXHIBIT D

### NOTE GUARANTY

232657v6

## PROMISSORY NOTE

**$2,500,000**                                              Miami, Florida
                                                            June 30, 2008

FOR VALUE RECEIVED, the undersigned, W.B. Care Center LLC, a Florida limited liability company with offices c/o 2627 South Bayshore Drive, Suite 2506, Miami, Florida 33133 (the "Maker"), hereby promises to pay to INSTITUTIONAL LEASING 1 LLC, a Florida limited liability company, having an address at P.O.B. 402401, Miami Beach, Florida 33140, its successors, assigns or designees (collectively, the "Payee") the principal sum of TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 ($2,500,000) DOLLARS, payable as follows: the principal sum of $2,500,000 and 00/100 ($2,500,000), with interest at the Interest Rate (as hereinafter defined) from the date of this Note, shall be paid on or before the fifth (5th) anniversary of the date hereof (the "Maturity Date"). All payments shall be applied first to accrued and unpaid interest, then to principal.

1.      The "Interest Rate" as used here shall mean a variable interest rate per annum equal to the Lender's Base Rate, as hereinafter defined, plus six (6 %) percent, but in no event will the interest rate be less than 10.5% per annum (the "Floor Rate") on the unpaid balance from time to time outstanding until the entire principal balance of the indebtedness evidenced by this Note and all interest and other amounts from time to time payable under this Note shall have been paid in full. The term "Lender's Base Rate" as referred to in this Note is the interest rate published in the Eastern Edition of **THE WALL STREET JOURNAL** in the "Money Rates" table as the "Prime Rate" in effect from time to time computed daily and payable monthly on the basis of a three hundred and sixty (360) day year and actual days elapsed for JP Morgan/Chase Bank. If the said Prime Rate is published as a range, with a high and a low interest rate, the Lender's Base Rate shall be the highest rate on corporate loans posted by at least 75% of the USA's 30 largest banks known as The Wall Street Journal Prime Rate and is published in **THE WALL STREET JOURNAL**. The rate of interest under this note will change as of the effective date of each change in such Prime Rate. If **THE WALL STREET JOURNAL** shall cease to publish the Prime Rate in the Money Rates table of its Eastern Edition, the Lender shall choose an interest rate that in the sole and absolute discretion of Lender most closely approximates said Prime Rate and Lender may notify Borrower in writing of such designation, which rate shall be Lender's Base Rate from and after the date on which **THE WALL STREET JOURNAL** shall have ceased to so publish the Prime Rate. Lender's Base Rate may not be the lowest or most favorable rate charged by Lender.

2.      **REPAYMENT.** The entire outstanding principal balance of this Promissory Note, together with all unpaid and accrued interest and all other amounts due and owing pursuant to the terms of this Promissory Note shall be due and payable without notice or demand on the Maturity Date. The annual Interest Rate for this Promissory Note is computed on a 360/365 basis; that is, by applying the ratio of the

235660v2

1

annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

All payments of principal and interest shall be made in lawful money of the United States that shall be legal tender in payment of all debts at the time of payment. Any check, draft or money order remitted in settlement of this note, may be handled for collection in accordance with the practice of the collecting bank or banks and shall not be deemed payment until the money is actually received by the holder of this note.

3.   **DEFAULT.** Upon the occurrence of any Event of Default (as hereinafter defined), the entire outstanding balance of this Promissory Note shall, at the option of the holder, become immediately due and payable without notice or demand, and in any event, interest shall immediately accrue at a "default rate" which means the rate of interest which is Eighteen (18%) percent per annum, but in no event to exceed the maximum rate allowed by law.

4.   The occurrence of any of the following events shall be deemed an Event of Default hereunder:

(a)   Maker shall default in making payment of the principal, interest or any other amount due and payable under this Promissory Note when due, provided however that Payee shall be required to send Maker one ten (10) day notice to cure during any 12 month period for any default in payment before the same shall be deemed an Event of Default;

(b)   (i) Maker commences any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or the relief of debtors, seeking to adjudicate it a bankrupt or insolvent, or seeking an arrangement, adjustment, composition or other relief with respect to it or its debts, or (B) seeking the appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or making a general assignment for the benefit of creditors; or (ii) there is commenced against Maker any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order or judgment for relief or any such adjudication or appointment, or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (iii) Maker takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (i) and (ii) above; or

(c)   A default or an Event of Default by Maker under the Lease (as hereinafter defined) as set forth in Paragraph 8 hereof.

Upon the occurrence of (i) any Event of Default hereunder under clause (a), Payee may declare the unpaid principal amount of this Promissory Note and accrued unpaid interest to be due and payable by giving written notice of such declaration to Maker, and upon the giving of such notice, such principal amount and interest shall become

2

235660v2

immediately due and payable without any further notice or demand upon the Maker, (ii) any Event of Default under clause (b) above, the outstanding principal amount of this Promissory Note and accrued unpaid interest shall become immediately due and payable hereunder without any notice or demand upon the Maker, and (iii) any Event of Default hereunder, and continuing thereafter (including after the entry of judgment on this Promissory Note), interest on the unpaid principal balance of this Promissory Note shall accrue at the highest per annum interest rate permitted by law (the "Default Rate") until this Promissory Note is paid in full.

5.      Any notice required or permitted to be given hereunder shall be deemed to have been duly given when delivered, if sent by national overnight courier (such as Federal Express, or similar), or three (3) days after being sent by United States registered or certified mail, return receipt requested, with postage prepaid, addressed to Maker at the address set forth above. Any notice required or permitted to be given hereunder by Payee maybe given by an attorney on behalf of Payee.

6.      Maker hereof expressly waives the right to trial by jury.

7.      Maker hereby waives presentment for payment, demand, notice of nonpayment, protest of any dishonor, notice of protest and protest of this Promissory Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Promissory Note. In addition, Maker hereby also expressly waives the right to (i) interpose counterclaims or (ii) assert any and all defenses, counterclaims, set-off and reductions for any reason whatsoever against any other parties identified as Plaintiffs in the action referred to in the Stipulation of Settlement hereafter defined, except as set forth therein.

8.      This Promissory Note is the Note referred to in that certain Lease of even date herewith between Maker, as Tenant, and Payee, as Landlord (the "Lease"). A default or an Event of Default under the Lease shall also be deemed an Event of Default under this Promissory Note.

9.      In the event that (i) the indebtedness evidenced by this Promissory Note, or any part thereof, is collected in any proceeding at law, or (ii) this Promissory Note is submitted to attorneys for collection after the failure of Maker to make payment of any principal or interest when due and payable, Maker shall pay all reasonable costs of collecting this Promissory Note, including, without limitation, reasonable attorney's fees and expenses and court costs, if any.

10.      **DELAY IN ENFORCEMENT**. The liability of Maker and any subsequent endorser, guarantor or other accommodation maker under this Promissory Note is unconditional and shall not be affected by an extension of time, renewal, waiver or any other modification whatsoever, granted or consented to by the holder. Any failure by the holder to exercise any right it may have under this Promissory Note is not a waiver of the holder's right to exercise the same or any other right at any other time.

3

235660v2